E-FILED
Wednesday, 23 January, 2019  03:04:53 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## AT URBANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cr-20057 |
| | ) | |
| SARAH M. NIXON, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF UNITED STATES OF AMERICA'S
RESPONSE TO DEFENDANT SARAH M. NIXON'S
MOTION FOR NEW TRIAL**

NOW COMES Plaintiff United States of America ("United States"), by John C. Milhiser, United States Attorney for the Central District of Illinois, for its response to the motion for a new trial (R. 173) by Defendant Sarah M. Nixon ("Ms. Nixon"). The United States respectfully requests that the Court deny, without an evidentiary hearing, Ms. Nixon's motion.

## INTRODUCTION

In her motion Ms. Nixon argues that newly discovered communications the judge had during her criminal case are grounds for a new trial.  She contends that the newly discovered communications indicate that the judge was biased against her and against defendants in general.  Ms. Nixon, however, cannot demonstrate a disqualifying bias here.

Although many of the judge's communications at issue were ex parte, they do not constitute a violation of Ms. Nixon's due-process rights. The Supreme Court has held that the Due Process Clause of the Fifth Amendment requires a fair trial before a judge with no actual bias against the defendant or with no interest in the outcome of the defendant's case. The Seventh Circuit has held that litigants are not denied due process by either the appearance of partiality or by circumstances that might lead one to speculate as to a judge's impartiality. Rather, the presumption is that judges are able to rise above any biases and biasing influences. Thus, to prove a disqualifying bias warranting a new criminal trial, Ms. Nixon must establish much more than she does. She must come to this Court with direct evidence of bias -- actual bias -- or a possible temptation on the part of the judge so severe that a reviewing court presumes an actual, substantial incentive for the judge to be biased -- presumptive bias. This Ms. Nixon cannot do.

The newly discovered ex parte communications may very well reflect the judge's views about Ms. Nixon's pending case, but it is clear from those ex parte communications that the judge formed those views based on testimony, cross-examination, and events in the proceedings themselves. This is significant, because the Supreme Court has held that opinions formed by judges on the basis of facts introduced or based on events occurring in proceedings do not constitute a basis for a bias or partiality motion. The fact that the judge in Ms. Nixon's

2

criminal trial reached opinions about her case based on the proceedings before him is not evidence of actual bias and cannot establish presumptive bias. Judges are permitted to reach such opinions based on the proceedings before them. The fact that the judge in Ms. Nixon's case shared his opinions in ex parte communications may very well constitute an ethical breach, but ethical breaches are not automatic due-process violations warranting a new criminal trial.

The judge's views expressed in the ex parte communications do not demonstrate, under the undisputed facts of this case, that the judge had a temptation so severe that a reviewing court might presume a disqualifying bias on his part. Indeed, the even-handed manner in which the judge ruled in favor of, and against, both parties before, during, and after Ms. Nixon's trial is further evidence that demonstrates the judge did not have a disqualifying bias that entitles Ms. Nixon to a new trial. The fact that the judge also criticized, in the very same ex parte communications, the prosecution's strategy and performance in Ms. Nixon's trial further discredits Ms. Nixon's conclusion that this judge had a disqualifying bias against her. In addition, the undisputed facts here establish that the government's trial team in Ms. Nixon's case was wholly unaware of the judge's ex parte communications during her trial and thus were not in any way influenced by the judge's views, as expressed in the ex parte communications. No prejudice can be established here.

Ms. Nixon alternatively argues that the government violated the Rules of Professional Conduct when it failed to report the judge's ex parte communications immediately after they occurred.  The undisputed facts establish that the paralegal who received the judge's ex parte communications (and who was not part of the *Nixon* trial team) immediately deleted them and did not disclose them to anyone for nearly a year.  Even if imputed violations of the Rules of Professional Conduct occurred here, violations of ethics rules do not automatically translate into due-process violations warranting a new jury trial in a criminal case.  Ms. Nixon cannot avoid the requirement that she prove a disqualifying bias by attempting to recast her argument in terms of an alleged government violation of the Rules of Professional Conduct.  It is without dispute that the government's actions or inactions regarding the ex parte communications did not in any way affect the jury's verdict in Ms. Nixon's case.

The ex parte communications at issue here may have been unethical and improper, but they do not and cannot rise to the level of a due-process violation warranting the extraordinary remedy of a new jury trial for Ms. Nixon.  Her motion should therefore be denied.

## BACKGROUND

During contentious child-custody proceedings, Ms. Nixon accused her former husband G.G. of sexually assaulting their daughter S.G.  An Illinois state judge

4

limited G.G.'s parental rights while these allegations were being investigated. As the evidence in the custody proceedings neared its end, Ms. Nixon concluded that, at the next scheduled court date, the judge would terminate her parental rights and give G.G. fully custody of the child. The evening before the judge's decision was to be announced, Ms. Nixon left for Canada with the child and remained there even after learning that the judge had given G.G. sole custody. This led to Ms. Nixon's conviction for international parental kidnapping under 18 U.S.C. § 1204, after a December 2016 trial, and a 26-month prison sentence, followed by a one-year term of supervised release. *See United States v. Nixon*, 901 F.3d 918, 919 (7th Cir. 2018).[1]

The Hon. Colin S. Bruce, United States District Court Judge, ("Judge Bruce") presided over the *Nixon* criminal proceedings. Prior to receiving his commission on October 8, 2013, Judge Bruce served as an Assistant U.S. Attorney ("AUSA") in the Central District of Illinois, beginning in 1989. *See* Questionnaire for Judicial Nominees, United States Senate Committee on the Judiciary, Responses to Questions 6 and 16(a).[2]   Between 2007 and 2010, Judge Bruce served as the

---

[1] The facts in this paragraph are largely a verbatim recitation of those in the Seventh Circuit Court of Appeals' opinion affirming Ms. Nixon's conviction.

[2] Found at https://www.judiciary.senate.gov/imo/media/doc/Colin-Bruce-Senate -Questionnaire-Public-Final.pdf (viewed December 17, 2018).

Supervisory AUSA of the Urbana Branch Office of the U.S. Attorney's Office for the Central District of Illinois ("USAO"), and between 2010 and October 2013, he served as the Office's First Assistant U.S. Attorney under United States Attorney James A. Lewis.  *Id.*, Response to Question 16(a).

Trial Attorney Lauren Kupersmith, United States Department of Justice, Criminal Division, Child Exploitation and Obscenity Section, ("CEOS"), and AUSA Elly Peirson, who was on detail to CEOS in Washington, DC, at the time, prosecuted the *Nixon* case.  App. 116, 129.  Staci Klayer, then a Legal Assistant with the U.S. Attorney's Office,[3] provided in-court litigation support to the prosecution team.[4]  App. 130.

On the fifth day of trial, Friday, December 16, 2016, Ms. Nixon testified in her own defense.  *See* R. 143 at 8-148.  That same day, the defense tendered Ms. Nixon for cross-examination, which Ms. Kupersmith conducted.  *Id.* at 162-232.  Ms. Kupersmith did not complete her cross-examination of Ms. Nixon until Monday, December 19, 2016.  *See* R. 144 at 9-62, 121-126.

---

[3] Ms. Klayer was promoted to Paralegal Specialist in approximately May 2017.

[4] The USAO's Victim-Witness Coordinator and Public Information Officer, Sharon Paul, was not part of the prosecution team in *Nixon*.  App. 189.  Ms. Paul did handle the travel and reimbursement of the government's trial witnesses from Canada and facilitated the appearance of the other witnesses called by the government in the *Nixon* trial, including the victim-father.  *Id.*

At approximately 4:30 p.m., on Friday, December 16, 2016, Paralegal Specialist Lisa Hopps, who worked in the U.S. Attorney's Office's headquarters in Springfield, Illinois, sent an email to Judge Bruce concerning U.S. Attorney Lewis's retirement party, asking, "And just WHERE WERE YOU today?????"  Bates No. 2539; App. 141.  The following afternoon, on Saturday, December 17, 2016, Judge Bruce responded:

> Trial. Elly [Peirson].
>
> Where evidently the [sic] Elly and Co. decided they did not want to win by letting an entirely inexperienced DOJ attorney cross examine THE DEFENDANT. (Here are some words she evidently does not know: "alleged' [sic] "supposedly" "your story")
>
> Are you ever going to come over here and do another trial?

*Id.* at 2540; App. 141.

When Ms. Hopps responded by telling Judge Bruce that Staci Klayer was the "paralegal in training" in Urbana and that Ms. Hopps would not be providing litigation support in Urbana trials, *see* Bates No. 2541; App. 141, Judge Bruce replied:

> Damn it! I could use a little Lisa Hopps in the courtroom just to see you. Staci is doing a good job, so you trained her well.
>
> So far in this trial, in the over one hour cross-examination, the DOJ attorney had done a WONDERFUL job of repeating the bullshit the defendant said as if the defendant's story was all fact.

> How about the BASIC cross-examination skill of saying "and the ALLEGED event took place" or "and then, SUPPOSEDLY, this happened" or "so ACCORDING TO YOUR STORY . . . ."
>
> This trial went from a slam-dunk for the prosecution to about a 60-40 for the defendant, and there is more cross-examination to go. . . . . .

*Id.* at 2542; App. 140-141.

Ms. Hopps responded, asking Judge Bruce how he "[sat] through that" and commenting, "I can just see you looking like you're bored to death, but on the inside you're cracking yourself up with jokes! I would NOT be able to make eye contact with you. hahahahaha."   Bates No. 2544; App. 140.  On the afternoon of Sunday, December 18, Judge Bruce replied:

> I work hard not to try any of the cases.
>
> I actually have a sign on the bench from Judge Baker that says "DO NOT TRY THE CASE."
>
> When I'm not making jokes or when I'm not bored, lots of times I am cringing.
>
> I really cringed when the inexperienced DOJ attorney start[ed] crossing the defendant in this case.
>
> During the cross-examination, I keep wanting to say, "Seriously? That is your plan? Repeat the testimony of the defendant as though it was fact and then say, 'Right?'"
>
> And if you were in the courtroom, yes, I would be giving you looks that would make you crack-up.

*Id.* at 2546; App. 140. *See also generally id.* At 2539-2548 (entire email exchange between Judge Bruce and Ms. Hopps from December 16-18, 2016) (hereinafter referred to as the "December 2016 Email Exchange").

Ms. Hopps deleted the December 2016 Email Exchange on or about Monday, December 19, 2016, and did not make it known to the government's *Nixon* trial team -- or to anyone else -- until long after the conclusion of the *Nixon* jury trial, which ended on Tuesday, December 20, 2016.  App. 137-138.  It was nearly ten months later, on October 3, 2017, when Ms. Hopps first told anyone of the existence of the December 2016 Email Exchange.  App. 137.

