| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** |          (OIG) |
| **Cc:** | (OIG) |
| **Subject:** | RE: OIG Complaint - Central District of Illinois |
| **Date:** | Tuesday, January 16, 2018 4:19:00 PM |

Thank you,

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Identities of attorney-employees of DOJ Office of the Inspector General (on all pages)

**From:**         (OIG) [mailto       @usdoj.gov>
**Sent:** Tuesday, January 16, 2018 3:51 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:**      (OIG) <      @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Hi Tim.  It was last Thursday, Jan. 11.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Tuesday, January 16, 2018 4:44 PM
**To:**      (OIG) <     @OIG.USDOJ.GOV>
**Cc:**      (OIG) <     @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you for the response. If you could let me know if or when a referral has been made to    I would greatly appreciate it. I understand if that is not feasible.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:**      (OIG) [mailto:      @usdoj.gov]
**Sent:** Thursday, January 11, 2018 9:59 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:**     (OIG) <     @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

I hope this is helpful.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Wednesday, January 10, 2018 10:57 AM
**To:** _____ OIG) · _____ ƏOIG.USDOJ.GOV>
**Cc:** _____ OIG) ‹ _____ @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Lack of relevance: potential
internal government
investigations; no reference
to communications between
CSB and USAO

**From:** _____ (OIG) [mailto _____ ᴜsdoj.gov]
**Sent:** Monday, January 08, 2018 11:53 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** _____ OIG) · _____ @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

**From** _____ )IG)
**Sent:** Thursday, January 4, 2018 5:53 PM
**To:** 'Bass, Tim (USAILC)' <Tim.Bass@usdoj.gov>
**Cc:** _____ (OIG) · _____ @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim,

Your allegation of judicial misconduct concerning e-mail communications between a
federal district judge and USAO personnel

Thank you.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 4:24 PM
**To** OIG) OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From** (OIG) [mailto usdoj.gov]
**Sent:** Monday, December 11, 2017 2:40 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, Tim. I've received this and will discuss your request with my office.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 3:19 PM
**To:** OIG) OIG.USDOJ.GOV>
**Subject:** OIG Complaint - Central District of Illinois

> Lack of relevance: potential
> internal government
> investigations; no reference
> to communications between
> CSB and USAO


Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO.

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | (OIG) |
| **Cc:** | (OIG) |
| **Subject:** | RE: OIG Complaint - Central District of Illinois |
| **Date:** | Tuesday, January 16, 2018 3:43:00 PM |

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:** _____ (OIG) [mailto _____ @usdoj.gov]
**Sent:** Thursday, January 11, 2018 9:59 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc** _____ )IG) < _____ )usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

> Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

I hope this is helpful.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Wednesday, January 10, 2018 10:57 AM
**To** _____ (OIG) · _____ @OIG.USDOJ.GOV>
**Cc** _____ (OIG) · _____ ƏOIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:**                    DIG) [mailto              @usdoj.gov]
**Sent:** Monday, January 08, 2018 11:53 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:**               OIG) ·                    @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

**From**               (OIG)
**Sent:** Thursday, January 4, 2018 5:53 PM
**To:** 'Bass, Tim (USAILC)' <Tim.Bass@usdoj.gov>
**Cc:**            DIG)         @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim,

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

            Your allegation of judicial misconduct concerning e-mail communications between a federal district judge and USAO personnel

Thank you.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]

**Sent:** Monday, December 11, 2017 4:24 PM
**To:**           (OIG)      @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you,

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From**         (OIG) [mailto      @usdoj.gov]
**Sent:** Monday, December 11, 2017 2:40 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, Tim.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 3:19 PM
**To**         (OIG)     @OIG.USDOJ.GOV>
**Subject:** OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Lacks relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

| From: | Bass, Tim (USAILC) |
|---|---|
| To: | _____ OIG) |
| Cc: | _____ 'OIG) |
| Subject: | RE: OIG Complaint - Central District of Illinois |
| Date: | Wednesday, January 10, 2018 9:57:00 AM |

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:** _____ (OIG) [mailto _____ @usdoj.gov]
**Sent:** Monday, January 08, 2018 11:53 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** _____ 'OIG) · _____ @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

**From:** _____ (OIG)
**Sent:** Thursday, January 4, 2018 5:53 PM
**To:** 'Bass, Tim (USAILC)' <Tim.Bass@usdoj.gov>
**Cc:** _____ OIG) · _____ @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim,

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

Thank you.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 4:24 PM
**To:** _____ (OIG) _____ @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

Thank you, _____

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:** _____ (OIG) [mailto _____ @usdoj.gov>
**Sent:** Monday, December 11, 2017 2:40 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, Tim. _____

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 3:19 PM
**To:** _____ (OIG) _____ @OIG.USDOJ.GOV>
**Subject:** OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation



I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO.

| From: | Bass, Tim (USAILC) |
| To: | 'OIG) |
| Cc: | (OIG) |
| Subject: | RE: OIG Complaint - Central District of Illinois |
| Date: | Monday, January 08, 2018 12:29:00 PM |

## Tomorrow afternoon is fine. Thank you

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:** (OIG) [mailto: @usdoj.gov]
**Sent:** Monday, January 08, 2018 11:53 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** OIG) < @usdoj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

**From** (OIG)
**Sent:** Thursday, January 4, 2018 5:53 PM
**To:** 'Bass, Tim (USAILC)' <Tim.Bass@usdoj.gov>
**Cc:** OIG) @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Tim,

> Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

Thank you.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 4:24 PM
**To:** _____ (OIG) · _____ @OIG.USDOJ.GOV>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, _____

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From** _____ (OIG) [mailto _____ @usdoj.gov]
**Sent:** Monday, December 11, 2017 2:40 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, Tim. _____

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 3:19 PM
**To:** _____ (OIG) · _____ OIG.USDOJ.GOV>
**Subject:** OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation



I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO.

From: Bass, Tim (USAILC)
To: _____ (OIG)
Subject: RE: OIG Complaint - Central District of Illinois
Date: Monday, December 11, 2017 3:23:00 PM

# Thank you, _____

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

**From:** _____ OIG) [mailto _____ @usdoj.gov]
**Sent:** Monday, December 11, 2017 2:40 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: OIG Complaint - Central District of Illinois

Thank you, Tim. _____

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Monday, December 11, 2017 3:19 PM
**To:** _____ (OIG) < _____ @OIG.USDOJ.GOV>
**Subject:** OIG Complaint - Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

> Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | (OIG) |
| **Subject:** | OIG Complaint - Central District of Illinois |
| **Date:** | Monday, December 11, 2017 2:19:00 PM |

. I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the Schock matter) engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Thank you again for your consideration.

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO.

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | (OIG) |
| **Subject:** | RE: Schock: URGENT UPDATE |
| **Date:** | Wednesday, December 06, 2017 9:01:49 PM |
| **Attachments:** | Judge Bruce emails.pdf |

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Following our call today, I received some additional information today concerning Judge Bruce, the presiding judge in the Schock matter, and the close friend of Mr. Childress (current Interim USA) and friend of Mr. Hansen (former Acting USA and now FAUSA and sole counsel in the Schock matter). Mr. Childress was the best man in Judge Bruce's wedding and is recused from personally appearing before Judge Bruce, although I understand Mr. Childress continues to supervise matters and sign pleadings in matters before Judge Bruce. The information is attached, which consists of emails Judge Bruce sent to Lisa Hopps, a senior paralegal in our office and the paralegal assigned to the Schock matter. Ms. Hopps voluntarily informed me of the attached emails and felt compelled to provide copies to me.

As we have discussed, I believe there are reasonable grounds for OIG to review whether Mr. Hansen and Mr. Childress and Judge Bruce engaged in a concerted effort (in addition to the efforts by Mr. Terwilliger, counsel for Schock) to undermine and sabotage a pending high-profile case of national significance, to wrongfully undermine and discredit and cause the removal of me as the lead attorney in the matter since its inception in March 2015, to provide false and incomplete information to ODAG, and to thwart and corrupt the USA selection process. Part of the factual basis for this complaint is that, as witness by staff members in our Office, Mr. Hansen and Mr. Childress have had repeated ex parte contacts with Judge Bruce before and since Judge Bruce became the presiding judge in the Schock matter, including a call from Judge Bruce to Mr. Childress on November 16, 2017, just prior to Mr. Childress being sworn in as Interim USA on the next to last day of Mr. Hansen's term as Acting USA.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

In the first attached email string, Judge Colin Bruce sent an unsolicited email to Ms. Hopps on September 30, 2015, while he was a sitting district judge and six months after the Schock investigation began but more than one year before he became the presiding judge in the Schock matter in January 2017. The subject of the email was: "Score: Colin 1 - Tony Grootens and Tim Bass 0." At that time, Mr. Grootens was a former Resident Agent-in-Charge for DEA. Judge Bruce also sent an announcement about DOJ policy concerning the use of Stingray equipment. I do not know why Judge Bruce sent the email to Ms. Hopps. In my view, however, it conclusively demonstrates a personal bias toward me and a clear sense on his part of a competition with me, even years after he left our Office and became a district judge. In that same email string, Judge Bruce provides commentary and his personal views on the upcoming presidential election.

In the second email string one year later, Ms. Hopps asked Judge Bruce why he did not attend the farewell reception for then USA James Lewis, for whom Judge Bruce previously served as FAUSA. Judge Bruce responded by commenting about an ongoing trial and providing personal comments about "Elly & Co." [Elly Pierson is an AUSA in our Office] and a DOJ attorney, who were representing the government in the pending trial before Judge Bruce, and the strength of the government's case. I will let Judge Bruce's comments (including profanity) speak for themselves, but, again, these were comments made while the trial was still ongoing.

In my view, if Judge Bruce would send personal comments about me and other Department attorneys to a paralegal in our Office, including during a pending trial before him, it certainly is a circumstantial, if not strong, indication about the subject matter of his repeated contacts with Mr. Hansen and Mr. Childress (Judge Bruce's closer friends and former colleagues) during the pendency of the Schock matter.

Tim

**From:** [                    ] (OIG) [mailto[              ]@usdoj.gov]
**Sent:** Wednesday, December 6, 2017 5:58 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: Schock

Thank you.

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Wednesday, December 06, 2017 5:48 PM
**To:** [                ] (OIG) · [          ]@OIG.USDOJ.GOV>
**Subject:** RE: Schock

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

In August 2017, Schock filed a motion to dismiss the indictment on Fifth Amendment grounds.

Several weeks later (and during and following the time period during which Mr. Hansen and Mr. Childress had repeated ex parte contact with Judge Bruce), Judge Bruce entered an order (attached). Despite the fact that the government's response was filed in the names of the United States and Acting USA Hansen, and under the signatures of myself and Mr. Miller (co-counsel), Judge Bruce identified only me as the author of the initial response and stated that Mr. Hansen had admitted that the government's response to the first motion was false and

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

misleading and that the government was now changing its position. Judge Bruce further directed that the government review all pending pleadings and certify that there were no other misleading statements, but that this further response be authored by Mr. Hansen only.

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Judge Bruce denied the motion to reconsider but accepted Mr. Hansen's response to the Court's order.

Tim

**From** _____ (OIG) [mailt̲o̲ _____ @usdoj.gov]
**Sent:** Wednesday, December 6, 2017 10:48 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: Schock

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Tuesday, December 05, 2017 1:53 PM
**To:** _____ (OIG) _____ @OIG.USDOJ.GOV>
**Subject:** FW: Schock

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

(11/16/17)

Later that afternoon, Judge Bruce, the presiding judge in the *Schock* matter, contacted Mr. Childress by phone, shortly after

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

which (less than one hour) Mr. Childress was sworn in by a different district judge in Springfield as the Interim USA. That evening, Mr. Hansen again advised the assigned paralegal: "For the last time, I do not want this case." Both Mr. Hansen and Mr. Childress further advised the assigned paralegal that they believe Judge Bruce is personally "hostile to Tim."