Ms. Hopps first mentioned the December 2016 Email Exchange on October 3, 2017, immediately following Judge Bruce's order of the same date in *United States v. Aaron Schock*, 16-cr-30061.  App. 137.  Ms. Hopps was assigned to work on the *Schock* case with AUSA Bass and with Victim-Witness Coordinator Sharon Paul, who was assisting in editing memoranda in the case.  App. 137, 190.  Ms. Hopps viewed Judge Bruce's October 3, 2017, order in *Schock* as an unfounded personal attack against AUSA Bass.  App. 137.  Judge Bruce's order reminded Ms. Hopps of two emails she had received from Judge Bruce:  the December 2016 Email Exchange; and an email on September 30, 2015, in which Judge Bruce wrote: "Score: Colin 1 … Tim Bass 0."  App. 137, 143-146 (hereinafter referred to as the "September 30, 2015, Email Exchange").  Ms. Hopps mentioned both emails to

AUSA Bass and Ms. Paul when they were discussing Judge Bruce's October 3, 2017, order in *Schock.*  App. 137, 139-142, 143-146.

Several weeks later, AUSA Bass asked Ms. Hopps for a copy of both the December 2016 Email Exchange and the September 30, 2015, Email Exchange. App. 137, 164.  On December 6, 2017, Ms. Hopps emailed AUSA Bass the December 2016 Email Exchange, which she was able to retrieve from the USAO's email-search application.  App. 137-138.  This was the first time she had shared the December 2016 Email Exchange with anyone – and it was nearly a year after the email exchange had taken place.  App. 136-138.  Ms. Hopps gave it to only AUSA Bass, who had previously made a referral to the U.S. Department of Justice's Office of the Inspector General ("OIG") regarding Judge Bruce, the *Schock* case, and USAO management, and had asked Ms. Hopps for it.[5]  App. 137-138; 164.

Several hours later, on December 6, 2017, AUSA Bass sent an email to the OIG, supplementing his previous OIG referral and attaching both the December 2016 Email Exchange and the September 30, 2015, Email Exchange.  App. 164-165.  On December 6, 2017, AUSA Bass also forwarded both emails to Ms. Paul, who was

---

[5] The emails AUSA Bass sent to the OIG contain privileged and confidential information and therefore will be submitted to the Court *in camera* for the Court to make a determination on which parts of the emails, if any, can be disclosed.

working on the *Schock* case with him and who also was aware of his referrals to the OIG.  App. 164.

On the following day, December 7, 2017, AUSA Bass forwarded the email he sent to the OIG the night before to AUSA Eugene Miller, who was an attorney of record on the *Schock* case and who was also aware that AUSA Bass had made prior referrals to the OIG.[6]  App. 165, 203-204.  Also on December 7, 2017, AUSA Bass sent the OIG email to a DOJ ethics official in Washington, DC.[7]  App. 165.  AUSA Bass was thereafter in ongoing contact with the OIG and with professional responsibility and ethics officials in Washington, DC, concerning his referral and his ethical obligations.  App. 165.

The government's *Nixon* prosecution team of AUSA Peirson, Trial Attorney Kupersmith, and Legal Assistant Klayer did not become aware of the existence of the December 2016 Email Exchange until some 17 months after the *Nixon* trial.  AUSA Peirson, the lead trial counsel in the *Nixon* case, first became aware of the *Nixon*-related email communications involving Judge Bruce on May 16, 2018, when AUSA Bass informed her of the December 2016 Email Exchange in a phone

---

[6]  AUSA Miller does not recall reviewing the OIG email AUSA Bass sent to him on December 7, 2017.  App. 204.  AUSA Miller did not forward the OIG email to anyone, did not discuss it with anyone, and took no action based on its receipt.  *Id.*

[7]  The email AUSA Bass sent to the DOJ ethics official also contains privileged and confidential information.  This email will be submitted to the Court for its *in camera* review and a determination regarding disclosure.

11

conversation.  App. 118, 166.  The following day, May 17, 2018, AUSA Peirson, for the first time, received a copy of the December 2016 Email Exchange, when Ms. Hopps sent her the email.[8]  *Id.*  Ms. Kupersmith, the government co-counsel in the *Nixon* case, was apprised of the December 2016 Email Exchange on May 22, 2018.  App. 119, 129.  Ms. Klayer, the Legal Assistant on the *Nixon* trial team, did not become aware of the December 2016 Email Exchange until sometime in late May 2018.  App. 131.

When AUSA Peirson first learned of the December 2016 Email Exchange on May 16, 2018, she immediately began to consult with DOJ ethics officials as to how she should proceed.  App. 118.  When she received a copy of the email exchange the next day, May 17, 2018, she shared it with DOJ ethics officials in Washington, DC; with one of the USAO's professional responsibility officers, Greggory Walters; and with her supervisor, AUSA Eugene Miller.[9]  App. 118, 203, 209.  On May 18,

---

[8] AUSA Peirson was unable to contact AUSA Bass for a copy of the December 2016 Email Exchange, so she contacted Ms. Hopps for a copy on May 17, 2018. App. 118.

[9] The first time AUSA Miller remembers seeing the December 2016 Email Exchange was late in the afternoon of May 17, 2018, when AUSA Peirson provided a copy to him.  App. 204.

2018, AUSA Peirson also received a copy of the December 2016 Email Exchange from AUSA Bass, who gave her a copy in an email to her.[10]  App. 119, 166.

On May 18, 2018, First Assistant U.S. Attorney ("FAUSA") Patrick Hansen was first notified of the December 2016 Email Exchange, and upon reviewing the email, FAUSA Hansen notified Acting United States Attorney John Childress of the email exchange.   App. 211-212.   FAUSA Hanson thereafter began to consult with Department of Justice attorneys in Washington, DC, concerning a number of inter-related issues, which culminated with Mr. Hansen disclosing the December 2016 Email Exchange to Ms. Nixon's appellant counsel on May 30, 2018.  App. 212, 218; *see also* R. 173-1.

Ms. Nixon thereafter publicly filed a counseled motion (R. 153) under Rule 10 of the Federal Rules of Appellate Procedure to supplement the record on appeal with a copy of the December 2016 Email Exchange.  Judge Bruce thereafter ordered the motion sealed and directed the government to respond.[11]  In a publicly filed response, which Judge Bruce also ordered sealed after filing, the government stated that, although the December 2016 Email Exchange was not relevant to any

---

[10] The email AUSA Bass sent to AUSA Peirson on May 18, 2018, contains privileged and confidential information.  That email will also be presented to the Court for *in camera* review and a determination regarding disclosure.

[11] The sealed motion, as well as other filings that Judge Bruce had ordered sealed, have since been unsealed by order of the Chief Judge. *See* Text Order, dated September 24, 2018.

issue on appeal, it understood Ms. Nixon's desire to make the court of appeals aware of the email exchange and therefore did not oppose her motion.  R. 154.  In a sealed order, Judge Bruce denied Ms. Nixon's motion.  R. 155.  Ms. Nixon then filed in the Seventh Circuit a counseled motion under Rule 10 to supplement the record, which the appellate court denied.  CA7 R. 38, 39; *see* Fed. R. App. P. 10(e)(2)(C), (e)(3).

Ms. Nixon then filed a pro se motion for a new trial and for recusal in the district court.  R. 160.  In a text order dated August 15, 2018, Judge Bruce ordered the motion stricken because the motion was filed pro se and Ms. Nixon at the time was represented by counsel.  The following day, on August 16, 2018, Judge Bruce entered an order recusing himself from this matter.  R. 161.  In his order, the judge characterized the December 2016 Email Exchange as "innocuous and merely a private email conversation with someone entirely unrelated with the case."  *Id.*

Ms. Nixon has since filed a counseled motion for new trial (R. 173), and this response follows.

## ARGUMENT

### A. Legal Framework

A defendant may, within three years after a guilty verdict, bring a motion for a new trial that "is grounded on newly discovered evidence," and a district court

"may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a), (b)(1).

The Seventh Circuit has explained that, "under Rule 33(b)(1), the 'interest of justice' requires a new trial if additional evidence (1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) would probably have led to an acquittal." *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2015) (collecting cases); *see also United States v. Westmoreland,* 712 F.3d 1066, 1072 (7th Cir. 2013) (denying a motion for a new trial and affirming the conviction). The newly discovered evidence in this case, however, does not go to the question of Ms. Nixon's guilt or innocence. Instead, as the defendant has framed the issue (*see, e.g.,* R. 173 at 1-2, 9), the newly discovered evidence raises the question of whether Judge Bruce was biased against Ms. Nixon (and "against criminal defendants," as a whole).

Because evidence of bias does not implicate factual innocence, the Seventh Circuit's four-part test, which is commonly applied when evaluating the effect, if any, that newly discovered evidence would have on a jury, is ill-suited for

15

addressing an allegation of judicial bias that is based on newly discovered evidence.[12]

The Due Process Clause of the Fifth Amendment "requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations and quotation marks omitted). "A criminal defendant tried by a partial judge is entitled to have [her] conviction set aside, no matter how strong the evidence against [her]." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997) (citations

---

[12] An alleged indication of judicial bias arguably is not newly discovered "evidence" at all as that term is used in Rule 33. *See United States v. Rollins*, 607 F.3d 500, 504 (7th Cir. 2010) (explaining that "Rule 33 deals with contentions that evidence discovered after trial shows that the accused is innocent"); *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000) (holding that "a Rule 33 motion is designed to rectify factual injustice, not to correct legal error."); *see also United States v. Blackwell*, 436 F. Appx. 192, 198 (4th Cir. 2011) (finding that alleged juror intimidation was not the type of evidence that could support a Rule 33 motion); *United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir.1994) (noting that "a Rule 33 motion based upon 'newly discovered evidence' is limited to where the newly discovered evidence relates to the elements of the crime charged."). *But cf. O'Malley*, 833 F.3d at 815 (remanded because Rule 33 "encompasses all claims based on newly discovered evidence which likely would lead to acquittal whether or not because of actual innocence," although new trial motion denied on remand); *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) (finding that "unique set of events" – improper online commenting discovered post-verdict – justified new trial even though newly discovered evidence did not relate to guilt or innocence); *United States v. Rubashkin*, 655 F.3d 849, 858 (8th Cir. 2011) (permitting without discussion newly discovered evidence of judicial bias to be pursued under Rule 33 but denying motion because evidence would not have probably led to an acquittal, noting that "the district court's rulings and statements to the jury reveal no evidence of bias or prejudice toward [defendant].").

omitted).   In other words, a biased judge constitutes a structural error that "deprive[s] [a] defendant[] of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *United States v. Harbin*, 250 F.3d 532, 543 (7th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 8-9 (1999)) (quotation marks and ellipses omitted).