Tim

**From:** Bass, Tim (USAILC)
**Sent:** Thursday, November 16, 2017 9:56 AM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Patrick and John:

Thank you.

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

**From:** Hansen, Patrick (USAILC)
**Sent:** Monday, November 13, 2017 5:55 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** Schock

Tim,

Patrick D. Hansen
Acting U.S. Attorney
Central District of Illinois
217-492-4450

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

| From: | Hopps, Lisa (USAILC) |
|---|---|
| To: | Colin_Bruce@ilcd.uscourts.gov |
| Subject: | Back at ya" |
| Date: | Wednesday, September 30, 2015 1:14:11 PM |

Hahahahahahahaha!  Well, if Hillary gets it, it won't be for lack trying on Bill's part to carry her over the threshold.  She's just waiting to kicked off the island.  OMG, Donald Trump.  I just keep shaking my head.  I like Marco too, but it doesn't look good for him.

## Lisa Hopps

**OCDETF Paralegal Specialist**
**United States Attorneys Office**
**Central District of Illinois**
Direct:
Email:  lisa.hopps@usdoj.gov

Privacy: direct-dial phone number

**From:** Colin_Bruce@ilcd.uscourts.gov [mailto:Colin_Bruce@ilcd.uscourts.gov]
**Sent:** Wednesday, September 30, 2015 1:06 PM
**To:** Hopps, Lisa (USAILC)
**Subject:** RE: Score: Colin 1 - Tony Grootens and Tim Bass 0

All I can say is that you and I are going to have some interesting dialogues starting in about six months.

Trump? Carson? Seriously?
I actually LIKE Marco Rubio but he is not in it at this point.

And then there is the Hilary juggernaut.
Benghazi. Please.

Like our man Nate Silver said a few weeks ago, the only people seemingly interested in Benghazi and the e-mail issue are those who work for Fox News.

We are going to be moving bubbles like a couple of MoFo's.

So what's up?

**From:** Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov> [mailto:Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov>]
**Sent:** Wednesday, September 30, 2015 12:59 PM
**To:** "Colin_Bruce@ilcd.uscourts.gov" <Colin_Bruce@ilcd.uscourts.gov>
**Subject:** RE: Score: Colin 1 - Tony Grootens and Tim Bass 0

You're funny. How are things going?

Lisa Hopps

**OCDETF Paralegal Specialist**
**United States Attorneys Office**
**Central District of Illinois**
Direct: 
Email: lisa.hopps@usdoj.gov

Privacy: direct-dial phone number

**From:** Colin_Bruce@ilcd.uscourts.gov [mailto:Colin_Bruce@ilcd.uscourts.gov]
**Sent:** Wednesday, September 30, 2015 11:51 AM
**To:** Hopps; Hopps, Lisa (USAILC)
**Subject:** Score: Colin 1 - Tony Grootens and Tim Bass 0

# DOJ says using stingrays to intercept cellphone calls requires warrant, unless exception applies

New U.S. Department of Justice guidelines announced Thursday say warants are needed to use Stingrays and other cell-site simulators to in! tercept cellphone data and place limits on the information that can be collected.

However, the guidelines also say that the warrant requirement doesn't apply under "exigent circumstances" and "exceptional circumstances," CNN reports.

The American Civil Liberties Union estimates that the technology, which obtains cellphone location information by imitating a cellphone tower, is being used in at least 21 states and the District of Columbia.

The new policy, which is the first of its kind, applies to federal law enforcement agencies, the Associated Press reports. It will not apply to state a! nd local law enforcement, unless they are working in conjunction with federal agencies.

There is no question that cell-site simulators are a useful law enforcement tool. However, privacy advocates object to the government using individuals' cellphones as personal tracking devices and point out that third-party information of innocent people is gathered along with information on targets.

"Cell-site simulator! s are a really critical tool for us that we use in a variety of contexts," said deputy attorney general Sally Quillian Yates in a Thursday media briefing. "It's an important tool in finding fugitives and finding kidnapping victims and drug cases. But we also recognize that the public has a real privacy interest and concern here so we have tried to craft a policy that is mindful of all of those interests and have attempted to strike the right balance."

A lawyer for the ACLU called the new policy a positive first step but said more needs to be

done to prot! ect Americans from intrusive government monitoring.

"After decades of secrecy in which the government hid this surveillance technology from courts, defense lawyers, and the American public, we are happy to see that the Justice Department is now willing to openly discuss its policies," said staff attorney Nathan Freed Wessler in an ACLU press release.

However, he called for the DOJ to close "loopholes" in its policy, such as not requiring state and local agencies who used federal funds to purchase cell-site simulators to follow federal guidelines. Additionally, "Congress should act," he said, "to pass more comprehensive legislation to ensure that Americans' privacy is protected from these devices and other location tracking technologies."

The ! New York Times (reg. req.) and Reuters also have stories.

| | |
|---|---|
| **From:** | Colin_Bruce@ilcd.uscourts.gov |
| **To:** | Hopps, Lisa (USAILC) |
| **Subject:** | RE: Jim's Farewell |
| **Date:** | Sunday, December 18, 2016 12:45:15 PM |

I work hard not to try any of the cases.
I actually have a sign on the bench from Judge Baker that says "DO NOT TRY THE CASE".

When I'm not making internal jokes or when I'm not completely bored, lots of times I am cringing.

I really cringed when the inexperienced DOJ attorney starting crossing the defendant in this case..
During this cross-examination, I keep wanting to say, "Seriously? That is your plan? Repeat the testimony of the defendant as though it was fact and then say, 'Right?'"

And if you were in the courtroom, yes, I would be giving you looks that would make you crack-up.

**From:** Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov> [mailto:Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov>]
**Sent:** Saturday, December 17, 2016 7:55 PM
**To:** "Colin_Bruce@ilcd.uscourts.gov" <Colin_Bruce@ilcd.uscourts.gov>
**Subject:** RE: Jim's Farewell

DITTO my friend!! She is, I'm happy for her.  OMG.  How do you
sit through that?  I can just see you looking like you're bored
to death, but on the inside you're cracking yourself up with
jokes!  I would NOT be able to make eye contact with you.
hahahahaha

**From:** Colin_Bruce@ilcd.uscourts.gov [mailto:Colin_Bruce@ilcd.uscourts.gov]
**Sent:** Saturday, December 17, 2016 5:10 PM
**To:** Hopps, Lisa (USAILC) <LHopps@usa.doj.gov>
**Subject:** RE: Jim's Farewell

Damn it! I could use a little Lisa Hopps in the courtroom just to see you.
Staci is doing a good job, so you trained her well.

So far in this trial, in the over one hour cross-examination, the DOJ attorney has done a WONDERFUL job of repeating the bullshit the defendant said as if the defendant's story was all fact.

How about the BASIC cross-examination skill of saying "and then the ALLEGED event took place" or "and then, SUPPOSDEDLY, this happened" or "so ACCORDING TO YOUR STORY…."

This trial went from a slam-dunk for the prosecution to about a 60-40 for the defendant, and there is more cross-examination to go……

**From:** Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov> [mailto:Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov>]
**Sent:** Saturday, December 17, 2016 4:00 PM
**To:** "Colin_Bruce@ilcd.uscourts.gov" <Colin_Bruce@ilcd.uscourts.gov>
**Subject:** RE: Jim's Farewell

Are you kidding me?!?! Wow.  Never ☹.  Staci is the paralegal in training over there so I'm o-u-t.

**From:** Colin_Bruce@ilcd.uscourts.gov [mailto:Colin_Bruce@ilcd.uscourts.gov]
**Sent:** Saturday, December 17, 2016 2:11 PM
**To:** Hopps, Lisa (USAILC) <LHopps@usa.doj.gov>
**Subject:** RE: Jim's Farewell

Trial. Elly.

Where evidently the Elly and Co. decided they did not want to win by letting an entirely inexperienced DOJ attorney cross examine THE DEFENDANT.
(Here are some words she evidently does not know: "alleged' "supposedly" "your story")

Are you ever going to come over here and do another trial?

**From:** Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov> [mailto:Hopps, Lisa (USAILC) <Lisa.Hopps@usdoj.gov>]
**Sent:** Friday, December 16, 2016 4:26 PM
**To:** "'Colin_Bruce@ilcd.uscourts.gov'" <Colin_Bruce@ilcd.uscourts.gov>
**Subject:** Jim's Farewell

And just WHERE WERE YOU today?????

# Lisa Hopps

Paralegal Specialist
United States Attorneys Office
318 South Sixth Street
Springfield, IL 62701
Direct Line:
lisa.hopps@usdoj.gov

Privacy: direct-dial
phone number

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation. (This page and next four pages)

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | OIG) |
| **Subject:** | RE: Schock |
| **Date:** | Wednesday, December 06, 2017 4:47:49 PM |
| **Attachments:** | |

In August 2017, Schock filed a motion to dismiss the indictment on Fifth Amendment grounds.

Several weeks later (and during and following the time period during which Mr. Hansen and Mr. Childress had repeated ex parte contact with Judge Bruce), Judge Bruce entered an order (attached). Despite the fact that the government's response was filed in the names of the United States and Acting USA Hansen, and under the signatures of myself and Mr. Miller (co-counsel), Judge Bruce identified only me as the author of the initial response and stated that Mr. Hansen had admitted that the government's response to the first motion was false and misleading and that the government was now changing its position. Judge Bruce further directed that the government review all pending pleadings and certify that there were no other misleading statements, but that this further response be authored by Mr. Hansen only.

Judge Bruce denied the motion to reconsider but accepted Mr. Hansen's response to the Court's order.

consideration.

Tim

**From** [redacted] (OIG) [mailto [redacted] @usdoj.gov]
**Sent:** Wednesday, December 6, 2017 10:48 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Subject:** RE: [redacted]

**From:** Bass, Tim (USAILC) [mailto:Tim.Bass@usdoj.gov]
**Sent:** Tuesday, December 05, 2017 1:53 PM
**To** [redacted] OIG) [redacted] OIG.USDOJ.GOV>
**Subject:** FW: Schock

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

**(11/16/17)**

Later that afternoon, Judge Bruce, the presiding judge in the *Schock* matter, contacted Mr. Childress by phone, shortly after which (less than one hour) Mr. Childress was sworn in by a different district judge in Springfield as the Interim USA. That evening, Mr. Hansen again advised the assigned paralegal: "For the last time, I do not want this case." Both Mr. Hansen and Mr. Childress further advised the assigned paralegal that they believe Judge Bruce is personally "hostile to Tim."

Tim

**From:** Bass, Tim (USAILC)
**Sent:** Thursday, November 16, 2017 9:56 AM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Patrick and John:

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Thank you.