Thus, with respect to the question of whether Judge Bruce had a disqualifying bias, the government does press the question of whether the third and fourth prongs of the newly-discovered-evidence test even apply, although Ms. Nixon has chosen to proceed in her motion under Rule 33.   *See O'Malley*, 833 F.3d at 815 ("clarify[ing] that a motion for new trial based on newly discovered evidence that demonstrates a constitutional or statutory error may . . . be brought under Rule 33 and should be granted 'if the interest of justice so requires,'" but also stating that Rule 33 "encompasses all claims based on newly discovered evidence which likely would lead to acquittal whether or not because of actual innocence").   Further, the government concedes that the December 2016 Email Exchange, as well as other communications involving Judge Bruce and members of the U.S. Attorney's Office on which Ms. Nixon relies in support of her claim of judicial bias, constitutes evidence that the defense discovered after trial and that the defense could not have discovered sooner through the exercise of due diligence.   Therefore, the sole

question that this Court must answer is whether Judge Bruce had a disqualifying bias.

"[A] litigant is not denied due process by either the appearance of partiality or by circumstances which might lead one to speculate as to a judge's impartiality." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); *see Suh v. Pierce*, 630 F.3d 685, 692 (7th Cir. 2011) (distinguishing the broader recusal standard under 28 U.S.C. § 455 that requires a judge to recuse himself whenever "his impartiality might be questioned" from the standard for proving a due-process violation). Instead, "[t]he general presumption is that judges are honest, upright individuals and thus that they rise above biasing influences." *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) (citations omitted). "To prove a disqualifying bias, a petitioner must offer either direct evidence or 'a possible temptation so severe that [a reviewing court] might presume an actual, substantial incentive to be biased,'" *id.* (quoting *Del Vecchio*, 31 F.3d at 1380), and the actual or presumed bias must be "in [the defendant's] own case." *Bracy*, 520 U.S. at 905.

Almost every bias case before the Supreme Court where a due-process violation has been found has involved presumptive, not actual, bias. There are three situations in which the Court has found presumptive bias: (1) the judge had a direct, personal, or substantial pecuniary interest in the outcome of the case; (2) the judge had been the target of personal abuse or criticism from the party before

18

him; and (3) the judge had the dual role of investigating and adjudicating disputes and complaints.  *See, e.g., Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 824–25 (1986) (holding that the justice's interest in the case was "direct, personal, substantial, and pecuniary" and concluding that his participation in the case "violated appellant's due process rights") (quotation marks, citation, and brackets omitted); *Withrow v. Larkin,* 421 U.S. 35, 47 (1975) (reasoning that "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable" in cases in which the judge "has been the target of personal abuse or criticism from the party before him") (citations omitted); *In re Murchison,* 349 U.S. 133, 139 (1955) (holding that it was a violation of due process for one adjudicator to preside as the grand jury judge and trial judge for the same defendants); *see also Del Vecchio*, 31 F.3d at 1373-74 (discussing Supreme Court bias cases).

Here, Ms. Nixon cannot demonstrate an actual or presumptive bias.

**B. The December 2016 Email Exchange Does Not Rise to the Level of a Disqualifying Bias**

Plainly stated, Judge Bruce's expression of his views concerning Ms. Nixon's testimony in an email string with a staff member of the U.S. Attorney's Office and the judge's opining that government counsel's cross-examination was ineffective and had turned a "slam dunk for the prosecution to about a 60-40 for the

defendant" was improper.  *See, e.g.,* Code of Judicial Conduct for United States Judges, Canon 3(A)(4) (addressing ex parte communications).

However, Ms. Nixon, in arguing that Judge Bruce's ex parte expression of his views constitutes a disqualifying bias, mistakenly equates an ethical breach with such a bias. Judge Bruce formed his views of Ms. Nixon's testimony, the prosecution's cross-examination, and the probability of an acquittal based on the proceedings themselves.  This is a consequential distinction because, even in the context of the recusal statute, 28 U.S.C. § 455(b)(1) (personal bias or prejudice), the Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see Del Vecchio*, 31 F.3d at 1370-72, 1379 (citing *Liteky* in support of its due-process analysis).  Thus, the question is not whether a presiding judge has reached such opinions during the course of the proceedings, but whether the judge can "discipline[] [himself] to conduct fair proceedings and make impartial rulings despite the opinion one inevitably forms during the proceedings." *In the Matter of Huntington Commons Assoc.*, 21 F.3d 157, 158 (7th Cir. 1994) (quotation marks and citation omitted).

Here, Judge Bruce improperly expressed his views to a prior colleague, with whom he had a friendship, but that person was also an employee of the U.S. Attorney's Office. Although the employee did not work in the same office as the *Nixon* trial team and did not work on the *Nixon* prosecution, the United States was nevertheless a party to the action. The fact that Judge Bruce reached opinions or had views during the course of the *Nixon* trial, based on the evidence introduced and the events that occurred during the *Nixon* proceedings, does not rise to the level of a disqualifying bias. If judges forming opinions during the course of criminal trials concerning the veracity of witnesses, the performance of attorneys, and the probability of an outcome constitutes judicial bias in violation of the Due Process Clause, there is likely no criminal proceeding that could pass constitutional muster. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943) (quoted by *Liteky*, 510 U.S. at 551).

Ms. Nixon alleges that Judge Bruce "communicated his prejudged outcome ex parte to the prosecution so that it could prepare accordingly without giving the same notice to defense counsel." R. 173 at 16. The December 2016 emails between Judge Bruce and Ms. Hopps, however, do not support this allegation. Notably, it was Ms. Hopps who initiated the email conversation by inquiring why Judge

21

Bruce had missed U.S. Attorney Lewis' retirement party. If it were the judge's intent and motivation to communicate his views to the prosecution so that it could alter its cross-examination of Ms. Nixon, he would not have waited for someone from the U.S. Attorney's Office to reach out to him instead of initiating the communication himself. He also would not have communicated his views to a staff member who had no involvement in the *Nixon* trial and was located in a different office from the trial team. Moreover, he would have instructed the U.S. Attorney Office staff member, directly or implicitly, to convey his opinions to the prosecution team. In short, there is no evidence that Judge Bruce shared his opinions with a former colleague uninvolved in the *Nixon* case to influence the outcome of the *Nixon* trial. To the contrary, it is highly unlikely Judge Bruce would have been so critical of the government's prosecution team if he expected his comments to be relayed to them.

Further rebutting Ms. Nixon's speculation that Judge Bruce expressed his views ex parte with the hope that the government's prosecution team would improve its performance and prevail at trial are the many discretionary rulings the judge made in favor of Ms. Nixon and against the United States before, during, and after the *Nixon* trial. For example, Judge Bruce denied the government's pretrial motion to evaluate Ms. Nixon's competency. Text Order, dated December 18, 2015. And, over the government's objection (R. 28), the judge granted Ms.

Nixon's motion (R. 21, 27) to admit alleged statements of alleged sexual abuse of S.G. by S.G.'s father through the impeachment of the father and through Ms. Nixon's testimony (if she were to testify).  R. 33.  Judge Bruce also denied the majority of the government's proposed voir dire questions, characterizing them as "overbroad," "irrelevant," and "a waste of time." R. 84.

As a further example, during a December 9, 2016, pretrial hearing, Judge Bruce preemptively denied a yet-to-be-filed government motion to continue the trial date after the government counsel informed the judge that she had just learned that a material witness had suffered a stroke.  R. 139 at 13.  Concerning the possibility that the government might need to file a motion to continue the December trial setting, Judge Bruce stated, "Yeah. That motion would be denied. I'm not going to prolong this on the hope that some witness at some future point comes back." *Id.*  He soon thereafter remarked, "I'm not trying to single you out Mrs. Peirson; if you read my order on the voir dire, that would be a good indication.  Don't waste the Court's time . . . ." *Id.* at 14.

Judge Bruce, again over the government's objection (R. 89), also gave the defense's proffered instruction for Ms. Nixon's affirmative defense of "fleeing an incidence or pattern of domestic violence," 18 U.S.C. § 1204(c)(2), instructing the jury that Ms. Nixon need only to show that she "reasonably believed" that she was fleeing such an incidence or pattern, not that the incidence or pattern actually

existed.  R. 91; R. 105 at 25.  Additionally, during the trial, the judge commented
that he was "trying to bend over backwards to make sure [Ms. Nixon] gets
evidence in she needs to mount her defense," R. 142 at 148, and that "anytime there
[had] been a tie, or even a suggestion of a tie, [he had] endeavored to rule in favor
of the defendant," R. 144 at 213 (but ruling against Ms. Nixon on this particular
occasion).  Further, during the trial, Judge Bruce overruled a number of
government objections during the defense's direct examination of Ms. Nixon and
sustained a number of the defense's objections during the cross-examination of
Ms. Nixon.  *See, e.g.*, R. 143 at 32, 55, 58; R. 144 at 21, 41, 45-47, 49, 57, 58.  The judge
also denied, in part, a government motion to exclude certain defense witnesses, R.
80, and granted Ms. Nixon's motion to exclude a government witness, R. 68.

The only discretionary pretrial or trial matter of any substance on which Ms.
Nixon did not prevail was her request to call an expert witnesses (1) to testify
regarding battered person's syndrome and post-traumatic stress disorder, as those
conditions allegedly informed Ms. Nixon's actions, and (2) to testify concerning
S.G.'s hearsay statements.  Concerning these discretionary rulings, as well as
others with which Ms. Nixon took exception on direct appeal, the Seventh Circuit
succinctly concluded, "Most of these contentions failed in light of the three legal
[i.e., as-a-matter-of-law] decisions covered in this opinion.  The others need not be
discussed separately[.]"  *Nixon*, 901 F.3d at 922.

24

In addition, following the jury's verdict, Judge Bruce denied the government's oral motion for a psychiatric evaluation of Ms. Nixon to aid in sentencing.  R. 144 at 108-109.  He also varied below the effective Guidelines range of 36 months in prison, which was the sentence the government requested, by imposing a sentence of 26 months, and he denied the government's request for $14,537.93 in restitution, ordering instead that Ms. Nixon pay $2,000.  R. 146 at 61, 66-67.  Concerning the variance from the Guidelines range, Judge Bruce commented that, while he was "not trying to denigrate the offense," he "[did not] like the fact that" Ms. Nixon had been in pretrial custody.  *Id.* at 61.  Regarding the order of restitution, he explained, "I think any more of a restitution amount is just an unnecessary burden and, frankly, unfair to the defendant."  *Id.* at 66-67.