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

**From:** Hansen, Patrick (USAILC)
**Sent:** Monday, November 13, 2017 5:55 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** Schock

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

Tim,

Patrick D. Hansen
Acting U.S. Attorney
Central District of Illinois
217-492-4450

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

E-FILED
Tuesday, 03 October, 2017  11:21:59 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     Case No. 16-CR-30061 |
| | ) |
| AARON SCHOCK, | ) |
| | ) |
| Defendant. | ) |

## ORDER

On September 1, 2017, the Government filed a Response (#119) to Defendant's

Motion to Dismiss Indictment for Violation of Fifth Amendment Rights Before the

Grand Jury (#100).  In the response, the Government admitted that a previous claim

made by Assistant United States Attorney Timothy Bass was misleading, if not simply

false.  The claim related to Defendant's allegation that a Government attorney made

comments regarding Defendant's failure to testify before the Grand Jury.  Originally,

the Government denied Defendant's allegation, stating that it "unequivocally submits

to this Court that this allegation is false. It did not happen."  However, the Government

has now changed its position, admitting that "on eleven occasions - seven times before

the first grand jury and four times before the second grand jury - government counsel

commented on or addressed Mr. Schock's testifying or decision not to testify before the

grand jury."[1]

---

[1] The Government's clarification was made by Acting United States Attorney
Patrick Hansen approximately six and a half months after the original statement was
submitted to this court by AUSA Bass.

The recent revelation puts this court in a somewhat difficult position as it is now aware that it was misled by the Government. Unfortunately, this court relied upon, and even quoted, the Government's inaccurate statement, which it now knows to be false, in a previous order. While the court's reliance on that statement was not dispositive of any issue, the court must ensure that it does not rely on any inaccurate information in any future orders.[2]

Therefore, to ensure the accuracy of the record, as well as the integrity of this court, the Government is ordered to review all claims and statements made in its current filings to ensure that there are no more false or misleading claims.[3] After its review, and within fourteen (14) days of this order, the Government must file a memorandum with this court detailing any further misrepresentations or misleading statements made by the Government. If there are none, the memorandum should state that fact. The court orders that the memorandum be filed by Acting United States

---

[2]At the present time, the court is reviewing and preparing its ruling on Defendant's Motions to Dismiss (#76), (#78), (#86). These motions and memorandums, responses, replies and attachments total approximately 500 pages. Defendant's other non-evidentiary motions (#100), (#101), (#103), (#105), and (#107) were fully briefed on September 16, 2017, and are also now before the court. These motions and memorandums, responses, replies and attachments total approximately 4,855 pages. There are numerous representations and statements of facts made by the Government throughout these pleadings.

[3]As an example, the Government has claimed numerous times (including in a Response (#127) to a pending motion) that the Department of Justice authorized the charges in this case. The court wonders if such authorization was made with full knowledge of the occurrences before the Grand Jury as set forth by the Government in its recent filing. If not, the statement may be misleading.

2

Attachment No. 1 - page 000057

Attorney Patrick Hansen.

IT IS THEREFORE ORDERED THAT:

The Government is ordered to review all claims and statements made in all filings currently pending before the court.  After its review, the Government must submit a memorandum detailing any further misrepresentations or misleading statements.  The memorandum must be submitted within fourteen (14) days of this order and signed by Acting United States Attorney Patrick Hansen.

ENTERED this 3rd day of October, 2017.

_s/COLIN S. BRUCE_
U.S. DISTRICT JUDGE

3

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Tim,

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

E-FILED

Tuesday, 18 April, 2017  11:45:17 PM

Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-30061 |
| vs. | ) | |
| | ) | |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT SCHOCK'S MOTION FOR DISCOVERY REGARDING USE OF CONFIDENTIAL INFORMANT AND MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

The United States of America, by its attorneys, Patrick D. Hansen, Acting United States Attorney for the Central District of Illinois, and Timothy A. Bass, Assistant United States Attorney, respectfully submits its response to Defendant Schock's motions for discovery regarding the use of confidential informant and for disclosure of grand jury materials. The government states the following:

### INTRODUCTION

More than 30 years ago, the Supreme Court articulated the indisputable principles that Members of Congress are not "super-citizens, immune from criminal responsibility[,]" *United States v. Brewster*, 408 U.S. 501, 516 (1972), since "legislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons." *Gavel v. United States*, 408 U.S. 606, 615 (1972); *see Texas v. Corrigan*, 257 U.S. 312, 332 (1921) ("No man is above the law."). Consistent with these principles, the charges in this case against Defendant Aaron Schock were authorized by

the former United States Attorney for this district and the Department of Justice and are the result of an extensive, nearly two-year investigation conducted by career professionals within the Department and other law enforcement agencies. In November 2016, the grand jury charged that Defendant Schock engaged in a years-long scheme to defraud the United States, his campaign committees, and others, including his own constituents, made repeated false statements to the U.S. House of Representatives (House) and the FEC, among others, and, in doing so, caused a loss of more than $100,000.

From the beginning of the investigation that led to his indictment, Defendant Schock has engaged in an increasingly aggressive search for some governmental misconduct claim, initially to forestall the indictment, and now to avoid the trial on the merits. This quest, with all of its attendant inflammatory rhetoric, has led to the filing of the instant motions for discovery and production of grand jury minutes. In these motions, Defendant Schock futilely attempts to manufacture claims of governmental misconduct during the course of the investigation. The government respectfully submits to this Court that he has not made even a preliminary showing, and he should therefore be denied the extraordinary relief he seeks.

Defendant Schock asks this Court to order a response to an interrogatory-like list of questions, seeking various types of information, nearly all of which he has already received, or to which he is plainly not entitled under the law of this Circuit. As the court held in *United States v. Blagojevich*, 2010 WL 522661, at *1 (N.D. Ill. Feb. 8, 2010), in denying a motion similar to that advanced by Defendant Schock:

2

The volume of discovery already produced far exceeds that required by
established law. Producing . . . Section 3500 [Jencks] material three months
before trial is adequate, and these dates are well in advance of any
requirement found in existing statutory and case law. 18 U.S.C. § 3500(a);
*United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v.
Balogun*, 971 F.Supp. 1215, 1230 (N.D. Ill. 1997).

Defendant disputes none of the legal principles on which the prosecution
relies . . . Instead, Defendant offers an assortment of rhetorical flourishes
oddly detached from the issues in this case . . .

Defendant has had, and will continue to have, the right to seek
particularized discovery of certain documents or materials with respect to
specific witnesses, but the blunderbuss demand for everything to be
turned over sooner than the law allows is not well made.

Defendant Schock's inflammatory rhetoric and "blunderbuss demand for
everything" is likewise "not well made." *Id.* Accordingly, the government respectfully
requests that his motion for discovery be denied.

Defendant Schock further asks this Court to issue a judicial license to his
continued search for misconduct by requesting the extraordinary relief of disclosure of
grand jury minutes. Because Defendant Schock has not shown any compelling necessity
or a particularized need for such materials, and because there has been no
governmental misconduct, the government respectfully requests that his motion for
grand jury minutes be denied.

3

## STATEMENT OF FACTS

I.  **Background**

Defendant Schock was elected to the U.S. House of Representatives in 2008 as the

U.S. Representative for the 18th Congressional District, which is within the Central

District of Illinois. He maintained official Congressional offices in Peoria, Springfield,

and Jacksonville, Illinois, and Washington, DC, as well as a consolidated campaign

office (for Schock for Congress, Schock Victory Committee, and GOP Generation Y

Fund) in Peoria. He employed staff in each of the Congressional and campaign offices,

including Dayne LaHood (District Chief of Staff), an Office Manager (OM), and his

long-time friend, Shea A. Ledford (District Special Assistant), all of whom were

assigned to the Peoria, Illinois, office. The names and positions of his Congressional

staff members (federal employees) were public information. *See, e.g.,*

www.congressional-staff.insidegov.com.

Defendant Schock's district office in Peoria was located on the first floor of the

federal court building. The office consisted of a suite of offices, including an inner office

of Defendant Schock. None of the offices within the suite were locked and all were

connected. Defendant Schock rarely worked from his Peoria office, and his staff

regularly used the inner offices to meet with constituents.

The two senior staff members at the Peoria office included District Chief of Staff,

Dayne LaHood, and his OM. The OM reported to Dayne LaHood.[1]  Both Mr. LaHood

---

[1]Defendant Schock describes the OM as a "junior level staffer." (Dis.Mem. at 3) That assertion
is simply inaccurate. The government is prepared to present an affidavit from the OM to

4

and the OM had their own offices within the suite. The OM's duties involved those

described by the OM's job title, namely, managing the office, which included meeting

with constituents of Defendant Schock, representing Defendant Schock at public events,

paying the office bills, overseeing junior staff members, as well as document and

records management. In a December 2011 Interpersonal Communications Report, the

OM was described as having "a strong sense of duty and loyalty and will be

conservative in action." (Exhibit 1, at 3) The OM was further described as, "generally

comfortable 'wearing several hats' and taking on a wide range of responsibilities from

group leader to supporter and follower." (Exhibit 1, at 2)

Like the District Chief of Staff and other staff members, the OM had unrestricted

access to the entire Peoria office. Although none of the offices in the Congressional

office were locked, the OM was issued keys for the offices and maintained keys for

every door. In addition, the OM was often required to gather or review documents from

other offices, including from the Chief of Staff's office, and even watered the plants in

all inner offices. Finally, the OM and all other staff members, including Shea Ledford,

had mail.house.gov email accounts, which were individually password protected, on

the computer network maintained by the House in Washington.

### A. Pre-Investigation - Defendant Schock's Public Statements

On February 2, 2015, the Washington Post published a story concerning its

reporter's visit to Defendant Schock's newly-remodeled Congressional office in the

---

support the description of the OM's duties as well as present witness testimony at any
evidentiary hearing on Defendant Schock's motions should the Court deem a hearing necessary.

Rayburn Building in Washington. (*see He's got a 'Downton Abbey'-inspired office, but Rep. Aaron Schock won't talk about it,* available at www.washingtonpost.com.) The story reported that the reporter was only allowed into Defendant Schock's office when at least one staff member was present, was only allowed to take photographs of the office with his phone, and was "guided . . . to Schock's private office" by his interior decorator. (*Id.*)

A few days later, on February 6, 2015, Defendant Schock was interviewed in Peoria and asked about the Washington Post story. (*See Cong. Schock Talks to Reporters at Peoria County Farm,* available at www.youtube.com/ watch?v=H8unCMlGOMQ) During the interview, he described his staff's response to the Washington Post reporter's visit to his Congressional office as a "kerfuffle" and stated that "my office could've handled it much better." (*Id.*) Defendant Schock did not accuse his staff or the reporter of having committed a theft or a crime or invading his expectation of privacy. Rather, he stated that "there's nothing to hide"; "I've always been one to engage the press"; "my congressional office is open to my constituents, will always be open to my constituents"; he has hosted "thousands of constituents" in his prior Congressional office and "thousands more of my constituents will be hosted in this Congressional office"; "once she's [the office decorator's] done decorating my office people will be in it" because "that's what happens with your offices."

Later in February 2015, but prior to the commencement of any criminal or grand jury investigation, Defendant Schock announced he had retained the Jones Day law firm in Washington, DC, and others, including accounting and communication firms, in

6

connection with an internal audit "to review the compliance procedures in his official office, campaign, and leadership PAC." *See Schock Lawyers Up*, Politico, February 25, 2015 (available at www.politico.com)

During a press conference held in Peoria on March 6, 2015, Defendant Schock announced that he had "asked for a review of his various office procedures" and that he had "brought on board experts," including "attorneys at Jones Day"; "third party administrators for both the campaign and official office finance functions"; and a "certified public accountant" to "add an additional layer of oversight," that he "anticipate[d] that I will be filing various clarifying amendments based upon the results of the review," and that "we are making some major changes prospectively." (*see Aaron Schock Addresses Recent Controversies*, www.youtube.com/watch?v=f5zXw7AW4yg ) When asked how long the review would take, Defendant Schock stated that he didn't know but that the review would be "thorough," and that "when I know you'll know." (*Id.*) He stated that he believed that "you have to earn the trust every day of the voters you represent and that's exactly what I intend to do." (*Id.*)

## B. Commencement of Grand Jury Investigation

On March 12, 2015, a grand jury in this district initiated a criminal investigation of Defendant Schock. (Exhibit 2) On that date, the grand jury issued several subpoenas, for his financial records, both personal and campaign, including charge accounts and travel records. All of these subpoenas were issued and served or mailed by March 19, 2015. (Exhibit 2) The grand jury's investigation was well underway by March 19, 2015.