In summary, the fact that Judge Bruce reached opinions about the truthfulness of Ms. Nixon's testimony, about the prosecution team's performance, and about the probability of an acquittal is not evidence of actual bias and does not establish presumptive bias.  The judge was permitted to reach such opinions, even if he improperly shared those opinions with a former colleague in the U.S. Attorney's Office.  This conduct does not demonstrate that Judge Bruce had "a possible temptation so severe that [a reviewing court] might presume" a disqualifying bias.  *Franklin*, 398 F.3d at 959.  In fact, the even-handed manner in which he ruled in favor of and against both parties before, during, and after the *Nixon* trial further

demonstrates that Judge Bruce did not have a disqualifying bias against the defendant in favor of the prosecution.

Because the judge's emails to Ms. Hopps during the *Nixon* trial do not demonstrate an actual or presumptive disqualifying bias, the only question that remains with respect to the December 2016 Email Exchange is whether Ms. Hopps shared the judge's comments in any manner or to any extent, directly or indirectly, with any member of the *Nixon* prosecution team during the *Nixon* trial.  *See* R. 173 at 26-27 (Ms. Nixon questioning whether Ms. Hopps shared the judge's comments with the trial team).  Ms. Hopps did not.  App. 136-138.  And the government's *Nixon* trial team of AUSA Peirson, Trial Attorney Kupersmith, and Legal Assistant Klayer was unaware of the emails until May 2018 – some 17 months after the *Nixon* trial ended.  App. 116-119, 129, 130-131.[13]   There is no indication or evidence of any prejudice here.  *Cf. Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 387 (7th Cir. 2014) ("[n]on-prejudicial ex parte communications are not a basis for vactur").

---

[13] *See Chichakly v. United States,* 926 F.2d 624, 632 (7th Cir. 1991) (agreeing that "an affirmative representation, made by an officer of this Court, was (and is) entitled to special consideration"); *United States v. Melton*, No. CR. 04-40043-011-JLF, 2006 WL 1722379, at *2 (S.D. Ill. June 21, 2006) ("The Court further relies upon the presumption that attorneys, as officers of the court, make truthful representations to the court").

## C.  Other Communications

Since learning of the December 2016 Email Exchange, the U.S. Attorney's Office has identified 1,233 documented communications that involved Judge Bruce and one or more members of the USAO.  These communications comprise:

- 1,230 emails—a number of which include multi-page attachments, such as search warrant documents, advance copies of plea agreements, and criminal complaint documents—that contain at least one USAO email address(es) *and* at least one of Judge Bruce's @ilcd.uscourts.gov email addresses ("Colin_Bruce" and/or "Bruce"), *see* Bates Nos. 1-2266, 2268-2992, 3008-3720, 3725-3789;[14]

---

[14] A number of these communications and attachments involved multiple addressees in addition to U.S. Attorney personnel and/or concerned, for example, matters such as birth, death, and other personal announcements; courthouse holiday and social gatherings; building maintenance and security issues; court administration; employment and retirement announcements; and administrative issues relating to Judge Bruce's departure from the U.S. Attorney's Office. *See, e.g.,* Bates Nos. 4-5, 16, 41-45, 61, 64-69, 87, 97-100, 102-105, 113, 147-148, 153, 168-172, 175-178, 189-193, 223-228, 232-233, 235-236, 242-258, 261-264, 268, 283-298, 317-329, 336, 342, 433-434, 450, 504-510, 533-534, 546, 700, 741-742, 752-756, 947-848, 851-853, 861-869, 965-966, 968-970, 976-977, 982-992, 1011, 1013, 1015-1016, 1041-1042, 1044-1048, 1050-1054, 1074-1078, 1080, 1143-1154, 1179-1192, 1198-1202, 1218-1225, 1351, 1480, 1500-1501, 1588, 1607-1610, 1715-1716, 1762-1765, 1828-1843, 1861-1869, 1892-1896, 1936-1938, 1989-1990, 2018, 2033-2034, 2037, 2158, 2162-2169, 2188-2194, 2223-2223, 2266, 2268-2272, 2279-2294, 2352-2353, 2357, 2359-2361, 2429-2433, 2436-2437, 2490-2491, 2500-2503, 2531-2534, 2549-2551, 2587, 2688-2689, 2862-2863, 2892-2901, 2906-2923, 2946-2948, 2982-2992, 3028-3052, 3065-3120, 3129-3160, 3226-3249, 3549-3554, 3608-3676, 3720, 3741, 3789.

● an April 14, 2016, email memorandum to file prepared by Supervisory AUSA Miller regarding a conversation he had with Judge Bruce during which the judge was critical of an AUSA, *see* Bates Nos. 3721-3722;

● a March 10, 2017, letter from AUSA Katie Boyle to a defense attorney, *see* Bates No. 3723; and

● a screen shot of a May 2018 text message string between Judge Bruce and Ms. Klayer (three text messages, total), *see* Bates No. 3724.[15]

## 1. The ex parte communications

Of the 1,233 communications,[16] the U.S. Attorney's Office has identified 101 communications (478 pages, including attachments, duplicate emails, and duplicate attachments) that each (1) were, or were part of a series of, either ex parte

---

[15] Due to .pdf merging and inadvertent Bates numbering errors, there are no documents that have the Bates numbers 2267 and 2993 through 3007. *See* Inventory, p. 43 (Entry 903-1/904-1 & n.11) and p. 54 (Entry 1100-2 & n.14).

[16] There is an additional document that is not included in this number. That additional document is an internal memorandum written by an employee of the United States Attorney's Office concerning a verbal communication(s) that the employee had with Judge Bruce.  The conversation(s) with Judge Bruce that the author documented in the internal memorandum was not an ex parte communication and did not pertain to any defendant or any case.  The internal memorandum also contains privileged and confidential information; therefore, the internal memorandum will be submitted to the Court *in camera* for the Court to make a determination on which parts of the memorandum, if any, can be disclosed.

or potentially ex parte communications;[17] and (2) were not previously disclosed to defense counsel in the cases to which the communications related.  *See infra*, pp. 30-36 (chart).   In addition to having turned over the December 2016 Email Exchange, the government has since turned over the other ex parte communications in those cases to which the communications related, with the following exception: the government was unable to identify to which cases three email strings (11 emails) related.  *See* Bates Nos. 849-850, 1028-1036, 2885-2887.

In general, but not exclusively, the ex parte communications involving U.S. Attorney's Office personnel and Judge Bruce (and/or his chambers email address) related to the scheduling of hearings; the provision of documents, such as plea agreements and jury instructions, to the judge in advance of a hearing or trial; and the judge inquiring about (and/or U.S. Attorney's Office personnel informing the judge of) whether the government anticipated a particular case(s) was going to

---

[17] In identifying which communications were ex parte, the government used the criteria of (a) a communication between government counsel (or a U.S. Attorney's Office staff member), (b) in a pending matter over which the judge was presiding, (c) where opposing counsel was not copied on the communication.  *See* Illinois Rule of Professional Conduct 3.5(b); Black's Law Dictionary 597 (1999 ed.).  Excluded from those communications that the government identified as ex parte were communications that related to matters that were appropriately ex parte (*e.g.*, scheduling appointments for criminal complaints, search warrants, and Title III materials and the provision of such materials to the judge).  Also excluded from those communications identified as ex parte were communications that related to the scheduling of an initial appearance or an arraignment in an under-seal matter.

trial.  More specifically, the communications that the U.S. Attorney's Office has identified as ex parte and potentially ex parte that were not previously disclosed are:

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 0446-0448, 0480 | 2 and 1 attach't | 04/24/14 | Staci Klayer CSB | Klayer informed CSB of open/active cases that were not set for sentencing or change of plea. |
| 0545, 0547-0565, 3725-3740 | 2 and 2 attach't | 06/05/14-06/06/14 | Staci Klayer CSB Magistrate | Klayer provided CSB with an advance copy of a plea agreement in *U.S. v. Finas Glenn*, and CSB responded that the agreement was approved (copying the Magistrate on the response). |
| 0572 | 1 | 06/20/14 | Staci Klayer CSB Probation USMS Clerk's Office | Klayer informed the addressees of a new arrest (Oscar Martinez) and commented, "Name sound familiar? It should—this will be our fourth case on him." |
| 0702-0738 | 4 and 1 attach't | 07/28/14 | CSB Staci Klayer | CSB requested, and Klayer provided, a copy of the jury instructions in *U.S. v. J.B. Brown*. |
| 0775-0791 | 8 | 09/22/14-09/23/14 | Staci Klayer CSB Law Clerks | Klayer informed the addressees of an arrest in *U.S. v. Jermaine Speed*, and Klayer and CSB (clerks not copied) discussed setting a time for the arraignment that was "inconvenient" for defense counsel (and former AUSA) Larry Beaumont. |
| 0849-0850 | 2 | 10/20/14 | AUSA Coleman CSB | Coleman informed CSB that "[AUSA] Bohm indicates his trial is not going that week," and CSB responded, "Thanks AUSA Coleman." |

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 0859-0860 | 2 | 10/29/14 | Probation Magistrate CSB Clerk's Office AUSA Miller Staci Klayer | Probation informed the addressees that Defendant Oscar Martinez had violated conditions of pretrial release and asked that he be admonished at the next hearing. CSB responded, "I can do what you request." |
| 0978-0980 | 2 | 11/28/14 | AUSA Peirson CSB Clerk's Office | Peirson informed the addressees that Defendant Salvatore DiBenedetto had rejected a plea offer and was proceeding to trial. CSB responded, "Thanks! (surprising also…)." |
| 0996-1010 | 5 | 12/18/14 | CSB AUSA Miller USMS | CSB forwarded to AUSA Miller an email from the USMS concerning a furlough request by Defendant Eulalio Martinez. AUSA Miller informed CSB and the USMS that he would work with defense counsel on an agreed order and present it to the Magistrate at the next day's hearing. |
| 1028-1036 | 6 | 01/13/15 | Staci Klayer CSB | Klayer informed CSB that AUSA Coleman needed to speak with CSB and the Magistrate about "a pending case" and that "[w]e're trying to keep you out of trouble down here.☺" CSB asked if it could wait until the next day at 10:00 a.m., and Klayer responded, "Sounds good." |
| 1228-1292, 1294 | 2 and 1 attach't | 07/06/15-07/07/15 | Staci Klayer CSB | Klayer forwarded the defense opening brief in *U.S. v. Jermaine Speed* appeal to CSB's chambers address, stating, "Since we were not sure Judge Bruce would receive a copy or even know that it had been filed, we are forwarding a copy to chambers for his review given the issues that were raised on appeal." CSB responded, "Unbelievable. Thanks for the heads up." |