7

One of the subpoenas issued on March 12 was to Defendant Schock's office

decorator. After being advised at that time that McGuireWoods represented the office

decorator, the government provided the subpoena to McGuireWoods, at its request.

(Exhibit 3) The office decorator later retained separate counsel and produced certain

records to the grand jury, including photographs of his inner offices. Since then,

representatives of the Architect of the Capitol have produced additional photographs to

the government of Defendant Schock's Congressional offices in the Cannon Office

Building, including his private office, which included photos of his private office.

(Exhibit 4) The government has produced these photographs to Defendant Schock as

part of its discovery disclosure in this criminal matter.

### C. Defendant Schock's Resignation Announcement/Issuance of Grand Jury Subpoenas to His Congressional Offices and to Him Personally

On March 17, 2015, just eleven days after his Peoria press conference, Defendant

Schock announced his resignation from Congress, to be effective March 31, 2015. On

March 18 and 19, 2015, two additional grand jury subpoenas were issued to Defendant

Schock's offices in Peoria and Washington, DC. (Exhibit 5) The subpoena to the Peoria

office was served on the OM on March 18. On March 19, the subpoena to the

Washington office was served on William F. Coffield, counsel for Defendant Schock's

Chief of Staff. The Washington and Peoria subpoenas were identical to each other and

sought the production of records covering a period of 2010 to the present. Specifically,

the subpoenas requested the production of the following:

> 1. Any and all financial, campaign or political fundraising, and accounting
> records, in electronic form or otherwise, that in way relate to Congressman

8

Aaron Schock or Aaron Schock individually, including but not limited to all banking and financial institution, travel, and reimbursement records for Aaron Schock, Congressman Aaron Schock, Schock for Congress, Schock Majority Fund, GOP Generation Y Fund, and Schock Victory Committee . . .

\* \* \*

3. Any and all financial records, in electronic form or otherwise, that relate to Members' Representational Allowance, including but not limited to any records relating to receipt of funds, expenditures, reimbursements and budgets.

Following the issuance of the grand jury subpoenas, no attorney contacted the

government to advise of any representation of Defendant Schock concerning the grand

jury subpoenas issued to his offices or any grand jury investigation in this district. Mr.

Coffield, however, advised the government that he had been retained to represent what

was later determined to be eight of Defendant Schock's staff members (but not

Defendant Schock personally), including the Chief of Staff, and acknowledged that his

fees may be paid by Defendant Schock's campaign committee.

## D. The Office Manager's Agreement to Cooperate with Law Enforcement; Production of Pictures and a Confidential Staff Roster; Consensual Recordings.

During the service of the March 18 grand jury subpoena to the Peoria office, the

OM voluntarily agreed to be interviewed by law enforcement agents. (Exhibit 6,

AGT_RPT 791-93) The OM provided information concerning Defendant Schock and his

Congressional Office, including the names of staff members in the Peoria and

Washington offices. The OM further advised that during an "internal review," a law

firm collected and removed several boxes of original documents from the Peoria office,

which the OM was uncertain would be returned. (Exhibit 6, AGT_RPT 791-93)

9

On the morning of March 20, 2015, the OM voluntarily emailed a law enforcement agent a copy of a roster of Defendant Schock's Congressional staff. The roster was marked "Confidential-Internal Use Only." (Exhibit 6, AGENT_RPT 821) A few minutes later, the OM voluntarily emailed the law enforcement agent a second updated staff roster. (Exhibit 6, AGENT_RPT 821) The staff rosters contained both personal (address, phone, personal email) and official (email, office location) information concerning the staff. The rosters, which were accessible by all staff members, were e-mailed from his office email account and computer. (Exhibit 6, AGENT_RPT 821) In September 2015, the House later produced, without objection from Defendant Schock, a similar staff roster to the government. The government did not present the staff rosters to the grand jury, and it does not intend to present them as evidence at trial.

Later in the morning on March 20, the OM agreed to conduct consensually-recorded meetings with Defendant Schock and three of his Congressional and campaign staff members, as allowed under federal law. 18 U.S.C. § 2511(c)(2). After review by the Department, authorization to conduct the consensual recordings was given by the FBI and the Deputy Assistant Attorney General.[2] The OM was given specific instructions on the manner in which the recordings were to be conducted.

---

[2]Although the government has repeatedly assured the defense that all DOJ requirements were followed, the defense has repeatedly demanded the production of internal documentation to prove this. While it is axiomatic that a failure to follow internal guidelines gives no rights to a defendant, if this Court wishes to satisfy itself that such documentation exists, the government will gladly file a copy *in camera.*

Attachment No. 1 - page 000071

Specifically, he was orally instructed: 1) to activate the recording device only when one

or more of the approved individuals was present; 2) not to record any conversations in

which an attorney was present; 3) not to intrude into any attorney-client relationship or

deliberately elicit any attorney-client privileged information; and 4) not to initiate any

discussion concerning legislative matters. (Exhibit 6, (FBI report reflecting instruction

on attorney-client matters)) The instructions included oral instructions from the

attorney for the government directly to the OM in the presence of two law enforcement

agents. The OM later testified in the grand jury that the OM "received very explicit,

careful instructions on that." (Exhibit 6, 4/8/15 GJ Tr. at 19)

Between March 20, 2015, and continuing to April 16, 2015, the OM conducted

several consensual recordings of meetings with Defendant Schock and certain members

of his Congressional and campaign staff. (Exhibit 7) In this investigation, as with any

other, the government was interested to determine whether anybody was engaging in

efforts to improperly influence witness testimony or withhold records required by the

grand jury subpoenas. During the recorded meetings, Defendant Schock and other staff

members made repeated statements concerning the investigation. (Exhibit 7)

During a meeting with staff members on March 20, Defendant Schock stated: "I

can honestly say my bookwork in the campaign and the MRA the official office was

sloppy. My business stuff, have at it. Cause that's all legit."(Exhibit 7, 3/20/15 Tr. at 4)

He also stated: "I don't do any of the finances . . . in the campaign or the MRA at the

official offices, so at the end of the day my name is on the door, I am the one responsible

for whatever happens, but . . . I'm not working with the House Finance Office and I'm

11

not working with the FEC." (Exhibit 7, 3/20/15 Tr. at 15) During a later meeting with the OM, Defendant Schock stated that the mileage: "started with [a Washington staff member] . . . I'm the one that get's the money." (Exhibit 7, 3/20/15 #2 Tr. at 1) He also predicted to the OM what his staff members would say, stating: "[staff member A] will never say that I told her to do what she did, and [staff member B] will never be able to say that I told her what to do . . ." (Exhibit 7, 3/20/15 #2 Tr. at 4) According to the statements of those same staff members, Defendant Schock's statements were false.

On March 22, 2015, the OM voluntarily emailed a law enforcement agent various pictures the OM took with the OM's cell phone of gifts and commemorative items Defendant Schock had received that were publicly displayed in his office and in the hallway of the Congressional office. (Exhibit 6, AGENT_RPT 850-66) The government did not present these photos to the grand jury and does not intend to present them at trial.

During a meeting with the OM on March 30, 2015, Defendant Schock discussed the investigation, stating that he could "say actually no, you know, there's nothing here and that, you know, these were honest mistakes." (Exhibit 7, 3/30/15 Tr. at 4) He further referred to a former staff member as "a lunatic" and stated that "DOJ's not gonna have his emails." (Exhibit 7, 3/30/15 Tr. at 4) Defendant Schock also specifically discussed the grand jury investigation, stating: "the purpose of the grand jury, is to try and indict me . . . [The government has] asked us for some documents, but the documents aren't due until the same day that you guys are supposed to go in. Which means [the government's] gonna have no basis for [its] questions so it's gonna turn into

12

some giant fishing expedition." (Exhibit 7, 3/30/15 Tr. at 18-19) He also predicted what

the OM might be asked in the grand jury, stating further: "when you go into a grand

jury, it's yes, no or I don't remember . . . because anything you say, and they'll get you

to lie to a grand jury . . . what they try and do is trip up the witness, trip up guys like

you who have nothing to lose." (Exhibit 7, 3/30/15 Tr. at 20-21)

The government may present one or more of the recordings with Defendant

Schock at trial. The government does not intend to present in its case-in-chief any of the

recordings with other staff members when Defendant Schock was not present, unless

needed for impeachment.

### E. Lack of Notice to the Government of Any Legal Representation of Defendant Schock in the Grand Jury Matter

On March 20, 2015, the government issued a preservation request to the House

(Exhibit 8) The request sought preservation of various records identical to those sought

in the grand jury subpoenas to Defendant Schock's offices in Peoria and Washington.

In addition, from March 18, 2015 (the date of service of the first subpoena to

Defendant Schock's Peoria office), and continuing to March 31, 2015, Defendant Schock

remained a Congressman. During that period, however, no attorneys contacted the

government and advised that they represented him, either individually or otherwise, in

connection with the grand jury subpoenas issued to his offices or any criminal

investigation. Nor was there any assertion by anyone during this time of any Fifth

Amendment, Speech and Debate, or other privilege; any challenge to the validity of

the subpoenas; or any assertion of any difficulty in complying with the subpoenas. In

13

short, there was no contact from anyone on behalf of Defendant Schock or counsel for

the House.

### F.  Defendant's Schock's Resignation Date/Congressional Records and Personal Effects "Left Behind"

Defendant's Schock's last day in office was on March 31, 2015. Upon his

departure, the Congressional office became the "Office of the 18th Congressional District

of Illinois." (Exhibit 10) In a public statement later made by Defendant Schock on

November 10, 2016, he stated:

> Unlike some politicians, I did not delete any emails, nor did my staff
> smash or destroy any electronic devices. Quite the opposite, every record,
> every document, every picture on the wall was left behind. I took nothing
> with me. I knew I had nothing to hide, and I believed that a quick review
> would prove this fact.