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 1463-1468, 1471-1476 | 5 | 07/21/15-07/22/15 | Staci Klayer CSB | Klayer inquired whether a telephone status conference in *U.S. v. Edward Dorsey* could be moved due to AUSA Miller's schedule. CSB responded, "I'm good. Whatever. (easy-going judge…. Love my job….)." Klayer replied, "Yeah dude—you're rockin' it. You were made for that position.☺" |
| 1688-1696 | 3 and 1 attach't | 09/28/15 | Staci Klayer CSB | Klayer forwarded a sentencing agreement in *U.S. v. Valeriano Zarate* to CSB. CSB responded, "Monarch Butterfly?" and Klayer replied, "Giraffe." |
| 1718 | 1 | 10/16/15 | Staci Klayer CSB | Klayer informed CSB that, based on a conversation that AUSA Miller had with defense counsel, Defendant Markese Smith may want to plead guilty at that day's hearing. |
| 1766 | 1 | 10/28/15 | CSB AUSA Bohm | CSB stated, "Nice job in US v. Armour. Good ammo for your [U.S. v. Jermaine] Speed argument also. Top notch." |
| 1939 | 1 | 01/19/16 | CSB AUSA Bohm | CSB forwarded a CA7 "final opinion" docket entry in *U.S. v. Jermaine Speed* and stated, "Well done, sir. Well done." |
| 1985 | 1 | 02/01/16 | CSB AUSA Peirson | In response to an email from AUSA Peirson (on which defense counsel was copied) apologizing for any confusion that she may have created at that day's pretrial conference in *U.S. v. Gmoser*, CSB wrote: "My bad. You're doing fine. Let's get this thing done." |
| 2012-2013 | 2 | 02/23/16 | AUSA Miller CSB | AUSA Miller responded to CSB's inquiry, informing CSB of the plea/trial status of four cases. CSB replied, "Thank you." |

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 2170-2173 | 2 | 05/26/16 | Clerk's Office Law Clerk CSB Staci Klayer | Email string concerning a writ/ASR not having been issued for Defendant Dennis Droughns and discussing whether he could appear by telephone for the hearing. |
| 2174-2175 | 1 | 05/27/16 | Staci Klayer CSB | Klayer informed CSB that the government had filed a memorandum advising CSB that his prior government service did not disqualify him from presiding over *U.S. v. Fiore*, Nos. 04-cr-20043 and 15-cr-20037. |
| 2350-2351 | 1 | 08/18/16 | Courtroom Dep. Staci Klayer CSB | Courtroom deputy replied to an email that Klayer had sent to the deputy and AUSA Freres concerning the case settings for August 30, 2016. The courtroom deputy stated, "That is super helpful! Thank you Staci," and copied CSB on her reply. |
| 2362-2416 | 1 and 1 attach't | 09/02/16 | Soni Holmes CSB | Legal Assistant Holmes provided CSB with a Word copy of the jury instructions that had been filed in *U.S. v. Walter*. |
| 2438-2480 | 4 and 1 attach't | 10/31/16 | Staci Klayer CSB | Klayer provided CSB with a Word copy of the jury instructions in *U.S. v. Jose Lopez*. CSB responded, referring to Klayer as "'Nator." Klayer replied, referring to CSB as "Dude," and further stated, "Wish me luck tomorrow!!!! New trial presentation software . . . Trial Director. Praying all goes as planned!!!!!" CSB responded, "Everything will be fine…." |
| 2492, 2495 | 2 | 11/07/16 | Soni Holmes CSB | Holmes inquired whether a certain date and time were acceptable for the initial appearance of Defendant Jesse Dorsett. Judge Bruce responded, "Roger-dodger. GO SONCHETTA!" |

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 2535-2538**[18] | 4 | 12/15/16 | Courtroom Dep. CSB Soni Holmes Clerk's Office | Courtroom deputy informed the addressees that defense counsel had called to arrange a change of plea hearing. Clerk's office employee responded, "Cool. If CSB confirms it's okay in the morning, I'll set it." |
| 2539-2548 | 6 | 12/16/16-12/18/16 | Lisa Hopps CSB | The email string concerning the *U.S. v. Nixon* trial. |
| 2552-2579 | 1 and 1 attach't | 01/13/17 | AUSA Boyle CSB | AUSA Boyle forwarded an advance copy of the plea agreement in *U.S. v. Clinton Schaffer*. |
| 2588-2647** | 2 and 8 attach't | 02/10/17 | Staci Klayer CSB AUSA Miller | Klayer forwarded documents for a waiver/filing/plea hearing in *U.S. v. Ashley Miller*. |
| 2690-2694** | 4 | 04/01/17-04/04/17 | CSB Probation Clerk's Office Magistrate District Judge AUSA Miller Staci Klayer | CSB replied to all in responding to an email from Probation in which Probation informed the addressees that Probation would be unavailable on September 11 and 12, 2017. CSB stated, "Shawn Shannon re-sentencing set for September 11. Nice." Klayer replied to CSB, stating, "Sounds like the probation officer . . . needs to stay here and work." CSB responded to Klayer, stating, "Yep. Don't think it's moving……" |

---

[18] An email string marked with two asterisks indicates that the string includes at least one duplicate email.

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 2696-2710 | 10 | 04/06/17- 04/07/17 | Staci Klayer CSB | A series of emails between CSB and Klayer concerning whether certain cases were projected to proceed to trial or result in guilty pleas. In the email string, CSB told Klayer, "You are efficient as ever" and "You are THE BEST!" Klayer responded, "Ahhh! Thank you!!!" and "You're too kind☺" In reference to four of the cases, CSB also stated, "Do [AUSA Freres] and [AUSA Boyle] understand that there will be no more continuances in these cases?" |
| 2729 | 1 | 04/18/17 | Soni Holmes Magistrate Clerk's Office Courtroom Dep. CSB AUSA Miller | Holmes informed the addressees that Defendant Deon Evans had rejected the plea offer, that the change of plea hearing before the Magistrate needed to be canceled, and that the parties were requesting a status hearing before CSB. |
| 2731 | 1 | 05/11/17 | CSB AUSA Bohm | CSB inquired whether the trial in *U.S. v. Higgins-Vogt* was anticipated to last "three days, four days or more?" |
| 2732-2753 | 3 and 1 attach't | 05/23/17 | Staci Klayer CSB | Klayer forwarded an advance copy of the plea agreement in *U.S. v. Nicolae Popa* and thanked CSB for agreeing to cover the change of plea hearing. CSB responded, "'Nator! No prob. I've got your back." In reply, Klayer stated that CSB had "saved the day" because an out-of-town government attorney was scheduled to appear at the hearing. She further informed CSB that she had been promoted from Legal Assistant to Paralegal Specialist. |
| 2754-2758 | 2 and 1 attach't | 05/26/17 | Carol Swiney CSB | Paralegal Specialist forwarded an order for signature in a foreclosure matter. CSB responded, "Yo! Yo! I'm on it!" |

| Bates Nos. | No. of Emails | Date(s) | Participants | Topic/Subject |
|---|---|---|---|---|
| 2885-2887 | 3 | 05/07/17 | Staci Klayer CSB | Klayer informed CSB that AUSAs Miller and Freres were "going to schedule a time to come up to talk to you about the upcoming trials and your schedule.☺" Judge Bruce responded, "The sooner the better," and Klayer replied, "Roger that." |
| 2924-2945 | 3 and 1 attach't | 08/15/17- 08/16/17 | Staci Klayer CSB | Klayer forwarded an advance copy of the plea agreement in *U.S. v. Kami Miller*. CSB responded, "'Nator!☺," and Klayer replied, "Dude!" |

Ms. Nixon argues that these communications collectively demonstrate a systemic bias in favor of the government and, thus, against her. R. 173 at 9-16, 21-23. The government strongly disagrees. The communications admittedly reveal multiple ex parte communications. And some of the ex parte communications, particularly those between Judge Bruce and Ms. Klayer, often digressed into personal dialogue. That ex parte communications occurred, and that some of those communications became personal in their tone or content, "*might* lead one to speculate as to a judge's impartiality." *Del Vecchio* 31 F.3d at 1372 (emphasis added). They do not, however, collectively or individually, demonstrate actual bias or presumptive bias – "a possible temptation so severe as to overcome the presumption that the judge rose above any biasing influences." *Franklin*, 398 F.3d at 959. This is particularly true given that the ex parte communications largely pertained to administrative matters.

36

In her motion Ms. Nixon highlights communications (or a series of communications) in seven cases that she argues demonstrate a disqualifying bias in favor of the government. We address each of these examples, but none of these communications establish the disqualifying bias Ms. Nixon alleges.[19]

### a. *United States v. Edward Dorsey*, No. 14-cr-20026 (Bates Nos. 1463-1476), and *United States v. Jessie Dorsett*, No. 16-cr-20043 (Bates Nos. 2492, 2495)

In the *Dorsey*-related email string (July 22, 2015), Ms. Klayer sent an email to Judge Bruce's chambers email address, inquiring whether a telephone status conference scheduled for July 31, 2015, could be rescheduled to the week of August 3, 2015, because AUSA Miller would be out of town on July 31. Judge Bruce responded, "Sure. This is just a TSC to set the matter for a resentencing. File a

---

[19] At the time counsel for Ms. Nixon filed this motion for new trial, counsel was not privy to copies of each ex parte and potentially ex parte communication beyond those that related to cases handled by the Office of the Federal Public Defender. *See* Bates Nos. 0446-0448, 0480, 0775-0791, 736, 0859-0860, 1228-1292, 1294, 1463-1468, 1471-1476, 1766, 1939, 2170-2177, 2350-2351, 2492, 2495, 2690-2694, 2696-2703 (provided to the Public Defender's Office prior to its filing of the motion for new trial); *id.* at 2539-2548 (provided to Ms. Nixon's appellate counsel on May 30, 2018). Further, *Nixon* counsel had not yet had access to the entire set of communications that involved Judge Bruce and at least one member of the U.S. Attorney's Office. The government therefore expects that counsel for Ms. Nixon will supplement its argument in reply, and the government has no objection should the defense do so. The government notes that it has not yet produced the redacted copies of the communications to the defense, because the parties were unable to reach a protective agreement; thus, the need for the government to move for a protective order prior to disclosing these communications. *See* Motion for Protective Order.

motion to continue.  The morning of August 21 looks wide open."  Bates No. 1465.

The government, however, never filed a motion regarding an August 21 date

because, while Judge Bruce and Ms. Klayer were emailing, one of the judge's law

clerks reset the hearing for August 3.  *Id.* at 1467, 1469; *see also* Docket Sheet, No.

14-cr-20026.  Ms. Klayer informed the judge of the same, and the judge replied,

"I'm good.  Whatever. (easy-going judge…. Love my job. . . .)."  *Id.* at 1471.  Klayer

responded, "Yeah dude—you're rockin' it.  You were made for that position. ☺"

*Id.* at 1473.