(Exhibit 9)

On May 18, 2015, nearly two months following Defendant Schock's departure

from office, House Counsel wrote to counsel for Defendant Schock to advise him that

the House "Clerk was compiling an inventory of tangible personal property (furniture,

artwork, decorative objects, books, awards, framed photos, and the like) which former

Congressman Schock *left behind* in his Washington, D.C. congressional office, and/or his

district offices, when he departed the House on March 31, 2015." (Exhibit 10) (emphasis

added) House Counsel further advised counsel for Defendant Schock that "it will be

Mr. Schock's responsibility to retrieve his personal effects — or arrange for them to be

shipped — from the House (and from the district office(s) to the extent any of his

personal effects are located there)." (Exhibit 10)

14

On June 30, 2015, three months after Defendant Schock left office, House Counsel wrote to counsel for Defendant Schock a second time to advise him that the "inventory now is completed and is attached [and that] [t]he items on this inventory are those which the Clerk has not been able to determine definitively to have been purchased with Members Representational Allowance ("MRA") funds." (Exhibit 10) The inventory was 22 pages in length, containing a single-spaced listing of more than 200 items of "furniture, artwork, decorative objects, books, awards, framed photos, and the like[,]" from the Washington, Peoria, Springfield, and Jacksonville offices. (Exhibit 10) House Counsel further suggested a "schedule" that, by "July 10, 2015," Defendant Schock would advise House Counsel whether the inventory included any items that were purchased with MRA funds; and any items as to which he wished to disavow any ownership interest; and that by August 10, 2015, all personal effects would be retrieved or shipped to him from the House and the district offices. House Counsel requested that Defendant Schock retrieve the items from his former offices because of the upcoming special election. House Counsel provided a copy of the letter and the 22-page inventory to the government and the House Clerk. (Exhibit 10)

### G. Service of Personal Grand Jury Subpoena to Defendant Schock

On March 31, 2015, Defendant Schock's last day in office, the government served him with a grand jury subpoena, authorized and initialed by the United States Attorney. The subpoena required the production of the identical records sought in the grand jury subpoenas directed to his Peoria and Washington offices on March 18 and 19, 2015. (Exhibit 11)

15

### H. Defendant Schock's Representation in the Grand Jury Matter

Two days later, on April 2, 2015, and for the first time, the government was

contacted by current counsel for Defendant Schock, who advised that they had been

retained as co-counsel with Jones Day to represent Defendant Schock concerning the

grand jury investigation. During a conference call the next day between the government

and Defendant Schock's counsel, there again was no assertion of any privilege or

challenge to the validity of any of the three subpoenas. Counsel for Defendant Schock

advised the government that they had been retained as co-counsel with Jones Day to

represent him "individually" and requested that the government unconditionally

withdraw the grand jury subpoena to Defendant Schock for testimony and production

of records in its entirety to allow for future discussion. The government declined that

request but asked whether counsel would discuss compliance with the subpoenas,

including a possible rolling production of records to accommodate any timing or

volume concerns and what records existed that were responsive to all three subpoenas,

the location of such records, and whether any attorneys for Defendant Shock had taken

possession of such records. Counsel for Defendant Schock declined the government's

request.

### I. Defendant Schock's Motion to Quash Grand Jury Subpoenas/Denial of Ownership and Possession of Records.

On April 6, 2015, Defendant Schock filed an emergency motion to quash

subpoena. In his motion, Defendant Schock disavowed any possession of and denied

any claim of any personal ownership of the records in his former Congressional Office:

16

> The Subpoena appears to assume that records of *entities* such as Mr.
> Schock's campaign committee, *his former congressional office* and several
> political committees, *all of which are separate legal entities,* are or should be
> in Mr. Schock's personal possession or custody.

(No. 15-3005, R.1 (Schock Mot. to Quash) at p.2 n.2) (emphasis added).

> The Subpoena here seeks documents and information likely held by *Mr.*
> *Schock's former congressional office,* his campaign, his Political Action
> Committee, or his joint fundraising committees . . .

(*Id.* at 13)

***

> Mr. Schock does not physically possess the records and documents held
> by *these distinct entities.* Thus, he is not the proper subject of a subpoena to
> produce them . . . Mr. Schock is no longer in office and clearly would not
> physically possess the records held by his *former congressional office* (which
> continues to serve Illinois's Eighteenth Congressional District), his former
> district office, his campaign, his PAC or his fundraising committees.
> *Simply put, they are separate entities,* no matter how much the government
> insists they are one-and-the-same.

(*Id.* at 13 n.6) (emphasis added).

The government filed a response to Defendant Schock's motion and a motion to

enforce the grand jury subpoenas.

### J. District Court Enforcement of Grand Jury Subpoenas

On April 9, 2015, the district court held a hearing on the government's motion to

enforce grand jury subpoenas and Defendant Schock's motion to quash. During the

hearing, Defendant Schock referred to his Congressional office records as his "official

office records, many of which I would note are available as a matter of public

information on-line." (No. 15-3005, 4/9/15 Tr. at 14) He again represented that he did

not have possession or custody of his Congressional records and asserted no personal

17

or private interest in them. The district court denied Defendant Schock's motion to

quash and held that "Schock has authority and control over the documents" in his

Congressional offices. (Order at pp.7-18). The district court noted that his counsel "was

able to copy all records from Mr. Schock's various former offices within a relatively

short period of time" and that he was not asserting any privilege, and held that because

"no challenge has been made to the subpoenas directed to the custodian of records, the

Court orders compliance with all of the subpoenas." (Order at p.17) The district court

granted the government's motion to enforce all three grand jury subpoenas and held

that they were "ENFORCED for all items sought." (Order at p.17) During the hearing,

the district court also directed that counsel for Defendant Schock provide confirmation

to the government that any records withdrawn from the Congressional offices had been

returned. Jones Day later provided written confirmation to the government that all

records that had been removed were returned. (Exhibit 12)

### K.  Search Warrant for Defendant Schock's Campaign Office

On June 4, 2015, due to Defendant Schock's failure to produce campaign records,

the district court authorized a search warrant for his campaign offices in Peoria. (Exhibit

14) None of the information produced by the OM was used to obtain the warrant.

During the execution of the warrant, law enforcement agents seized numerous records,

including American Express records and copies of all of the receipts that the OM had

sent to the law enforcement agent on May 20. (Exhibit 6, Receipts from SW Tab)

18

## L. District Court Contempt Litigation

On June 13, 2015, the government filed a motion for an order to Defendant

Schock to show cause why he should not be held in civil contempt for failing to comply

with the subpoena. In his response to the government's motion, Defendant Schock

asserted, for the first time, and in contrast to his earlier motion to quash, that he "owns

those records in a personal capacity." (Response at p.4)

On June 18, 2015, during a hearing on the government's show cause motion, the

district court noted that Schock was "already ordered" to produce records, and "[h]e

did not do it." (6/18/15 Tr. at 69) The district court "specifically" held that "the

congressional office is a collective entity," and that therefore Defendant Schock could

not assert an act-of-production privilege. (6/18/2015 Tr. at p.67; SEALED OPINION at

pp.13-20 ("the Court finds that the Congressional offices are more akin to a corporation

than a sole proprietorship"). In a written opinion, the district court concluded that

Schock "maintained custody and control of the Campaign Entity Records" and that "he

cannot assert a Fifth Amendment act-of-production privilege for his production of the

records as a representative of the Campaign Entities." (SEALED OPINION at p.25)

Thus, the district court held that the "Schock Subpoena, which the Court enforced on

April 9, 2015, required without qualification that Mr. Schock produce Campaign Entity

Records that he held in his representative capacity." (SEALED OPINION at p.23) The

district court further held that Defendant Schock may raise the issue of whether the

Speech or Debate Privilege "applies to certain documents" but also noted that he had

the burden of going forward and of persuasion on the issue. (*Id.* at p.28) The district

19

court concluded, however, that "Mr. Schock has had several months to review the documents and prepare to produce them pending the issues relating to his privileges." (SEALED OPINION at p.28) The district court ordered Defendant Schock to appear before the court on July 28, 2015, to show cause why he should not be held in civil contempt.

On July 27, 2015, the day before the contempt hearing, both Defendant Schock and the House filed briefs in opposition to a finding of civil contempt. They argued that the district court incorrectly held that a Congressional office is a collective entity because, they asserted, Members' Congressional records are their personal property under the rules and practices of the House. (Amicus BLAG Brief, at p.1)

At the outset of the contempt hearing on July 28, 2015, the district court orally held that it had decided to reverse its written ruling but allowed the government leave to file a motion to reconsider. The government later filed a motion to reconsider the district court's oral reversal. That motion was rendered moot following the government's efforts to obtain Defendant Schock's Congressional office records from the House, which concluded in April 2016.

### M. Defendant Schock's Consent for the House to Produce Congressional Office Records in Compliance with Grand Jury Subpoenas

During the period of the grand jury litigation, and beginning on May 1, 2015, Defendant Schock advised counsel for the Clerk of the House that he "direct[ed] the Clerk . . . to comply with *any* subpoena for those records [which Schock referred to as a

20

'broad assortment of his official records'] served upon the Clerk by the Department of Justice." (Exhibit 14) (emphasis added).

On May 6, 2015, Defendant Schock advised House Counsel that "Mr. Schock hereby authorizes the Clerk of the House, through her counsel, to produce any of his official records responsive to the grand jury subpoena [issued to Schock] (and which are not privileged) to the government in full compliance with the said grand jury." Defendant Schock specifically referred to his "authorization" as "Schock's obligation to provide direction regarding the disposition of the records[.]" (Exhibit 14) On that same date, Defendant Schock advised the government that he had "authorized the Clerk of the House to produce responsive official records from his former offices, which are in the custody and possession of the House, to [the government] as expeditiously as possible." (Exhibit 14)

### N. The OM's Disclosure of Additional Records to Law Enforcement Agents

The government learned that among the records "left behind" in Defendant Schock's former Congressional offices were "pink sheets" or receipts for records that had been removed by Jones Day and later returned. (Exhibit 7, AGENT_RPT 917) To avoid any implication of the attorney "work-product" rule, the government attempted to obtain copies of the receipts "by other means," *see* Fed.Civ.P. 26(b)(3)(A)(ii), rather than from any attorney or Defendant Schock directly, as part of its investigation into whether Defendant Schock alone (and not Jones Day) was improperly withholding records he controlled from the grand jury. The OM advised a law enforcement agent that the receipts were "easily accessible." (Exhibit 7, AGENT_RPT 917) The government

21

later learned that Defendant Schock's former Congressional Chief of Staff had removed

the receipts from the Washington office and provided them to his (the Chief of Staff's)

attorney, Mr. Coffield. (Exhibit 15)

On May 20, 2015, nearly two months *after* Defendant Schock left office and left

numerous items behind, a law enforcement agent asked the OM if the OM could locate

the receipts in the Peoria office and provide copies. (Exhibit 7, AGENT_RPT 917) The

OM looked for the receipts in Mr. LaHood's office desk but did not locate them. Instead,

he located various credit card (fuel, Target, Dunkin Donuts, restaurants, etc.) and other

receipts, including from Garrett's Popcorn and Enterprise car rental, and two pages of

an American Express card statement of Defendant Schock, reflecting charges incurred

by Mr. LaHood and Defendant Schock's Congressional Chief of Staff under credit cards

issued in their names for Defendant Schock's account. (Exhibit 7, AGENT_RPT 917-51)

The OM emailed copies of the receipts from the OM's office computer and email

account to the law enforcement agent.