Similarly, in the *Dorsett*-related emails (November 8, 2016), Legal Assistant Soni

Holmes sent an email to the judge's email address indicating that she was

preparing to file a writ of habeas corpus *ad testificandum* for Defendant Dorsett to

appear in federal court and inquired whether "November 29 at 10:00 [would] work

for the [sic] Judge Bruce."  Bates No. 2492.  Judge Bruce replied, "Roger-dodger.

GO SONCHETTA!"

As Ms. Nixon rightly notes (R. 173 at 10), in neither instance was it necessary

to schedule the hearing ex parte.  In fact, in none of the instances involving ex parte

communications to schedule a hearing did it appear necessary to do so ex parte.

Further, as Ms. Nixon states, each email string reflected an informality and

familiarity between those involved.  *See* R. 173 at 13.  The personal nature into

which these email strings (as well as others) digressed perhaps reflects a level of

unprofessionalism.   Such dialogue, however, does not and cannot lead to the conclusion that a disqualifying bias under the Due Process Clause existed—i.e., the conclusion that the judge had a "direct, personal, substantial, or pecuniary interest" in any case, *Franklin*, 398 F.3d at 960, including Ms. Nixon's, because Judge Bruce communicated in an informal manner with legal assistants in the U.S. Attorney's Office.

### b. *United States v. Shawn Shannon*, No. 15-cr-20014 (Bates Nos. 2690-2694)

In this email string (April 1-4, 2017), a probation officer informed a number of addressees—including Judge Bruce, AUSA Miller, Ms. Klayer, clerk's office personnel, the magistrate judge, and another district court judge—that the probation office would be unavailable for hearings on September 11 and 12, 2017. Judge Bruce, replying to all of the addressees, stated, "Shawn Shannon re-sentencing set for September 11. Nice."   Bates No. 2690, 2691 (duplicate emails). Ms. Klayer then replied solely to Judge Bruce, writing, "Sounds like the probation officer assigned to this case needs to stay here and work," and Judge Bruce responded, "Yep. Don't think its [sic] moving……" *Id.* at 2692-2694.

Ms. Nixon contends that the emails between Judge Bruce and Ms. Klayer "are yet another example of Judge Bruce's pattern of ex parte communications with the United States Attorney's Office and a bias in favor of his old office and against criminal defendants."   R. 173 at 14.   Technically, the judge telling Ms. Klayer that

he was not going to move the sentencing hearing was an ex parte communication since it pertained to a pending case and defense counsel was not copied.  But Ms. Nixon's argument that this communication exhibits bias in favor of the government is without support.   Instead, the communication reflects that the judge was unwilling to be flexible with respect to a probation officer's training requirements by rescheduling a sentencing hearing.  It falls well short of evidence of a judge seeking to give the government a leg up for a sentencing hearing—i.e., a hearing that as of April 4, 2017, was still more than five months away.

### c. *United States v. Oscar Martinez*, No. 14-cr-20035 (Bates Nos. 859-860)

The *Martinez*-related email string (October 29, 2014) began with an email from a probation officer addressed to a magistrate judge.  Copied on that email were Judge Bruce, a person from the clerk's office, AUSA Miller, and Ms. Klayer.  *See* Bates No. 0859.  In the email, the probation officer informed the magistrate judge that Defendant Martinez, who was in pretrial release, had violated the rules of location monitoring and had been admonished by a probation officer in the district where Mr. Martinez was then residing.  *Id.*  In that same email, the probation officer advised Judge Bruce that Mr. Martinez was scheduled to appear by telephone on October 31, 2014, and asked the judge "to inform the offender that the Court is aware of his noncompliance and request that he abide by all of his

conditions of bond." *Id.* Judge Bruce responded, "I can do what you request. Thanks." *Id.* at 860.

Again, this was an ex parte communication, since it concerned a pending case and defense counsel was not copied. R. 173 at 14-15. Ms. Nixon contends that Judge Bruce's response reflects a willingness to make "substantive decisions" in a criminal case with notice to the government but not to the defense; consequently, the judge's response to the probation officer "reveals an inability to fairly and impartially preside over criminal cases." *Id.*

To the extent that the judge's "no action" decision on an alleged pretrial release violation constitutes a substantive decision, it was ultimately a decision that was beneficial to the defendant who was on bond. This, in turn, negates any inference of bias against Mr. Martinez (not to mention Ms. Nixon). In fact, Mr. Martinez's conditions of bond remained unchanged at the October 31, 2014, hearing. *See* Docket, Case No. 14-cr-20035 (10/31/2014 entry). Further negating any inference of bias against Mr. Martinez (or any other defendant), is the fact that Judge Bruce sentenced him to 12 months and one day of imprisonment, even though Mr. Martinez was responsible for transporting approximately 150 kilograms of cocaine, the bottom of his advisory Guidelines range was 46 months' imprisonment, and the government recommended a sentence of 25 months. *Id.* (Docs. 73, 84, 86).

41

In sum, Ms. Nixon's claim that the e-mail exchange between Judge Bruce and the probation officer demonstrated bias against Mr. Martinez, or defendants as a whole, is untenable in light of this record.

### d. *United States v. Michael Baker*, No. 16-cr-20065 (Bates Nos. 2696-2710)

In this series of communications (April 6-7, 2017), Judge Bruce inquired ex parte of Ms. Klayer which pending criminal cases were likely to go to trial. The cases they discussed included four in which AUSA Bryan Freres and AUSA Katie Boyle were lead counsel: (1) *United States v. Deon Evans*, 16-20067, then set for trial on April 25, 2017; (2) *United States v. Roy Collins*, 16-20059, then set for trial on June 19, 2017; (3) *United States v. Michael Baker*, 16-20065, then set for trial on May 2, 2017; and (4) *United States v. Emerson Brooks*, No. 16-20012, then set for trial on May 23, 2017. *See* Bates No. 2698; App. 70-71, 82, 95, 105.

In the email string, Judge Bruce asked, "Do Bryan and Katie understand that there will be no more continuances in these cases?" Bates No. 2697. Ms. Klayer relayed that message to AUSAs Freres and Boyle, stating, "[Judge Bruce] wants to know if they are going to be definite trials and to let us know that he will NOT continue any of them because of the Schock trial [*United States v. Aaron Schock*, 16-

cr-30061], which will be held in July and probably part of August [2017]." *Id.* at

2698.[20]

Ms. Nixon alleges this email string is evidence of bias in favor of the

government because, according to her, Judge Bruce prejudged the merits of any

motion to continue that might have been filed by either party in criminal cases and

communicated that alleged prejudged outcome ex parte to the government so it

could prepare accordingly, without giving the same notice to the defense. *See* R.

173 at 15-16, 22.

The government agrees that the email string was an ex parte communication.

That, however, is where our agreement with Ms. Nixon ends.  There is a non-

nefarious explanation for the judge's ex parte "no more continuances" comment

to Ms. Klayer (and indirectly to AUSAs Freres and Boyle): (1) he was emphasizing

or re-emphasizing his *publicly* proclaimed "one continuance per party" rule in an

ex parte manner, *see, e.g.*, App. 23, 26-27, 30-31, 34, 37-38, 41, 44-45, 48-49, 54, 58-

59, 62-63; (2) he was informing the government that it would not grant any

government motion for a continuance; and/or (3) he was endeavoring to maintain

what he claimed was "the fastest case closure rate in the district," Bates No. 995;

*see also* App. 59.  Regardless, counseling against Ms. Nixon's allegation that Judge

---

[20] In the same email string, Judge Bruce referred to the trial in *United States v. Schock* as "Schock-a-palooza."  *See, e.g.*, Bates No. 2698.

Bruce had prejudged any additional motions for continuances is the fact that in *Evans*, *Collins*, *Baker*, and *Brooks*, Judge Bruce subsequently reset the scheduled trial date for a later date as a result of pending motions, defense motions to continue, or the parties advising the court that the defendant would be entering a plea of guilty. *See* App. 71-72, 83-84, 95, 105.

Finally, without making any accusation of wrongdoing against any defense attorney, the government notes that in the same email string, Judge Bruce wrote, "[Defense Counsel] said [he/she] will need a continuance in Cizmar [*United States v. Cizmar*, No. 16-cr-20080] unless [he/she] has all the forensics, and even then [he/she] may want a continuance."  Bates No. 2706 (on April 7, 2017).  On that date, however, there was no pending motion for a continuance in *United States v. Cizmar*.  *See* Docket Sheet, Case No. 16-cr-20080.  This certainly suggests that Judge Bruce might have engaged in similar scheduling discussions with defense attorneys to which the government was not privy.  Assuming Judge Bruce did so no more suggests a disqualifying bias against the government in those cases than his ex parte scheduling discussions with a government legal assistant suggest a disqualifying bias against Defendants Evans, Collins, Baker, and Brooks, let alone Ms. Nixon.

### e. *United States v. Jason Gmoser*, No. 14-cr-20048 (Bates No. 1985)

The context of Judge Bruce's February 1, 2016, reply email to AUSA Peirson—"My bad. You're doing fine. Let's get this thing done," Bates No. 1985—demonstrates that the judge was not aligning himself with the government or against Mr. Gmoser. Judge Bruce's comments came in response to Ms. Peirson's email (on which defense counsel was copied) in which she apologized for any confusion she may have created at the pretrial conference earlier that day. At that hearing, Judge Bruce alternatively complained and expressed confusion regarding whether Ms. Peirson had filed the required trial documents (she had). *Id.*; App. 18-20. Earlier, during a November 6, 2015, pretrial hearing, Judge Bruce was also critical of Ms. Peirson's alleged failure to determine the availability of the government's expert witness for the November 2015 trial setting. App. 4-5. The judge also repeatedly stated that he was "unhappy" that government counsel was affecting his trial calendar. App. 4, 11, 13-14.

Taken together, these events serve to explain Judge Bruce's February 1, 2016, ex parte apology ("My Bad. You're doing fine.") and his interest in getting the case tried on the trial date ("Let's get this thing done."). He was not aligning himself with the government or government counsel against Mr. Gmoser, as Ms. Nixon suggests.

   f.   *United States v. Jermaine Speed*, **No. 14-cr-20056 and Appeal No.**
        **(Bates Nos. 0775-0791, 1228-1292, 1294, 1766, 1939)**

Finally, we address the communications relating to the district court case and
direct appeal of *United States v. Jermaine Speed*.  Ms. Nixon's argument that these
communications establish Judge Bruce's disqualifying bias, when taken into
context, fare no better than her other claims regarding cases in which she was not
involved.