The law enforcement agent also asked the OM for copies of the OM's own office

emails. By that time, May 2015, Shea Ledford had resigned from the Office of the 18th

Congressional District and had provided the OM his (Ledford's) password to Ledford's

official email account in case the OM needed access to Ledford's emails as part of the

OM's office duties. (Exhibit 7, AGENT_RPT 953-54) On May 26, 2015, again nearly two

months following Defendant Schock's departure from office, the OM copied his own

and Ledford's emails onto a thumb drive and provided them to the law enforcement

agent. The OM advised the law enforcement agent that at that time, the House Clerk

22

was reviewing and collecting records from the Peoria office. (Exhibit 7, AGENT_RPT 953-54)

In early June 2015, the government was advised by Defendant Schock's former Congressional Chief of Staff that he had removed the "pink sheets" from the Washington office and provided them to his attorney, Mr. Coffield. When the government asked Mr. Coffield, a third party, to provide the records to the grand jury on behalf of another third party, his client--the former Chief of Staff, Mr. Coffield declined, explaining that the sheets were marked "Attorney Work Product." He did not explain, however, how records left behind in a Congressional office, in a third party's possession, and then transferred by that third party to the third party' counsel, implicated any privilege, or how an attorney for that third party could assert a privilege on behalf of another attorney representing Defendant Schock. (Exhibit 15)

On July 24, 2015, nearly four months after Defendant Schock's departure from office, the OM emailed a law enforcement agent from his official email account a spreadsheet containing information relating to staff vacation, sick, and personal days. (Exhibit 7, AGENT_RPT 953-54)

### O. Contempt Hearing/House's Production of Congressional Office and Other Records With Defendant Schock's Consent and No Assertion of Any Privilege

Following the contempt hearing on July 28, 2015, the grand jury, on July 31, 2015, issued a subpoena to the House Clerk, seeking the identical records named in the subpoenas issued to Defendant Schock and his Congressional offices, which the district court enforced on April 9, 2015. On October 1, 2015, the grand jury issued two

23

additional subpoenas to the Chief Administrative Officer (CAO) of the House. The second subpoena required the production of three categories of email accounts, including the production of the mail.house.gov email accounts of six of Defendant Schock's former Congressional staffers, including Shea Ledford. (Exhibit 16)

From July 31, 2015, and continuing to early 2016, the government engaged in extensive efforts with House Counsel to obtain all records responsive to the three subpoenas issued to the Clerk and CAO. During that period, the House produced nearly 30,000 pages of financial records and emails from Defendant Schock's former Congressional office and from House records. (Exhibit 16) Defendant Schock consented to this production and did not assert a privilege to a single document. (Exhibit 16)

From February 26, 2016, to April 8, 2016, the House produced more than 3,000,000 pages of documents to the grand jury, including more than 1,000,000 emails. (Exhibit 17) The emails were produced from the official accounts of Defendant Schock and several of his former staffers in his Washington and Peoria offices, including Mr. LaHood and Mr. Ledford. The emails produced for Mr. Ledford totaled more than 12,000, or 89.5%, of his official email account, a larger number of Mr. Ledford's emails than that copied by the OM in May 2015. In addition, the documents produced by the House were copied from the hard drives of computers used by several staffers in the Washington and Peoria offices, including Mr. LaHood, Mr. Ledford, the OM, and others. (Exhibit 16) Defendant Schock consented to the production of all of these records to the grand jury and asserted no privilege. (Exhibit 16)

24

## P. February 2016 Consensual Recording By a Second Witness with Defendant Schock

In January 2016, the government was advised by a grand jury witness, with the consent of the witness's counsel, that Defendant Schock had attempted to contact the witness, and that the witness believed that Defendant Schock may wish to discuss the grand jury investigation. (Exhibit 17) The witness agreed to record any communications with Defendant Schock. At that time, he was represented by his current counsel. Authorization to conduct a consensual telephone recording was given by the FBI. (Exhibit 17) As was the case with the OM, this witness was given specific oral instructions not to intrude into any attorney-client relationship and not to initiate conversations with Defendant Schock concerning that relationship or elicit any privileged information.

On February 4, 2016, the witness conducted a consensual recording of a telephone conversation with Defendant Schock. (Exhibit 7, 2/4/16 Tr.1-70) During the conversation and according to the witness and documentary evidence, Defendant Schock wanted to discuss and attempted to suggest an inaccurate account of one of the specific matters now charged in the indictment. (Exhibit 7, 2/4/16 Tr.1-70) He further referred to his campaign accounts as "three million of my money." (Exhibit 7, 2/4/16 Tr. at 61) The government may present this recording or parts of it at trial.

Prior to the disclosure of the consensual recordings to the investigative team and the grand jury, two attorneys for the government not involved in the investigation conducted a review of all of the recordings to determine whether any of the recordings

25

contained attorney-client privileged information. The results of that review were that the recordings contained no privileged information, and all of the recordings were subsequently disclosed to the prosecution team and the grand jury. (Exhibit 7)

### Q. Defendant Schock's Request for Internal DOJ Review/Expiration of Grand Jury's Term

Beginning in March 2016, Defendant Schock appealed to the leadership at the Department of Justice in Washington and requested that they review the matter prior to allowing the indictment. That review continued beyond the grand jury's expiration, and it was discharged from further service. The matter was approved to go forward shortly thereafter.

## II.  Indictment by Successor Grand Jury

Beginning in August 2016 and continuing to November 2016, the evidence in the case was presented to a successor grand jury for consideration. On November 10, 2016, Defendant Schock was charged in an indictment with nine counts of wire fraud, in violation of 18 U.S.C. § 1343, one count of mail fraud, in violation of 18 U.S.C. § 1341, one count of theft of government funds, in violation of 18 U.S.C. § 641, two counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2), (c)(1), five counts of falsifying FEC filings, in violation of 18 U.S.C. § 1519, and six counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1). None of the counts charge a violation of the Federal Election Campaign Act.

26

## III.    Government's Discovery Production

On December 12, 2016, Defendant Schock was arraigned. Immediately following

the arraignment, the government advised Defendant Schock that the discovery

materials included consensual recordings with Defendant Schock by two separate

witnesses. Thereafter, on January 17, 2017, the district court conducted a hearing on

Defendant Schock's motion to continue the trial date of February 7, 2017. The

Magistrate Judge granted the motion to continue and rescheduled the trial for July 10,

2017. In addition, the Magistrate, at the government's suggestion, imposed a discovery

and pre-trial motion schedule, which provides that the government's Rule 16 discovery

disclosures are due by April 1, 2017 (three months before trial), and Defendant Schock's

Rule 16 disclosures are due by May 1, 2017. Finally, the Magistrate Judge denied

without prejudice the government's request for early return date of trial subpoenas. The

court advised at that time that the request for early return date of trial subpoenas could

be renewed at a later date.

Prior to and following the return of the indictment, the government initiated

discovery conferences with Defendant Schock pursuant to Local Rule 16.1 and advised

that the government would attempt to exceed its constitutional and Rule 16 discovery

obligations. Beginning on December 28, 2016, and continuing to the present, the

government has provided discovery materials far beyond that which is required.

Specifically, the government has provided access and copies to Defendant Schock of the

following:

27

• All consensual recordings, including the recorded statements of Defendant Schock and his former staffers, and draft transcripts. All reports involving law enforcement contact with the OM and all existing text messages between the OM and law enforcement agents. The government has also requested that the OM provide copies of any emails with law enforcement agents in his possession to ensure that all such documents have been produced. Any additional emails (potentially witness (Jencks) statements) from the OM will be produced to the defense.

• All Rule 16 documents, objects, etc. in the government's possession with a detailed discovery index (Exhibit 19) to be supplemented as Rule 16 disclosure is completed)).

• All completed law enforcement reports of interviews of potential trial witnesses and a corresponding index of reports. (Additional interview reports have been completed and are in the process of being completed as witnesses are being interviewed in preparation for trial. These reports will be disclosed prior to trial). (Exhibit 19)

• All transcripts of witnesses who testified before the grand jury and a corresponding index of transcripts (Jencks material). (Exhibit 19)

• Copies of the search warrant documents relating to the search warrant executed at Defendant Schock's campaign offices in Peoria. All electronic data seized during the execution of the search warrant and an index of data provided.

The total volume of discovery materials provided is approximately 5.8 TB. Approximately 5.4 TB of this amount is electronic data copied from computers seized

28

from and then returned to Defendant Schock's campaign office in Peoria and a reproduction of the same data he received from the House at the same time it was produced by the House to the government. To date, Defendant Schock has not asserted any Speech or Debate privilege as to any of the information produced to the government, including the more than 3,000,000 pages of documents and emails produced by the House. It is notable that the House provided Defendant Schock an opportunity to assert a privilege before their disclosure to the government.

In its disclosures of materials other than electronic data (i.e. copies of non-email computer data) to Defendant Schock, the government initially provided the materials, including those previously produced to him by the House, in a searchable *Eclipse* format. This is standard in the Central District of Illinois. After full disclosure, the defense then requested that the government also disclose the material using a program called *Relativity* as it would be easier for the defense to review. The government has attempted to accommodate this request. In addition, the government has made its one IT official and one assigned paralegal available to Defendant Schock's team throughout the discovery process. These two staff members have been committed nearly full time, including overtime hours and on weekends, in the discovery process and in providing assistance to Defendant Schock's representatives.

To date, Defendant Schock has produced no discovery to the government and, prior to April 14, 2017, declined to engage in a discovery conference with the government pursuant to Local Rule 16.1 concerning the defense's discovery production. On April 14, 2017, after the filing of the instant motions, counsel for Defendant Schock

29

advised that they would be willing to engage in such a conference during the week of April 24, 2017.

## IV.    Government's Use of Materials Produced by the OM

Although the government is confident that records produced by the OM during the course of the investigation were lawfully obtained, the government, in the abundance of caution, did not make use of the records during the grand jury investigation, nor were the records presented to the grand jury. The records were segregated from other records obtained from grand jury subpoenas and the execution of the search warrant and were organized for full disclosure during the discovery process. At this time, the government does not intend to present any of the information produced by the OM at trial.

On January 31, 2017, in a separate discovery disclosure, the government highlighted this matter for the defense, and disclosed all of the records produced by the OM to Defendant Schock. (Exhibit 18) The government advised Defendant Schock that, while maintaining the confidentiality of the OM's cooperation, the materials were separated from other materials produced during the grand jury investigation and not reviewed by the prosecution team, except for identification of the general nature of the documents produced by one law enforcement agent and two members of the government's support staff. In addition, the government advised that the materials were not presented to or discussed with the grand jury and would not be presented at

30

trial.[3] Finally, the government requested direction from Defendant Schock on its continued possession of the materials. The government also advised that the documents appeared to be responsive to the grand jury subpoenas issued to Defendant Schock's Congressional offices and campaign offices in March 2015 and inquired whether he was willing to review them for responsiveness and produce back to the government. Defendant Schock responded to the government's disclosure by accusing the OM of engaging in criminal activity and by filing the instant discovery motions. (Exhibit 19)

## ARGUMENT

### I.    Defendant Schock's Discovery Motion

As an initial matter, Defendant Schock's discovery motion is facially deficient, and it is supported by neither the facts nor the law. In fact, he has received nearly all of the information he demands.. (Exhibit 20 (discovery index)) Defendant Schock's discovery motion is largely based on a request for this Court to order the government to produce internal governmental reports and continues with a request for potential trial witnesses, which "[a] court has no authority . . . to order the government to produce . . . prior to the time the government witnesses testify." *United States v. Napue*, 834 F.2d 1311, 1318 (7th Cir. 1987). Finally, he peppers his motion with charged language such as "Allegations of Pre-Indictment Misconduct" (Dis.Mem.16) and allegations of the Office Manager's "theft" of documents and "illegal conduct." (Dis.Mem. at 4-27) This is despite clear law that claims "relating to ownership, custody and theft as well as other

---

[3]This was not done out of any concern about the legality of the OM's actions, but instead to simply avoid an avoidable issue to move this matter along.

Attachment No. 1 - page 000092

incidents of property law are not particularly relevant to this inquiry [and that the Seventh Circuit is] not concerned with determining whether these documents are properly characterized as 'stolen.'" *United States v. Ziperstein*, 601 F.2d 281, 289 (7th Cir. 1979) (finding "no merit" in defendant's claims that records were "stolen" or "that alleged government encouragement of this 'theft' violated the Fourth Amendment"). In fact, "[t]he premise that property interests control the right of the Government to search and seize has been discredited," *Oliver v. United States*, 466 U.S. 170, 183 (1984), and "an illegal search only violates the rights of those who have a legitimate expectation of privacy in the invaded place." *United States v. Salvucci*, 448 U.S. 83, 91 (1980). In short, (1) Defendant Schock's motion for discovery should be denied because the government has elected to produce all the discovery to which he is entitled under the law and much more; and (2) his legal claims of "theft" and "misconduct" involve (a) evidence the government lawfully obtained but does not, in any event, intend to use at trial and (b) are therefore moot and "much to do about nothing." *BNSF Ry. Co. v. Swanson*, 533 F.3d 618, 622 n.1 (8th Cir. 2008).