   *i. The district court-related emails.*  Mr. Speed was indicted on September 10, 2014,
for multiple drug-trafficking crimes.  Docket, Case No. 14-cr-20056 (Doc. 1).  On
September 23, 2014, the magistrate judge set the arraignment for 2:30 p.m. that
day.  *Id.* (09/23/2014 entry).  Larry Beaumont, a former AUSA of 20 years and
former colleague of Judge Bruce's, represented Mr. Speed.  *Id.* (Doc. 5); *see also*
http://www.news-gazette.com/news/local/2017-12-31/verdict-federal-judge-
colin-bruce-hes-very-fair-even-handed.html) (viewed Dec. 17, 2018).

   The day prior to the arraignment, Ms. Klayer sent an email addressed to a
member of the clerk's office and one of the magistrate judge's law clerks, asking if
the magistrate judge's trial calendar would prohibit him from conducting the
arraignment on September 23.  *See* Bates No. 775.  In that same email, Ms. Klayer
stated, "Larry Beaumont is the defense attorney [and] would like to have [the
arraignment] . . . late tomorrow if possible (like 4:30) because he has court in

Chicago at 1:30." *Id.* The law clerk indicated that he/she was unsure if the magistrate judge would be in trial on the twenty-third and advised Ms. Klayer to "check with CSB's chambers . . . to get on the calendar with him, so that we know that at least one of [the judges] will be available." *Id.*

Ms. Klayer then forwarded the email chain to Judge Bruce's chambers address, his courtroom deputy, and one of his law clerks, stating "see below." Bates Nos. 775-778. Judge Bruce, replying only to Ms. Klayer, responded, "What would be the most inconvenient time for Larry?" *Id.* at 779. Klayer answered, "LOL! Early in the morning or 1:30 when he's in Chicago in court!!!! But if we do that, he's just going to call and cry!" *Id.* at 781.

According to Ms. Nixon, the email exchange between Judge Bruce and Ms. Klayer "is another example of [the judge] casually engaging in ex parte discussions of cases with the United States Attorney's Office as if he were still a member of that office." R. 173 at 12. The emails between the judge and Ms. Klayer were admittedly casual. Casualness, however, does not translate to a predisposition against Mr. Speed, or any other defendant -- or in favor of the government. Notably, not even Mr. Beaumont took exception to the tone of the email when the government produced it to him in September 2018. According to the defense, Mr. Beaumont is of the view that the judge was being sarcastic, *id.*, a personality trait that one might accurately conclude that the judge possesses if one were to read all

47

of Judge Bruce's communications, *see, e.g.*, Bates Nos. 229-230 (the judge confessing, "I live for the snark.").

*ii. The appeal-related emails*. After Judge Bruce sentenced Mr. Speed to a 216-month prison sentence, which was 46 months below the low end of the Guidelines range, and entered final judgment on March 11, 2015, the defendant pursued a direct appeal. *See* Docket, *United States v. Speed*, No. 14-cr-20056 (Docs. 22, 35, 37); Docket, *United States v. Speed*, Appeal No. 15-1520. Approximately four months after the entry of final judgment, on July 6, 2015, Mr. Speed publicly filed his opening appellate brief. *Speed* Appeal Docket (Docs. 10, 11). In his brief, Mr. Speed raised two issues: (1) whether Judge Bruce erred by imposing discretionary supervised release conditions without making the findings to support three of the conditions, and (2) whether the condition that Mr. Speed not possess a "dangerous weapon" was unconstitutionally vague. *Speed* Appeal Docket (Doc. 11 at 2).

After Mr. Speed filed his brief on July 6, that same day Ms. Klayer forwarded a copy of Mr. Speed's brief to Judge Bruce's chambers address. *See* Bates Nos. 1228-1292. In her email, Ms. Klayer stated: "The attached brief was filed today. Since we weren't sure if Judge Bruce would receive a copy or even know that it had been filed, we are forwarding a copy to chambers for his review given the issues that were raised on appeal." *Id.* at 1228. The following day, on July 7, Judge Bruce responded, "Unbelievable. Thanks for the early warning." *Id.* at 1294.

AUSA (former) Jason Bohm, then a member of the USAO's appellate section, entered his appearance in the *Speed* appeal as lead counsel for the government on July 8, 2015.  *Speed* Appeal Docket (Doc. 8).  He filed the government's responsive brief on August 6, 2015.  *Speed* Appeal Docket (Doc. 16).

More than two months later, on October 26, 2015, the Seventh Circuit affirmed the judgment of the district court in another appeal, *United States v. Armour*, 804 F.3d 859 (7th Cir. 2015).  *Armour* was a direct appeal from one of Judge Bruce's criminal cases that involved issues concerning the imposition of conditions of supervised release, including two of the conditions at issue in the *Speed* appeal ("use of alcohol" prohibition and "dangerous weapon" prohibition), and in which Mr. Bohm was appellate counsel of record for the government.  On the day that the Seventh Circuit affirmed the judgment of the district court in *Armour*, Judge Bruce sent an email to AUSA Bohm, stating, "Nice job in US v Armour.  Good ammo for your Speed argument also.  Top notch."  Bates No. 1766.

On January 19, 2016, the Seventh Circuit affirmed the judgment of the district court in *United States v. Speed*, 811 F.3d 854 (7th Cir. 2016).  In that opinion, the court cited with approval its decision in *Armour* in holding that the "dangerous weapon" prohibition was not unconstitutionally vague.  *See Speed*, 811 F.3d at 861. That same day, Judge Bruce sent an email to AUSA Bohm, stating, "Well done, sir. Well done."  Bates No. 1939.

49

Contrary to Ms. Nixon's contention, the email between Ms. Klayer and Judge Bruce and the email from Judge Bruce to AUSA Bohm were not ex parte communications, since the district court case had concluded and was never remanded after the direct appeal.  Nonetheless, the government does not seek to quibble with the defense on this point since the defense's ultimate claim is that Judge Bruce was biased in favor of the government and against Mr. Speed (and, by inference, all defendants, including Ms. Nixon).

Ms. Nixon refers to these series of emails as "smoking gun" evidence of the judge's bias.  R. 173 at 12.  The government strongly disagrees and suggests that there is a more plausible explanation other than some overarching bias against Mr. Speed, who was sentenced by Judge Bruce to a below-range sentence.  Setting aside for the moment the issue of whether it is proper of Judge Bruce to communicate in this fashion with former colleagues, the "unbelievable" comment by Judge Bruce concerning Mr. Speed's brief was the judge expressing frustration over a defendant who was appealing supervised release conditions and procedures to which he did not object at sentencing.  *See* App. 113, 114.  Although the judge's expression of his frustration in an email to the government was ill-advised and reflected intemperance, we suggest that the frustration he had was not unique among district court judges at that time, when appeals of supervised release conditions were commonplace, even after defendants had raised no

objections at sentencing.  To be clear, the government is not excusing the judge's comment, or that the government sent Mr. Speed's publicly filed brief to the judge, but Judge Bruce's "unbelievable" comment—particularly in a matter over which he then had no jurisdiction—does not and cannot amount to a disqualifying bias against Mr. Speed or defendants as a whole.

Similarly, the judge's "nice job" and "well done" compliments to AUSA Bohm were just that: compliments.  Those compliments concerning AUSA Bohm's advocacy do not evidence a temptation that was so severe that a reviewing court must presume that Judge Bruce was unable to impartially preside over Mr. Speed's case or, as relevant here, over Ms. Nixon's trial that was still more than a year away.  *Franklin*, 398 F.3d at 959.

The judge's comment to AUSA Bohm that the *Armour* decision was "good ammo" for the *Speed* appeal does not begin to reflect that Judge Bruce and the U.S. Attorney's Office were "collaborating to litigate Mr. Speed's appeal" or to undermine Seventh Circuit precedent.  R. 173 at 11, 21.  Notably, the government filed its opening brief in *Speed* more than two-and-a-half months (August 6, 2015) before the Seventh Circuit decided *Armour*.  Further, the government certainly did not need the prompting of Judge Bruce to file a letter of supplemental authority when the court of appeals decides one case (*Armour*) that directly addresses an issue raised in a pending appeal (*Speed*).  That Judge Bruce expressed his view to

51

government counsel that *Armour* was "good ammo" for *Speed* may evidence poor judgment on the judge's part. That comment, which was actually an incontrovertible observation about something that was obvious, does not, however, lead to the conclusion of a disqualifying bias against Mr. Speed or any other defendant.

Finally, detracting from the conclusion that Judge Bruce and the government have collaborated on any appeal is the fact that the government has not hesitated to confess error against the judge when the government has determined that his rulings are unsupportable on appeal. *See, e.g., United States v. Gmoser*, Appeal No. 16-3054; *United States v. Shoffner*, Appeal No. 17-2605.

### 2. Other email communications

Many of the communications that involved Judge Bruce and at least one member of the U.S. Attorney's Office reveal that the judge maintained a degree of friendship with his former colleagues, including Mr. Lewis and Ms. Klayer.[21]  In

---

[21] Additionally, although not reflected in the communications, Judge Bruce maintained a friendship with John Childress, who served as an AUSA, Criminal Chief, First Assistant, and United States Attorney.  There were two waiver/filing/plea cases over which Judge Bruce presided that involved documents prepared under AUSA Childress's signature.  *See* Dockets, *United States v. Ashley Miller*, No. 17-cr-20015 (R. 1, 4) & *United States v. Kami Miller*, No. 17-cr-20042 (R. 1, 4).  In each case, AUSA Miller appeared for the United States at the waiver/filing/plea and sentencing hearings.  Additionally, government pleadings were signed by AUSAs under Mr. Childress's official capacity title of United States Attorney between December 2017 and October 2018.  The

addition, the communications reveal that the judge and some members of the U.S. Attorney's Office at times engaged in, for example:

- friendly banter, *see, e.g., id.* at 307-308 (the judge sharing a Dilbert comic strip with First Assistant (former) Long); *id.* at 743-751 (the judge and AUSA Miller discussing an article in Men's Health magazine concerning *The Simpsons* television series); *id.* at 225, 229-230 (Mr. Lewis characterizing the judge as "snarky," and the judge agreeing with this characterization);

- discussions of inside jokes and common experiences, *see, e.g., id.* at 49, 54, 58, 95, 200, 205 & 569-571 (the judge and AUSA Bohm referencing the song "What Does the Fox Say" and discussing Department of Justice training each had attended);

- politically related discussions, *see, e.g., id.* at 440-445, 1701-1706 (the judge and Ms. Hopps discussing political analysis and presidential primary candidates);

- the use of first names, nicknames, and irreverent titles, *see e.g., id.* at 106, 149, 201, 363, 604, 1454 (Ms. Klayer addressing the judge as "Dude" and "Judgie wudgie"); *id.* at 763, 764, 1927, 1994 (the judge addressing Ms. Klayer as "'Nator"); *id.* at 1097, 2495 (the judge addressing Ms. Holmes at "Sonchetta");

---

communications between Mr. Childress and Judge Bruce are found at Bates Nos. 279, 280, 367, 368, 2145, and 2148-2149.