## A. Applicable Law

It is well-settled that "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Rivera*, 6 F.3d 431, 441 (7th Cir. 1993) ("we believe the presumption that, absent some specified requirement, the defendant is not entitled to disclosure is the correct one"). "A criminal defendant does, of course, have some specific rights to pretrial discovery." *Napue*, 834 F.2d at 1316. The government's discovery obligations are set forth in Rules 16 and 26.2

32

of the Federal Rules of Criminal Procedure and the Jencks Act, 18 U.S.C. § 3500, and

arise from the Due Process Clause. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Rule 16(a) provides that the government is required to disclose the defendant's

statements and prior record, documents and objects, reports of examinations and tests,

and expert witnesses. Fed.R.Crim.P. 16(a). Rule 16(a)(2), however, provides:

> this rule does not authorize the discovery or inspection of reports,
> memoranda, or other internal government documents made by an
> attorney for the government or other government agent in connection
> with investigating or prosecuting the case. Nor does this rule authorize
> the discovery or inspection of statements made by prospective
> government witnesses except as provided in 18 U.S.C. § 3500.

The language of Rule 16(a)(2) was "included to make clear that the work product

of the government attorney is protected." *United States v. Williams*, 792 F.Supp. 1120,

1132 (S.D. Ind. 1992) (quoting the Notes of the Advisory Committee on the 1974

Amendment). Likewise, "under Rule 16(a)(2), [a defendant] may not examine

Government work product in connection with his [the defendant's] case." *United States*

*v. Armstrong*, 517 U.S. 456, 463 (1996).

In addition, criminal defendants have a due process right to disclosure of

exculpatory evidence from the government that is "material either to guilt or

punishment." *Brady*, 373 U.S. at 87 ("suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment."); *United States v. Tadros*, 310 F.3d 999, 1005

(7th Cir. 2002) ("the government must disclose evidence favorable to the defense where

the evidence is material to either the guilt or punishment of the defendant"). *Brady*

33

established a criminal defendant's right to exculpatory evidence that has a reasonable likelihood of affecting the outcome of the case as to guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 675 (1985). The Supreme Court has extended *Brady* information to include favorable material relating to the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002).

The government's *Brady*, obligations, however, are not triggered by "the *mere possibility that an item of undisclosed information* might have helped the defense, or might have *affected the outcome* of the trial." *United States v. Reyes*, 270 F.3d 1158, 1166 (7th Cir. 2001) (emphasis in original and rejecting defendant's *Brady* claim as "frivolous"). "*Brady* does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit." *Id.* Rather, a defendant's right to *Brady* and *Giglio* information is limited to that which is material and required for a fair trial; it does not create a general right to discovery of exculpatory or other evidence. *Bagley*, 473 U.S. at 675 ("The Prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."); *Weatherford*, 429 U.S. at 559 ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."); *Degen v. United States*, 517 U.S. 820, 825 (1996) ("A criminal defendant is entitled to rather limited discovery, with no general right to obtain the statements of the Government's witnesses before they have testified."); *United States v. Agurs*, 427 U.S. 97, 106 (1976) (The Government is under "no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor"); *Pennsylvania v. Ritchie*,

34

480 U.S. 39, 53 (1987) ("The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.").

In short, "*Brady* is a disclosure requirement rather than a discovery requirement." *United States v. Dixon*, 790 F.3d 758, 759 (7th Cir. 2015) (rejecting contention that *Brady* disclosure should have occurred before rather than during trial as "a nonstarter, because *Brady* is a disclosure requirement rather than a discovery requirement."). The Seventh Circuit has "consistently held [and again most recently in March 2017] that *Brady* does not require the disclosure of favorable evidence prior to trial." *Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017) (citing *Armstrong v. Daily*, 786 F.3d 529, 552 (7th Cir. 2015) (recognizing that *Brady* disclosure obligations can be met "in the time leading up to or even during trial")); *see Reyes*, 270 F.3d at 1166-67 ("this court has made clear that there is nothing in *Brady* or *Agurs* to require that such disclosures be made before trial."); *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001) (explaining that "*Brady* does not require pretrial disclosure" and demands only that disclosure come with enough time for a defendant to make use of the evidence)).

Finally, Rule 26.2 and the Jencks Act, 18 U.S.C. § 3500, require production of a witness's statements once that witness has testified on direct examination. The Seventh Circuit has held that a district court has the "inherent power" to order the government to produce "a list of the government's witnesses to be called at trial." *Napue*, 834 F.2d at 1318. "A court has no authority, however, to order the government to produce statements of its witnesses prior to the time the government witnesses testify." *Id.*

35

Moreover, a "[d]efendant's request that witness statements be produced before trial in

the name of efficiency is no match for the Jencks Act's prohibition of discovery of

statements made by a Government witness or a prospective Government witness prior

to the witness's testimony." *United States v. Thomas*, 2016 WL 6948444, at *4 (C.D. Ill.

Nov. 28, 2016) (also holding, at *3-5, that "Defendant's requests for *Brady* and *Giglio*

material are mooted by the Government's confirmation that it will satisfy its obligations

under *Brady* and *Giglio*"; and that "Defendant's request for the informant's file is

premature and overbroad")).

### B. Analysis

In his discovery motion, Defendant Schock asks that this Court issue an order for

the government to go well beyond its required production, in fact, beyond its expansive

production and to respond to civil-like interrogatories, demanding the production of

Jencks material and internal government reports. He fails to even begin to acknowledge

the government's substantial demonstration of good faith in the discovery process since

before the indictment was returned. More importantly, Defendant Schock fails to advise

this Court that he has already received most, if not all, of the information he demands.

As described in detail in the background section of this response, the government,

before and since the indictment, has elected to produce approximately 5.8 TB of

discovery with discovery indexes, all grand jury transcripts, and all law enforcement

reports relating to interviews of potential witnesses, and has committed two members

of its staff to assisting Defendant Schock's defense team. As the government noted at

the outset of this response, it can provide no better or accurate of a response to

36

Defendant Schock's motion for discovery than the district court in *Blagojevich*, 2010 WL

522661, at *1 (N.D. Ill. Feb. 8, 2010):

> The volume of discovery already produced far exceeds that required by
> established law. Producing . . . Section 3500 [Jencks] material three months
> before trial is adequate, and these dates are well in advance of any
> requirement found in existing statutory and case law. 18 U.S.C. § 3500(a);
> *United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v.
> Balogun*, 971 F.Supp. 1215, 1230 (N.D. Ill. 1997).
>
> Defendant disputes none of the legal principles on which the prosecution
> relies . . . Instead, Defendant offers an assortment of rhetorical flourishes
> oddly detached from the issues in this case . . .
>
> Defendant has had, and will continue to have, the right to seek
> particularized discovery of certain documents or materials with respect to
> specific witnesses, but the blunderbuss demand for everything to be
> turned over sooner than the law allows is not well made.

Here, Defendant Schock's inflammatory rhetoric and demand for the

government to answer his "interrogatories" as well as for Jencks material and internal

government reports (nearly all of which the government has already in good faith

elected to produce), is no different than that rejected in *Blagojevich*. *See also Thomas*, 2016

WL 6948444, at *3-4 ("Defendant's request for the informant's file is premature and

overbroad."); *Williams*, 792 F.Supp. at 1132 (defendant's demand "that the Government

divulge 'all communications, written or oral, with any state or local law enforcement

personnel pertaining to the prosecution of this case . . . surely is the exact information

which Rule 16(a)(2) was designed to prevent from being discovered."); *United States v.

Stephens*, 2008 WL 4372024, at *1-3 (N.D. Ill. Sep. 22, 2008) (rejecting defendant's "broad

37

brush" motion "for entry of an order directing the government to make inquiry and disclosure of all evidence at least four weeks prior to trial which may lead to the impeachment of any government witnesses")

Accordingly, the government respectfully requests that Defendant Schock's motion for discovery be denied.

## II.     There Was No Violation of Defendant Schock's Constitutional or Other Rights

As an initial matter, it has long been settled that "[c]ourts have countenanced the use of informers from time immemorial[.]" *Hoffa v. United States*, 385 U.S. 293, 311 (1966). Indeed, "[t]he risk of being . . . betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society." *Id.* At 303"In other words, that's life." *United States v Jenkins*, 46 F.3d 447, 456 (5th Cir. 1995). Public officials, including Congressman, are not immune from legitimate law enforcement methods, for they are not "super-citizens, immune from criminal responsibility[,]" *Brewster*, 408 U.S. at 516, and do not "stand above the law they create but ought generally to be bound by it as are ordinary persons." *Gavel*, 408 at U.S. 615. It is also not unprecedented, let alone inappropriate, for public officials, including Congressman, just like "ordinary persons," to be subject to a Title III (wiretap) or to having their conversations consensually recorded by a staffer turned informant. *United States v. Renzi*, 722 F.Supp.2d 1100 (D. Ariz. 2010) (wiretap of Arizona Congressman Renzi); *United States v. Renzi*, 692 F.Supp.2d 1136, 1154 (D. Ariz. 2010) (denying motion to suppress "consensually recorded phone calls in which cooperating witnesses

38

[including former Legislative Director] questioned Renzi at the Government's direction"; "The government also procured" documents from staffers that had been "taken from Congressman Renzi's office.").

Nor is it unconstitutional or even inappropriate for the government to conduct a wiretap of or consensual recordings with a Congressman (or anyone else) with counsel present where "there was no purposeful intrusion [of the attorney-client relationship], . . . "no communication of defense strategy to the prosecution", and . . . "no tainted evidence." *Weatherford*, 429 U.S. at 558 (no per se constitutional rule); *see Hoffa*, 385 U.S. at 307-08; *Renzi*, 722 F.Supp.2d 1100 (interception of privileged communications, while inappropriate, did not violate Fifth Amendment right to due process).

In this case, the government, after careful consideration, with the approval of the former United States Attorney for this district, the FBI, and the Deputy Assistant Attorney General, and under strict conditions not to intrude into *any* privileged attorney-client communications, utilized the OM as a confidential informant to record *pre-indictment* conversations with Defendant Schock and certain members of his Congressional and campaign staff, consistent with controlling precedent.

### A. Applicable Law

The Fourth Amendment does not prohibit *all* searches but only protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A government agent's (as opposed to a private person's) search is unreasonable only when it infringes on "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (198); *United States v. Miller*, 800 F.2d 129, 134 (7th Cir. 1986)

39

(quoting *Marshall v. Barlow's Inc.*, 436 U.S. 307, 315 (1978)). That question, in turn, involves "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *see also, e.g., United States v. Crowder*, 588 F.3d 929, 934 (7th Cir. 2009). "The subjective prong of the expectations analysis presents a fact-specific inquiry that looks to the individual's affirmative steps to conceal and keep private whatever item was the subject of the search." *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014) (citing *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)). "A hope for privacy is not an expectation of privacy." *Yang*, 478 F.3d at 835. "To have standing to challenge the search and seizure in this case, [the defendant] bears the burden of establishing that he had both a subjective and an objectively reasonable expectation of privacy." *Id.*

In applying the "reasonable-expectation-of-privacy" inquiry, the Supreme Court and other federal courts, including the Seventh Circuit, have articulated well established principles:

First, "[t]he premise that property interests control the right of the Government to search and seize has been discredited." *Oliver*, 466 U.S. at 183. The Supreme Court "has repeatedly repudiated the notion that `arcane distinctions developed in property and tort law' ought to control our Fourth Amendment inquiry . . . [and] concluded that, `it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law.'"