*id.* at 147, 168, 170, 237 (district administrative officer referring to the judge as "Your Excellency"); and *id.* at 227, 245, 1026, 1111 (the judge addressing U.S. Attorney Lewis as "Sparky," "Admiral," and "Dude"); and

- Ms. Klayer asking the judge to use, and the judge purporting to have used, his relationship with Mr. Lewis to recommend Ms. Klayer for a promotion from legal assistant to paralegal specialist, *see id.* at 2142 (April 2016 email from the judge telling Ms. Klayer that he "took care of it" and that she was a "lock" for the "paralegal spot" in Urbana, even though she was not promoted to that position until more than a year later).

The relationships that Judge Bruce maintained with various members of the U.S. Attorney's Office after his appointment to the bench—while at times involving informal dialogue—do not constitute a disqualifying bias.   As the Seventh Circuit has recognized in the context of the "appearance of partiality" rule of 28 U.S.C. § 455(a):

> In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases.

*United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985); *see also Dyas v. Lockhart*, 705 F.2d 993, 995-97 (8th Cir. 1983) (in a capital murder case, holding there was no structural error upon which bias would be presumed even though the trial and sentencing judge was the uncle of the lead prosecutor and father of the two assistant prosecutors who participated in the case). In short, the relationships that Judge Bruce maintained (or purported to maintain) with certain members of the U.S. Attorney's Office—even those that included off-putting dialogue—do not overcome the strong presumption that the judge held the proper balance between the government and Ms. Nixon.

In fact, Judge Bruce did not withhold from criticizing, and at times offering harsh personal views concerning, his former colleagues, including lead government counsel in the *Nixon* case and law enforcement agents with whom he once worked. *See, e.g.*, Bates Nos. 77, 133, 145, 198, 203, 209, 212, 284, 664, 670, 1697, 1814, 1817-1824, 2419, 3721-3722. The judge's communications do not show bias in favor of the government, as Ms. Nixon alleges, but rather disdain for the U.S. Attorney's Office and in particular certain trial attorneys in the USAO. *See, e.g.*, Bates Nos. 37 (describing an AUSA as "a man without honor"); 2423 (complaining that an AUSA had "less skill than a third year law student", and was "often not prepared"); 3721-3722 (expressing frustration with an AUSA throwing what the judge described as "hand grenades" into trials). Even while maintaining some

comradery with certain members of the U.S. Attorney's Office, Judge Bruce did not refrain from making critical comments to other U.S. Attorney's Office personnel. *See, e.g.,* Bates 668; 212. Consistent with the law, however, the government presumes that Judge Bruce was able to "rise above" the "biasing influences" of his personal views of some of his former government colleagues. *Franklin*, 398 F.3d at 959.

### D. Any Violations of the Rules of Professional Conduct Are Not Themselves a Basis for Granting a New Trial in a Criminal Case

In her motion Ms. Nixon alternatively argues (R. 173 at 23-27) that, by not reporting the December 2016 Email Exchange immediately, the government violated the Rules of Professional Conduct. Therefore, Ms. Nixon contends, she should be granted a new trial. Ms. Nixon, however, does not cite any authority for the proposition that a violation of the Rules of Professional Conduct is itself a separate basis for granting a new trial in a criminal case. In fact, Ms. Nixon apparently agrees that a violation of the Rules of Professional Conduct is not a structural error that alleviates her of her burden of demonstrating prejudice, since she explains why, in her view, the government's alleged violations of the ethical rules prejudiced her. *See* R. 173 at 25-26.

Ms. Nixon is entitled to a new trial under Rule 33 only if the ex parte communications affected her "substantial rights," which "are those that affect the outcome of the case." *United States v. Bishawi*, 272 F.3d 458, 462 (7th Cir. 2001); *see*

*also* Charles A. Wright et al., 3 Fed. Prac. & Proc. Crim. § 581 (4th ed.) ("New trial

motions are subject to the harmless and plain error provisions of Rule 52; if the

substantial rights of the defendant were not affected, the court should refuse to

grant the defendant's motion.") (citations omitted).  Thus, the relevant question is

whether the government's actions or inactions regarding the December 2016 Email

Exchange "likely affected the jury's verdict." *Bishawi*, 272 F.3d at 462.  Given the

undisputed fact that the government's trial team in the *Nixon* case was wholly

unaware of the December 2016 Email Exchange until well after the *Nixon* trial had

concluded, *see* App. 116-119; 129; 130-131, there is no possibility that the

government's actions or inactions regarding the December 2016 Email Exchange

affected the jury's verdict in Ms. Nixon's case.

At bottom, Ms. Nixon's argument is that, by not disclosing the December 2016

Email Exchange immediately, the government "deprived her of the right to a fair

trial before an unbiased judge." R. 173 at 25.  But whether Ms. Nixon was deprived

of the right to a fair trial before an unbiased judge rises or falls on whether she can

prove a disqualifying bias that overcomes the presumption that Judge Bruce

presided fairly. *Franklin*, 398 F.3d at 959.  Ms. Nixon cannot avoid that requirement

by recasting her argument in terms of an alleged government violation of the Rules

of Professional Conduct.   And for all of the reasons already articulated, Ms. Nixon

is unable to demonstrate a disqualifying bias here.

### E.  There is No Need for an Evidentiary Hearing on this Motion

There is no need for an evidentiary hearing on Ms. Nixon's motion for a new trial.  The government has submitted, with this response, declarations from the members of the government's trial team in *Nixon*.  These declarations establish, without dispute, that the government's *Nixon* trial team of AUSA Peirson, Trial Attorney Kupersmith, and Legal Assistant Klayer was wholly unaware, during the *Nixon* trial, of the December 2016 Email Exchange and did not become aware of it until May 2018 -- long after the end of the *Nixon* trial on December 20, 2016. App. 116-119, 129, 130-131.  The government has also submitted a detailed declaration from Ms. Hopps.  App. 136-138.  That declaration establishes that Ms. Hopps, who did not work on the *Nixon* case or trial,  deleted the December 2016 Email Exchange after the email exchange ended, on or about December 19, 2016, and that Ms. Hopps told no one about it until October 3, 2017 -- long after the *Nixon* trial ended.  App. 137-138.  Thus, the facts most relevant to resolving Ms. Nixon's motion for a new trial are established by sworn statements in declarations and are without dispute:  (1) Ms. Hopps, who was not a member of the *Nixon* prosecution team, deleted the December 2016 Email Exchange on or about December 19, 2016; (2) Ms. Hopps did not mention the December 2016 Email Exchange to anyone until October 3, 2017; and (3) the *Nixon* prosecution team did not become aware of the December 2016 Email Exchange until long after the *Nixon* jury trial ended.

In addition to these declarations, the government has submitted with this response declarations that detail which USAO employees first learned of and received copies of the December 2016 Email Exchange prior to its disclosure to Ms. Nixon's counsel on May 30, 2018.[22]  Although irrelevant to the resolution of Ms. Nixon's motion for a new trial, these declarations provide the context and the details regarding how the December 2016 Email Exchange first came to light.

Evidentiary hearings may certainly be appropriate in cases in which a defendant argues in a motion for a new trial that newly discovered evidence goes to the defendant's innocence.  *See, e.g., Arnold v. Dittmann*, 901 F.3d 830, 842 (7th Cir. 2018) (holding in habeas context that plausible claim of actual innocence entitled defendant to an evidentiary hearing).  In such cases, the issue of whether the newly discovered evidence actually goes to innocence is typically greatly disputed and must be vetted in an evidentiary proceeding.  *Id.*  Evidentiary hearings may also be necessary when newly discovered evidence directly relates to statements made by jurors or actions of jurors during a trial.  *Compare Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) (holding trial court may consider evidence of juror's statement of racial animus at post-trial evidentiary hearing) *with United States v. Torres-Chavez*, 744 F.3d 988, 998 (7th Cir. 2014) (affirming

---

[22] The declarations are from:   AUSA Bass, App. 162-166; Victim-Witness Coordinator Paul, App. 189-191; AUSA Miller, App. 201-204; AUSA Walters, App. 209; and FAUSA Hansen, App. 211-212.

district court's ruling that juror statements are inadmissible under Federal Rule of Evidence 606(b) at post-trial evidentiary hearing).

Here, the issue of whether Judge Bruce possessed "disqualifying bias" under the applicable Supreme Court and Seventh Circuit tests can certainly be resolved without an evidentiary hearing, given the declarations filed and the ex parte communications disclosed. *See, e.g., United States v. Ogle,* 425 F.3d 471, 478 (7th Cir. 2005) (affirming denial of an evidentiary hearing based on motion for new trial because it would not have "produced any details adding verisimilitude to the issue" and would have been a "redundant procedure"); *cf. United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995) (noting that a defendant has the burden of establishing the necessity of an evidentiary hearing by demonstrating that there is a disputed material issue of fact).

Certainly Ms. Nixon's alternative argument -- that the government violated the Rules of Professional Conduct by failing to disclose the December 2016 Email Exchange immediately and that this imputed ethics violation entitles her to a new trial -- can also be resolved without an evidentiary hearing. The declarations submitted with the government's response detail when each USAO employee was made aware of the December 2016 Email Exchange prior to its disclosure to Ms. Nixon's counsel on May 30, 2018. But Ms. Nixon's alternative argument is that the government should have disclosed the December 2016 Email Exchange on or

about December 19, 2016 -- immediately when the email exchange ended -- and that the failure to disclose it at that time was a violation of the Rules of Professional Conduct that is imputed to the government on that date.  It is thus irrelevant, to the consideration of Ms. Nixon's alternative argument, how many months later which individual USAO employees received notice and copies of the December 2016 Email Exchange.

As noted, whether Ms. Nixon was deprived of the right to a fair trial before an unbiased judge is dependent on whether she can establish a disqualifying bias that overcomes the presumption that the judge presided over her trial fairly.  And Ms. Nixon is unable to demonstrate a disqualifying bias here.

## CONCLUSION

For the reasons presented, the Court should deny Ms. Nixon's motion for new trial without an evidentiary hearing.


Respectfully submitted,
JOHN C. MILHISER
*United States Attorney*

By:     Gregory G. Brooker
*Special Assistant United States Attorney*
*  for the Central District of Illinois*
*Assistant United States Attorney*
*District of Minnesota*
*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, Minnesota  55415*

61

## CERTIFICATE OF SERVICE

I certify that on January 23, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of Illinois by using the CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Gregory G. Brooker
*Special Assistant United States Attorney*