40

*Salvucci*, 448 U.S. at 91. "Even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." *Oliver*, 466 U.S. at 183. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry." *Salvucci*, 448 U.S. at 91. "The existence of a property right is but one element in determining whether expectations of privacy are legitimate." *Oliver*, 466 U.S. at 183. Likewise, "[t]he person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation." *Salvucci*, 448 U.S. at 91. Simply put, "an illegal search only violates the rights of those who have a legitimate expectation of privacy in the invaded place." *Id.* at 91-92.

Second, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). While "individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer . . ., some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor v. Ortega*, 480 U.S 709, 717 (1987).

> Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. . . . An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences,

41

> consultations, and other work-related visits. Simply put, it is the nature of
> government offices that others-such as fellow employees, supervisors,
> consensual visitors, and the general public-may have frequent access to an
> individual's office.

*Id.*

Similarly, "[what employees] observe in their daily functions is undoubtedly

beyond the employer's reasonable expectation of privacy." *Marshall*, 436 U.S. at 315; *see*

3 LaFave, Wayne R., Search and Seizure § 8.3(c) (3d ed. 1996) ("If it may be said that

certain risks are assumed when there is joint use of or access to certain property because

of a familial or real property relationship, then it may also be said that an employer

runs some necessary risks that his employees will permit a search—even if such

permission is not strictly within their authority as an agent of the employer.").

Third, the "Fourth Amendment protection does not extend to abandoned

property." *United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993). Thus:

> The test for abandonment is whether an individual has retained any
> reasonable expectation of privacy in the object. This determination is to be
> made by objective standards. An expectation of privacy is a question of
> intent `which may be inferred from words spoken, acts done, and other
> objective facts' . . . 'When a person voluntarily abandons property he
> forfeits any reasonable expectation of privacy that he might have had in
> the property.'

*Id.* "In short, a conclusion that one has 'abandoned' one's reasonable expectation of

privacy is just another way of saying that there is no reasonable expectation of privacy,

and that therefore a warrantless search may proceed." *United States v. Redmon*, 138 F.3d

1109, 1127 (7th Cir. 1998) (J. Flaum and J. Easterbrook) (concurring).

Finally, even assuming a defendant has both a subjective and reasonable

expectation of privacy and therefore has been subjected to a search, "[i]t is . . . well

42

settled that one of the specifically established exceptions to the requirements of both a

warrant and probable cause is a search that is conducted pursuant to consent."

*Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The Supreme Court has "long

approved consensual searches because it is no doubt reasonable for the police to

conduct a search once they have been permitted to do so." *United States v. Jimeno,* 500

U.S. 248, 250–51, (1991). The Supreme Court has also made "clear that when the

prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not

limited to proof that consent was given by the defendant, but may show that

permission to search was obtained from a third party who possessed common authority

over or other sufficient relationship to the premises or effects sought to be inspected."

*United States v. Matlock,* 415 U.S. 164, 171 (1974). The Court explained:

> The authority which justifies the third-party consent does not rest upon
> the law of property, with its attendant historical and legal refinements, but
> rests rather on mutual use of the property by persons generally having
> joint access or control for most purposes, so that it is reasonable to
> recognize that any of the co-inhabitants has the right to permit the
> inspection in his own right and that the others have assumed the risk that
> one of their number might permit the common area to be searched."

*Id.* at 171 n. 7; *see Georgia v. Randolph,* 547 U.S. 103, 110 (2006) (quoting *Matlock*).

To justify a search based on consent, the government "has the burden of proving that

the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S.

543, 548 (1968).

43

### B. Analysis

#### 1. The OM's Production of Information to Law Enforcement

Defendant Schock's motion for discovery rests on his assertions that the OM

engaged in "illegal acts" and violated Defendant Schock's constitutional rights by

engaging in "theft" of documents, in which Defendant Schock had a "personal

ownership interest[,]" from "Mr. Schock's Congressional Office[,]" and providing them

to the government. (Dis.Mem. at 19) He also suggests he had a "possessory interest" in

such documents, (*id.*), among the more than 3,000,000 pages of Congressional

documents, emails, etc. and the more than 200 other personal items he has emphatically

announced were "left behind," and which House Counsel attempted to summon him to

retrieve three months after he left office. Those assertions to this Court, however, are

contrary to what he himself declared to the district court in Springfield at the outset of

the grand jury litigation in 2015. There, he repeatedly referred to the Congressional

Office as "his former congressional office," which, together with his campaign

committees, he further described as: "[s]imply put, they are separate entities, no matter

how much the government insists they are one-and-the-same." (No. 15-3005, R.1

(Schock Mot. to Quash) at pp. 13 n.6, 2 n.2).

Likewise, Defendant Schock repeatedly represented to the district court in

Springfield that he "does not physically possess the records and documents held by

these distinct entities." (*id.* at p. 13 n.6) ("Thus, he is not the proper subject of a

subpoena to produce them . . . Mr. Schock is no longer in office and clearly would not

physically possess the records held by his former congressional office (which continues

Attachment No. 1 - page 000105

to serve Illinois's Eighteenth Congressional District")). He only changed his tune and

relied on an alleged 200 years of practice in the House and his "ownership" of the

documents when he faced the prospect of civil contempt for not producing them.

Not only does Defendant Schock ignore what he previously represented to the

district court in Springfield, Supreme Court and Seventh Circuit precedent are fatal to

his claims of illegal acts. Any claim of "ownership" as controlling the "right of the

Government to search and seize has been discredited." *Oliver*, 466 U.S. at 183. Similarly,

more than 30 years ago, the Seventh Circuit stated:

> It must be initially emphasized that in determining the validity of
> Ziperstein's Fourth Amendment claim the laws relating to ownership,
> custody and theft as well as other incidents of property law are not
> particularly relevant to this inquiry. *We are not concerned with determining
> whether these documents are properly characterized as 'stolen.'* The Fourth
> Amendment clearly countenances numerous seizures where the items
> seized are taken without the express consent of the owner. Instead, the
> Fourth Amendment inquiry focuses on whether the owner had a
> reasonable expectation of privacy with respect to the seized items. If no
> such expectation exists, the taking cannot run afoul of the Fourth
> Amendment.

*Ziperstein*, 601 F.2d at 289 (emphasis added) (finding "no merit" in defendant's claims

that records were "stolen" or "that alleged government encouragement of this 'theft'

violated the Fourth Amendment").

Even assuming that he had an ownership interest in the documents provided by

the OM (even in documents in a former staffer's desk and in emails accounts to which

Defendant Schock had no access nearly two months after he resigned office), and

further assuming that the OM was not acting in a purely private capacity at the time he

45

provided documents from Defendant Schock's former Congressional office, "would not automatically direct suppression; [they] would simply trigger a Fourth Amendment analysis." *United States v. Aldridge,* 642 F.3d 537, 543   (7th Cir. 2011) ("Even if Rivera was acting as a government agent, this would not automatically direct suppression; it would simply trigger a Fourth Amendment analysis."). That analysis involves whether Defendant Schock had "a legitimate expectation of privacy in the invaded place[,]" *Salvucci,* 448 U.S. at 91-92, including whether he took "affirmative steps to conceal and keep private whatever item was the subject of the search." *Walton,* 763 F.3d at 655.

Defendant Schock is silent on this question and alleges no reasonable or subjective expectation of privacy in his former office. That silence is fatal to meeting his burden of establishing an unreasonable search. *United States v. Collins,* 796 F.3d 829, 836 (7th Cir. 2015) ("The parties—not the courts—must research and construct available legal arguments"; "perfunctory and undeveloped arguments are deemed waived."). Notwithstanding any waiver of an argument of an unreasonable search, Defendant Schock has already answered the privacy question himself. During a press statement on November 10, 2016, he emphatically stated:

> Unlike some politicians, I did not delete any emails, nor did my staff smash or destroy any electronic devices. Quite the opposite, every record, every document, every picture on the wall was left behind. I took nothing with me. I knew I had nothing to hide, and I believed that a quick review would prove this fact.

(Exhibit 9); (www.youtube.com/watch?v=Hufm91VqckQ) While Defendant Schock may regret those and other public statements concerning the openness of his office, he still cannot articulate a legitimate expectation of privacy in the substantial documents

Attachment No. 1 - page 000107

and personal items he "left behind" by "offering nothing more than a self-serving, non-factual declaration that he expected privacy." *Rem*, 984 F.2d at 911; *see also, e.g. United States v. Asad*, 739 F.Supp.2d 1127, 1137 (C.D. Ill. 2010) ("defendant presented no evidence that he made any efforts to conceal and keep private the documents" that were "located in an unlocked desk in an office area").

Going even further, and assuming that Defendant Schock had a reasonable expectation of privacy, his arguments of theft or an illegal search also fail because the OM, the manager of his former Congressional office, had access (granted by Defendant Schock) to and authority over the office and the items in it as part of the OM's daily duties, both before Defendant Schock resigned and after. "This in turn means that [the OM] had authority to hand over the materials and consent to their search and seizure." *Aldridge*, 642 F.3d at 543. "Because [the OM] had authority to consent, and did consent, to the government's acquisition of the materials, the government required no warrant for its search." *Id.*; *Ziperstein*, 601 F.2d at 289 (consent valid); *Miller*, 800 F.2d at 134 (same); *United States v. Sells*, 496 F.2d 912, 913-15 (7th Cir. 1974).

In addition, given the fact that the OM had the authority to consent to search and did consent, the fact that the OM was a confidential informant is of "no moment" and "irrelevant." *Jenkins*, 46 F.3d at 460 ( "Whether Boyd is an agent of the government or not is of no moment unless his conduct violated the Fourth Amendment"); *United States v. Shelton*, 181 F.Supp.2d 649, 659 (N.D. Miss. 2001), *aff'd.* 337 F.3d 529 (5th Cir. 2001) ("Because the Court concludes that Cheryl Shelton possessed the authority to consent to a search at the time of her agreement with the government and throughout the relevant

47

period, the question as to whether she became an agent of the government for Fourth Amendment purposes is irrelevant and the Court need not reach it").[4]

In short, the Constitution's and the Supreme Court's response to Defendant Schock's cries of foul are that "[t]he risk of being . . . betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society." *Hoffa*, 385 U.S. at 303 (1966). "In other words, that's life." *Jenkins*, 46 F.3d at 456. Since the OM did not exceed his authority, there simply is no issue.

Finally, all of Defendant Schock's claims concerning the OM's production documents are moot, because the government made no use of them during the investigation, they led to no other evidence, and the government does not intend to present them at trial. *See, e.g, United States v. Zolp*, 659 F.Supp.2d 692, 717 (D. N.J. 1987) (since "the Government has indicated it does not intend to use Quinn's statement at

---

[4] *United States v. White*, 401 U.S. 745, 749 (1971) ("however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities"); *United States v. Mejia*, 2016 WL 7191630, at *6 (D. V.I. Dec. 16, 2016) ("As an individual exercising common authority over the premises, the confidential informant's status as a government agent is irrelevant to whether any search of the premises was permissible.");; *United States v Womack*, 2016 WL 1458492, at 11-13 (W.D. Mo. Mar. 14, 2016) (denying motion to suppress "stolen evidence" because "even if the Fourth Amendment is implicated," the employee "had common authority over her e-mails and the files from the F and S drives."); *United States v. Segal*, 299 F.Supp.2d 856 (N.D. Ill. 2004) (rejecting defendants' argument that "these cooperating witnesses violated their Fourth Amendment rights when they provided documents to the Government . . . because they assumed the risk that he would provide them to third parties.")

48