E-FILED

Monday, 17 February, 2020 02:49:35 PM

Clerk, U.S. District Court, ILCD

trial, . . . Quinn's motion to suppress is rendered moot"). Moreover, the evidence the government does intend to present at trial, from over 5.8TB of discovery, was produced pursuant to the numerous grand jury subpoenas that were issued both before and after the OM's production of any documents and the search of Defendant Shock's office. Thus, the evidence the government intends to present at trial arises from wholly independent sources and would most certainly inevitably been discovered in the absence of the OM's actions. *See, e.g., Murray v. United States*, 487 U.S. 533, 542 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 444 (1984)); *United States v. Vilar*, 729 F.3d 62, 83 (2d Cir. 2013) ("both the inevitable discovery' and 'independent source' doctrines permitted the admission of the documents obtained through the grand jury subpoena.").

### 2.  Prosecutorial Misconduct/Intrusion of Attorney-Client Relationship

Defendant Schock further suggests that he needs additional discovery to "investigate" a claim of prosecutorial misconduct and deliberate intrusion into the attorney-client relationship. These claims are likewise without merit.

First, even if Defendant Schock should find something, "the Seventh Circuit has never recognized the outrageous conduct defense." *See, e.g., United States v. Smith*, 792 F.3d 760, 765 (7th Cir. 2015) (noting that the Seventh Circuit does not recognize an "outrageous government conduct" defense); *United States v. Westmoreland*, 712 F.3d 1066, 1071 (7th Cir. 2013) (noting that, absent real guidance from the Supreme Court, the Seventh Circuit "has disallowed such a defense"); *United States v. Stallworth*, 656 F.3d

49

721, 730 (7th Cir. 2011) ("Outrageous government conduct is not a defense in this

circuit."); *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) ("[T]his circuit clearly

and consistently has refused to recognize any defense based on ... 'outrageous

government conduct.'"); *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006) (noting

that, while the Supreme Court "has left open the possibility of" granting such relief, the

Seventh Circuit has never taken the "extreme step of dismissing criminal charges

against a defendant because of government misconduct"); *United States v. Garcia*, 89

F.3d 362, 367 (7th Cir. 1996) (noting that the Seventh Circuit "has expressly refused to

recognize the doctrine of 'outrageous governmental conduct.' "); *United States v. Boyd*,

55 F.3d 239, 241 (7th Cir. 1995) (holding that the doctrine of "outrageous government

misconduct ... does not exist in this circuit").

Second, "A claim of outrageous government conduct premised upon deliberate

intrusion into the attorney-client relationship will be cognizable where the defendant

can point to actual and substantial prejudice." *United States v. Haynes*, 216 F.3d 789, 797

(9th Cir. 2000) (quoting *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)). "A claim

of government interference with the attorney-client relationship has three elements: (1)

the government was objectively aware of an ongoing, personal attorney-client

relationship; (2) the government deliberately intruded into that relationship; and (3), as

a result, the defendant suffered actual and substantial prejudice." *United States v.*

*Stringer*, 535 F.3d 929, 941 (9th Cir. 2009). "Most cases finding deliberate intrusion into

the attorney-client relationship involve government informants who somehow

penetrate the attorney-client relationship to obtain confidential or privileged

information, and then feed that information to the government." *Id.*

Nothing like that happened here. *see United States v. Ofshe*, 817 F.2d 1508 (11th

Cir. 1987) ("To constitute a constitutional violation the law enforcement technique must

be so outrageous that it is fundamentally unfair and shocking to the universal sense of

justice mandated by the Due Process Clause of the Fifth Amendment"; "The defense is

to be invoked only "in the rarest and most outrageous of circumstances") Defendant

Schock merely alleges a claim, as "a basis for concern" (Dis.Mem. at 22), but the facts

come nowhere near to supporting anything improper, let alone "outrageous." *See id.* He

primarily complains about the OM's alleged interference with the attorney-client

relationship between his former staffers and their attorney. But Defendant Schock,

however, may not assert any privilege for them, because the attorney-client privilege

"can be asserted only by the client (or one authorized by to do so on the client's

behalf)." *In re Sarrio, S.A.* 119 F.3d 143, 147 (2d Cir. 1997).

In any case, the OM was specifically instructed not to interfere with *any* attorney-

client relationship, for Defendant Schock or anyone else, and not to record any meetings

with an attorney; the OM did not deliberately intrude into any such relationship; the

OM did not communicate any privileged information to the government; and the

government utilized a filter review to ensure that no attorney-client privileged

information was obtained. To remove any question, the government has submitted

transcripts of all of the consensual recordings, which have been produced to the

defense, to this Court for review. (Exhibit 7) In short, "there was no purposeful

intrusion [of the attorney-client relationship], . . . no communication of defense strategy to the prosecution, and . . . no tainted evidence." *Bursey*, 429 U.S. at 558; *see Hoffa*, 385 U.S. at 307-08; *Ofshe*, 817 F.2d at 1515-17 (government's use of criminal defense attorneys as informants "was not so outrageous as to shock the universal sense of justice"); *cf. Renzi*, 722 F.Supp.2d at 1115 ("There is simply no evidence in this case of whole-sale egregious access by the prosecutor to privileged attorney-client communications" involving wiretap of Congressman Renzi's phone"). Allowing "additional discovery" into the government's files to pursue an impossible claim would be an extraordinary solution to a non-existent problem.

Third, in a footnote, Defendant Schock alleges that the OM's consensual recordings with Defendant Schock and his staff members "raises concerns under the Illinois Rules of Professional Conduct[.] (Dis.Mem. at 23 n.58) "However, by failing to raise this issue other than by a passing reference in a footnote, [Defendant Schock] has waived it." *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989). In any event, at the time of the consensual recordings, Defendant Schock was only represented by Jones Day as part of an internal review of office procedures and not part of any criminal investigation. The Supreme Court of Illinois has made clear that Rule 4.2 applies only to the specific matter involving the attorney-client relationship. *People v. Santiago*, 925 N.E.2d 1122, 1131 (Ill. 2010) ("Because defendant was not represented by counsel in the criminal matter, Rule 4.2 did not prohibit the prosecutors from communicating with defendant in that case").

Attachment No. 1 - page 000113

Moreover, it is somewhat odd that Defendant Schock would raise the Rule 4.2

issue concerning his representation by Jones Day in March 2015, but make no mention

of the consensual recording in February 2016 when he was actually represented in this

criminal matter. Nonetheless, courts have held that in "the near-unanimity of opinions

applying" the "'authorized by law' exception[,]" it is appropriate for the government

"to use an undercover informant, prior to indictment, to elicit incriminating admissions

from" a target of a criminal investigation. *United States v. Elliot*, 2017 WL 1244823, at 9

(10th Cir. Apr. 7, 2017). Although Defendant Schock suggests that it is inappropriate for

a government attorney to act as an "alter ego" for law enforcement agents (Dis.Mem. at

23 n.58) (citing *United States v. Thomas*, 39 F.Supp.3d 1015, 1024 (N.D. Ill. 2014), there is

no evidence to support that assertion because it simply did not occur. (*See* Exhibit 6, law

enforcement reports relating to the OM).

### 1.  Defendant Schock's Work Product and Speech or Debate Claims

Defendant Schock further argues that additional discovery is needed concerning

what he claims were the government's efforts to obtain attorney work product and its

access to Speech or Debate information. He claims this information is needed to support

a "motion to dismiss for prosecutorial misconduct." (Dis.Mem. at 24, 26) There are

several reasons why these arguments are without merit.

First, as discussed above, the government has provided all of the information

required by law and more, including the law enforcement reports relating to the OM's

production of information and all of the information the OM actually produced to the

government. In short, he has all of the information produced by the OM for which to

Attachment No. 1 - page 000114

claim any privilege. There is simply no more information to which Defendant Schock is entitled.

Second, as also noted above, "the Seventh Circuit has never recognized the outrageous conduct defense." *Owens*, 2016 WL 7079617, at *4 (citing cases)

Third, it is Defendant Schock's burden to establish a privilege "document-by-document." *See, e.g., Matter of Klein*, 776 F.2d 628, 632 (7th Cir. 1985); *see also United States v. BDO Seldman*, 337 F.3d 802, 811 (7th Cir. 2003). "The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements." *BDO Seldman*, 337 F.3d at 811; *see In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000). Defendant Schock has neither attempted to establish any privilege "document-by-document," nor presented to the Court or the government an adequate privilege log. *See Rao v. Board of Trustees of the University of Illinois*, 2016 WL 6124436, at *7 (N.D. Ill. Oct. 20, 2016) ("A timely and adequate privilege log is required by the federal rules, and the failure to serve an adequate and timely privilege log may result in a waiver of any protection from discovery."). He simply asserts privileges. It is therefore not possible for the Court or the government to review the merits of any privilege claim within the context of a motion for discovery. *See United States v. Renzi*, 651 F.3d 1012, 1030 (9th Cir. 2010) ("we think it incumbent on Renzi to bring to our attention those specific exhibits that cause him [Speech or Debate] concern").

Fourth, as to Defendant Schock's work product claim, the attorney-client and work product privileges protect against compelled disclosure from the attorney or the

54

client or possibly their agents. The government here attempted to obtain the receipts left behind in his Congressional offices from non-party and non-agent third parties, namely, the OM and Defendant Schock's former Congressional Chief of Staff. As the exception to the work product rule provides, a party may obtain the information "by other means." *see* Fed.Civ.P. 26(b)(3)(A)(ii). Thus, there is simply no merit to his claims of an attempted intrusion into work product materials that were left behind in his former offices, in the possession of former staffers.

Fifth, as to the Speech or Debate privilege, Defendant Schock oddly raises the privilege concerning the information produced by the OM, while he has consented to the production of more than 3,000,000 pages of documents from the House, which includes much of the information provided by the OM. In any event, the government does not intend to present any Speech or Debate materials at trial and has produced all of the information to Defendant Schock for which to assert a Speech or Debate privilege. Thus, until Defendant Schock properly asserts a privilege or actually files a motion to suppress, it is not necessary to further address the complex issue of the Speech or Debate Clause within a motion for discovery.

III.   **Defendant Schock's Motion for Disclosure of Grand Jury Minutes**

A. **Applicable Law**

More than 50 years ago, the Supreme Court made clear that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the

Attachment No. 1 - page 000116

merits. The Fifth Amendment requires nothing more." *Costello v. United States*, 350 U.S.

359, 363 (1956). The Supreme Court explained:

> If indictments were to be held open to challenge on the ground that there
> was inadequate or incompetent evidence before the grand jury, the
> resulting delay would be great indeed. The result of such a rule would be
> that before trial on the merits a defendant could always insist on a kind of
> preliminary trial to determine the competency and adequacy of the
> evidence before the grand jury. This is not required by the Fifth
> Amendment.

*Id.*

"[M]any constitutional protections afforded defendants in criminal proceedings

have no application to grand jury proceedings because the grand jury is an accusatory,

not adjudicatory, body." *United States v. Puglia*, 8 F.3d 478, 482 (7th Cir. 1993) (citing

*United States v. Williams*, 504 U.S. 36, 49 (1992)). A grand jury "may consider

incompetent evidence and act on rumor or the grand jurors' personal knowledge." *Id.*

(citing *United States v. Calandra*, 414 U.S. 338, 344 (1974)). The Supreme Court "has often

recognized the grand jury's singular role in finding the probable cause necessary to

initiate a prosecution for a serious crime." *Kaley v. United States*, 134 S.Ct. 1090, 1097

(2014). "An indictment fair upon its face, and returned by a properly constituted grand

jury . . . conclusively determines the existence of probable cause to believe the

defendant perpetrated the offense alleged." *Id.* "And 'conclusively' has meant, case in

and case out, just that." *Id.* There is "no authority for looking into and revising the

judgment of the grand jury upon the evidence, for the purpose of determining whether

or not the finding was founded upon sufficient proof." *Id.* "To the contrary, the whole

history of the grand jury institution demonstrates that a challenge to the reliability or

competence of the evidence supporting a grand jury's finding of probable cause 'will

not be heard.'" *Id.* (quoting *United States v. Williams*, 504 U.S. 36, 54 (1992); *see Bank of

Nova Scotia v. United States*, 487 U.S. 250, 261 (1988). "The grand jury gets to say —

without any review, oversight, or second-guessing — whether probable cause exists to

think that a person committed a crime." *Kyley*, 134 S.Ct. at 1098.

> The Supreme Court has further explained:

> It would make little sense, we think, to abstain from reviewing the
> evidentiary support for the grand jury's judgment while scrutinizing the
> sufficiency of the prosecutor's presentation. A complaint about the quality
> or adequacy of the evidence can always be recast as a complaint that the
> prosecutor's presentation was 'incomplete' or 'misleading.' Our words . . .
> bear repeating: Review of facially valid indictments on such grounds
> would run counter to the whole history of the grand jury institution, and
> neither justice nor the concept of a fair trial requires [it]."

*Williams*, 504 U.S. at 53-55.

Following these principles, a "district court [may] dismiss [an] indictment only if

it is established that the violation substantially influenced the grand jury's decision to

indict, or if there is grave doubt that the decision to indict was free from the substantial

influence of such violations." *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005)

(quoting *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997), and *Bank of Nova Scotia*,

487 U.S. at 256 ("a district court exceeds its powers in dismissing an indictment for

prosecutorial misconduct not prejudicial to the defendant"). "In other words, a district

court may not dismiss an indictment for errors in grand jury proceedings unless such

errors prejudiced the defendants." *Vincent*, 416 F.3d at 600 (quoting *United States v.

Brooks*, 125 F.3d 484, 497 (7th Cir. 1997), and *United States v. Mechanik*, 475 U.S. 66, 78

57

(1986)). Following the Supreme Court's decision in *Williams*, a claim to dismiss an indictment based on "misconduct . . . only arises from the violation of one of those 'few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's functions.'" *United States v. Thomas*, 2017 WL 56630, at *1 (N.D. Ill. Jan. 5, 2017) (quoting *Williams*, 504 U.S. at 46).

### B. Legal Analysis

Defendant Schock has filed a motion asking for the extraordinary relief of an order from this Court for the production of grand jury minutes. As the basis for most of his motion, he argues that the government gave erroneous legal instructions to the grand jury during the questioning of just 3 witnesses out of a total of 86 grand jury witness appearances, totaling more than 5,000 pages. (Exhibit 19) He then provides his strong disagreement with the manner in which those questions were asked and the answers that were given. For example, Defendant Schock alleges that the government incorrectly implied that it is improper to use campaign funds for the purchase of ski lift tickets. He also alleges that the government improperly questioned that same witness and another witness concerning the "irrespective test" under the Federal Election Campaign Act, and that one of those same witnesses was improperly questioned about the use of campaign funds to pay legal fees.

Whatever disagreement Defendant Schock may have with isolated parts of the questioning of two grand jury witnesses (out of 86 appearances), he is not charged with a violation of the Federal Election Campaign Act, nor is he charged with improperly using campaign funds to purchase lift tickets or pay legal fees. Rather, he is charged

58

with mail and wire fraud, theft of government funds, repeatedly making false statements, and filing false tax returns. Defendant Schock cites no authority for the proposition that he is entitled to the extraordinary relief of the invasion of grand jury secrecy because he disagrees with the manner in which select witnesses were questioned and the answers they gave. *See United States v. Simon*, 2010 WL 3980310, at 11 (N.D. Ind. 2010) (no "authority to support the proposition that a defendant is entitled to an evidentiary pretrial hearing to question a grand jury witness about why answers were phrased in certain way, or why certain information wasn't given"); *United States v. Fisher*, 692 F. Supp. 495, 504 (E.D. Pa. 1988) ("misstatements and mistakes alone, if such they were, are not sufficient to warrant a finding of misconduct or to justify dismissal of an indictment").

Moreover, questions and answers are not legal instructions, let alone erroneous instructions. There is simply no basis to believe, other than speculation by Defendant Schock, that there is "grave doubt that the decision to indict was free from the substantial influence of such violations." *Vincent*, 416 F.3d at 600. ("Defendant's challenge fails because he has not shown that any of the alleged discrepancies would have mattered to the grand jury"; the challenged matter "has little to no relevance to the mail or wire fraud charges").

For a second example, Defendant Schock alleges that the government improperly questioned a third witness about the House Ethics Manual and argues that the government suggested to the grand jury that it could indict him merely based on a violation of House Rules. The government did no such thing. Again, Defendant Schock

59

is not charged with a violation of House Rules, but rather the federal offenses of mail

and wire fraud and theft of government funds. Defendant Schock's "inescapable

conclusion" that the government improperly instructed the grand jury is nothing more

than mere speculation. (GJ Mem. at 13) Indeed, he admits as much by stating that the

government "presumably instructed" the grand jury. (GJ Mem. at 6) That is not enough

to meet his burden of showing a compelling necessity or a particularized need. *See*

*United States v. Shane*, 584 F. Supp. 364, 367 (E.D. Pa. 1984) ("courts generally reject

unsupported beliefs and conjectures as grounds for disclosure of grand jury materials to

defendants"); *United States v. Bennett*, 702 F.2d 833, 836 (9th Cir. 1983) ("The defendant's

assertion that he has no way of knowing whether prosecutorial misconduct occurred

does not constitute a particularized need outweighing the need for grand jury

secrecy."); See *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004)

("[Rule 6(e)(3)(E)(ii)] is not an invitation to engage in a fishing expedition to search for

grand jury wrongdoing and abuse"). *United States v. Fields*, 2016 WL 1428113, at 11 (E.D.

Pa. Apr. 12, 2016) (defendant "merely speculates that because he found several

violations, others may have occurred, and thus he seeks to engage in a fishing

expedition to uncover the hypothesized prosecutorial misconduct."); *United States. v.*

*Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972) ("mere speculation that such improprieties

may have occurred will not suffice to support that required showing [of a particularized

need or prejudicial irregularities]").

Finally, Defendant Schock argues that there is a "substantial question" about

whether the government improperly commented on his failure to testify before the

Attachment No. 1 - page 000121

grand jury. He attaches an affidavit from a witness, who alleges that the witness spoke

to a "dismissed" grand juror. According to the witness, the grand juror stated that the

government advised the grand jury that Defendant Schock was "requested to appear

and that no one had shown up." (Aff. Attach. to GJ Mem.) The government

unequivocally submits to this Court that this allegation is false. It did not happen.

Defendant Schock's speculation that it happened is not a "compelling necessity" to

invade grand jury secrecy. Moreover, there is also no possibility of prejudice to

Defendant Schock because the unidentified "dismissed" grand juror would not have

been part of the grand jury that indicted the case.

## CONCLUSION

For the foregoing reasons, the requests that his motions be denied.


Respectfully submitted,

PATRICK D. HANSEN
ACTING UNITED STATES ATTORNEY

BY:  s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov

Attachment No. 1 - page 000122

CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April 2017, I filed the foregoing directly with the Clerk of Court using the CM/ECF system, which will send notice to the following:

Counsel of record

s/Timothy A. Bass
Timothy A. Bass, Bar No. MO 45344
Assistant United States Attorney
318 S. Sixth Street
Springfield, IL 62701
Phone: 217/492-4450
Fax: 217/492-4044
tim.bass@usdoj.gov

Attachment No. 1 - page 000123

E-FILED

Friday, 01 September, 2017 07:36:37 PM

Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CR-30061-CSB |
| | ) | |
| AARON A. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS INDICTMENT FOR ALLEGED FIFTH AMENDMENT VIOLATION AND FOR LEAVE TO SUBPOENA A GRAND JUROR

The United States of America, for its response to the defendant's motion to

dismiss the indictment for violation of Fifth Amendment rights before the grand

jury (R. 100) and motion for leave to subpoena a grand juror (R. 101), states:

### Background

The grand jury investigation of the defendant, Aaron J. Schock, involved two

grand juries. In July 2016, the term of the first grand jury expired without it

having voted on any proposed indictment against Mr. Schock. The grand jury

that ultimately returned the indictment (R. 1) against Mr. Schock began its

investigation in August 2016. The grand jury presentation included eighty-six

witness appearances (by approximately fifty different witnesses), resulting in

approximately 5,000 pages of transcripts of witness testimony. Gov. Under Seal
App. 680-82.[1]

On November 10, 2016, the second grand jury returned the indictment that

charges Mr. Schock with wire fraud, 18 U.S.C. § 1343 (counts 1-9); mail fraud, 18

U.S.C. § 1341 (count 10); theft of government funds, 18 U.S.C. § 641 (count 11);

making false statements, 18 U.S.C. § 1001(a)(2)(c)(1) (counts 12-13); falsifying

filings with the Federal Election Commission, 18 U.S.C. § 1519 (counts 14-18);

and filing false tax returns, 26 U.S.C. § 7206(1) (counts 19-24)

In March 2017, Mr. Schock filed a motion for discovery and a supporting

memorandum of law. R. 63, 64. Therein, Mr. Schock requested that this Court

direct the United States to produce, among other items, the transcripts of the

minutes of the second grand jury that contained "any discussion or instruction

regarding Mr. Schock testifying or his decision not to testify." R. 63 at 2. Mr.

Schock alternatively requested that this Court conduct an in camera inspection of

these materials. *Id.*

---

[1] There were thirteen in-person appearances before the second grand jury by seven
different witnesses. Gov. Under Seal App. 682 (noting August 3 through November 3,
2016, witness appearances). The remaining seventy-three witness appearances occurred
in-person before the first grand jury between April 8, 2015, and June 29, 2016. *Id.* at 680-
82. Over the course of the second grand jury's service—i.e., during the period of August
3 through November 10, 2016—the government provided the second grand jury with
copies (in some instances, redacted copies) of witness transcripts from the first grand
jury.

2

In support of that request, Mr. Schock filed the handwritten declaration of a
third party concerning the third party's alleged conversation with a former
grand juror. R. 64-1 at 2. In the declaration, the declarant asserted that the former
grand juror "remarked that he was more free to talk about the case because the
grand jury had been dismissed." *Id.* According to the declarant, "The [former
grand juror] . . . told us that the prosecutor told the grand jury that Aaron Schock
and his attorney were requested to appear and that no one had shown up." *Id.*
Mr. Schock argued in his discovery motion that the declarant's statement entitled
him to either disclosure of the grand jury minutes or in camera review of the
minutes. R. 64 at 2-3, 15-18.

In its opposition to Mr. Schock's March 2017 motion, the government
"unequivocally" denied (R. 69 at 60) the allegation that the government told the
grand jury "that Aaron Schock and his attorney were requested to appear and
that no one had shown up." R. 64-1 at 2.

In a written order, this Court denied Mr. Schock's motion for disclosure of the
grand jury minutes. Concerning the third party's declaration, this Court
characterized it as "triple hearsay" and held that it was insufficient for this Court
to examine the inner workings of the grand jury. R. 95 at 10.

Based on the same third party declaration, Mr. Schock now moves to dismiss
the indictment. R. 100. He also moves to subpoena the grand juror to testify

Attachment No. 1 - page 000126

whether the statement occurred and the impact it had on the grand juror's decision-making process. R. 100, 101.

Upon receipt of Mr. Schock's motion to dismiss (R. 100), the government ordered the grand jury minutes for both the first and second grand juries to be sure that there was no statement, without something more, that "no one had shown up." Based on its review of the minutes of both grand juries, the government supplements and clarifies its response herewith. R. 64-1 at 2. *See* Illinois Rules of Professional Conduct 3.3 (the obligation of candor towards the tribunal).

As we describe in greater detail immediately below, on eleven occasions— seven times before the first grand jury and four times before the second grand jury— government counsel commented on or addressed Mr. Schock's testifying or decision not to testify before the grand jury, typically in response to inquiries by the one or more grand jurors.[2] *See* Text Order, Mar. 27, 2017 (stating parties may attach, quote from, and/or reference in public filings matters occurring before the grand jury "if the matters are necessary and relevant to a motion or response").

---

[2] The government has filed in camera and under seal the excerpts of the minutes that include the quoted materials in parts A and B of this background section. Upon further order of this Court, the government will provide in camera and under seal the entire set of minutes of each grand jury.

4

## A. The First Grand Jury

### 1. April 8, 2015

On April 8, 2015, government counsel (Mr. Bass) informed the grand jury that

the government intended to file a motion to enforce three grand jury subpoenas.

Gov. In Camera App. 3. Concerning those subpoenas, government counsel

stated:

> Tomorrow morning we have a hearing in front of the judge
> regarding our motion, which we've not filed yet—I intend to do so
> today—a motion to enforce compliance with three grand jury
> subpoenas that were served beginning on March 18th, three weeks
> ago, on Mr. Schock's congressional offices in Peoria and Washington,
> and then a third subpoena that was served on him personally on
> March 31st, all while he was still a congressman.
>
> In the intervening time between March 31st and April 2nd, which
> was last Thursday, there was no contact from anybody about
> complying with the subpoena. And it's our understanding that
> nobody did anything to comply.
>
> Last Thursday, we were contacted by counsel for Mr. Schock
> personally, now that he's no longer a congressman, wanting to
> withdraw the subpoena and have some discussion about compliance
> and so on and so forth. We said no.
>
> They filed an emergency motion to quash Monday, just the
> subpoena on him, while ignoring the two other subpoenas addressed
> to him three weeks ago.
>
> So we're going to file our own motion to enforce all three, which
> the subpoena to him commands his personal appearance, and we'll
> have a hearing on that tomorrow morning before the judge, which
> also could take a considerable amount of time.

5

But I think [the criminal chief] talked to you or was going to talk to you about being in session sometime tomorrow. Because if the judge orders compliance with the grand jury subpoenas, including his testimony, then we would want to be before you for that.

I highly doubt that his counsel would allow him, if he's ordered to testify, to actually come here and testify without invoking his Fifth Amendment privilege, which he has every—an absolute right to do. And if he were to invoke that privilege before coming here, we would, as an accommodation, excuse him from his appearance because we don't harass people by bringing them in front of the grand jury just to take the Fifth. But he's not invoked that privilege yet and he's not complied with the subpoena yet, so that's why we have to have the hearing tomorrow and force the issue. Are you going to comply with the subpoena or are you going to assert the privilege or a combination of both. Just tell us.

*Id.* at 3-5.

### 2. April 9, 2015

On April 9, 2015, the following conversation occurred between Mr. Bass and a

grand juror:

GRAND JUROR: Okay. I got a question the way the law applies and get my . . . head wrapped around it.

He hired a law firm to advise him, which is the law firm that pulled records out of the office.

MR. BASS: Before the subpoenas were served.

GRAND JUROR: Before the subpoenas were served.

MR. BASS: Which is totally fine.

GRAND JUROR: Okay. That's legal then?

6

> MR. BASS: Uh-huh. Absolutely. He has a right to an attorney. He
> can do whatever he wants. . . .

Gov. In Camera App. 7.

Concerning the March 31, 2015, service of a subpoena on Mr. Schock, Mr. Bass

commented during the same grand jury session that, after he had consulted with

"OPR[3] and the U.S. Attorney it was decided that it was proper to serve a

subpoena on Mr. Schock and attempt to interview him if he wished to [be

interviewed]." *Id.* at 8.

### 3. May 7, 2015

On May 7, 2015, a grand juror asked Mr. Bass, "Didn't you say Schock was

not issued a subpoena himself?" Gov. In Camera App. 10. The following

conversation the occurred:

> MR. BASS: He was.
>
> GRAND JUROR: He was?
>
> MR. BASS: He was.
>
> GRAND JUROR: But you're not going to push the—or, the
> government's not going to push the issue to bring him in?
>
> MR. BASS: Well, he has a right to assert a privilege. And our goal
> was to have the judge order him not to—not so much as to testify
> before the grand jury, recognizing that a person represented by
> counsel is likely not going to want to come in and incriminate
> themselves. So our goal was to have the judge order him to comply

---

[3] The reference to "OPR" reflected a conversation with the Professional Responsibility Advisory Office
(PRAO) rather than the Office of Professional Responsibility.

7

with producing the records. Which she did. She ordered him—she
ordered him to produce the records that he owned, controlled,
possessed, either campaign or office records.

*Id.* at 10-11.

### 4.  June 3, 2015

On June 3, 2015, a grand juror asked Mr. Bass, "Did they ever start producing

any of this stuff yet we've requested?" and Mr. Bass responded, "No." Gov. In

Camera App. 13. Mr. Bass further stated:

> MR BASS: Well, we—Mr. Schock has not produced anything.
> We've been working on this application. And our intent is after we
> obtain that, if we do, to also file—go back to Judge Myerscough on
> what's called a motion for a rule to show cause.

> And what that means is she's ordered the subpoenas to be
> enforced. A failure to comply with the subpoena is punishable by
> contempt unless the person can show just cause why they failed to
> comply with the order.

> I suspect that the just cause that Mr. Schock's going to allege is that
> part of these materials are not in his possession or control, i.e., the
> campaign. Those that are in his possession or control he's going to
> assert a Fifth Amendment privilege to him producing.

> The Fifth Amendment privilege protects not only when the person
> testifies, but if you subpoena them for records and they come in and
> they produce them, that's the equivalent of a statement. Here are the
> records, I have them. That's also subject to assertion of the Fifth
> Amendment privilege if the person has such a privilege.

> A corporation doesn't have a privilege. There's a—individuals
> have a privilege, but artificial entities don't have a privilege.

*****

8

MR. BASS: So corporations, labor unions, other non-person entities don't have a Fifth Amendment privilege. And then also situations where the production of records is a part of a regulatory scheme or regulatory environment where records are required to be produced. In those situations, oftentimes the Fifth Amendment privilege is not available.

And it's going to be our position—the government's position that Mr. Schock has no Fifth Amendment privilege as to campaign records or congressional office records because they're public records, they're required to be produced at least in part, and they're records of campaign entities and his office as of [sic] a congressman. So it's our position that he can't wrap himself in a privilege in—of his own individual privilege as to records that are not his individually. So we're going to have to litigate that.

\* \* \* \* \*

So there was some production with respect to campaign entities. But nothing from Mr. Schock, nothing from his congressional office, and nothing from Peoria. So that's why we decided we needed to pursue an alternative and that is a search warrant.

*Id.* at 13-16.

### 5.  August 6, 2015

During the August 6, 2015, grand jury session, a grand juror inquired about the status of the subpoena enforcement proceedings before Judge Myerscough. Gov. In Camera App. 18. Mr. Bass answered, "Well, here's the—we talked previously about whether a person has a Fifth Amendment privilege against self-incrimination, and so that's one of the issues that we've been litigating before Judge Myerscough." Gov. In Camera App. 19.

9

### 6. January 21, 2016

On January 21, 2016, the following discussion occurred with the grand jurors:

GRAND JUROR: I think you need to bring Mr. Schock in here is what I think.

GRAND JUROR: Can't do it.

MR. BASS: We can—we can invite Mr. Schock—we can invite Mr. Schock. We don't normally subpoena targets, but we can certainly invite—the grand jury can—and if you ask, we can certainly communicate to his counsel that the grand jury invites him to appear before them, and he can choose to—

GRAND JUROR: Well, he was so generous to pay back this money out there and all that, we thought maybe he might want to stop and say, hey, folks, I'm sorry.

MR. BASS: Would that be something you'd be interested in us doing is inviting him to appear before you?

GRAND JUROR: Oh, yeah.

GRAND JUROR: Absolutely.

GRAND JUOR: Absolutely.

MR. BASS: I figured you would, so—

GRAND JUROR: It would be a waste of time.

MR. BASS: [without commenting on the "waste of time comment," discussing the next witness called to appear and an upcoming break for the grand jurors.]

Gov. In Camera App. 21-22.

Attachment No. 1 - page 000133

### 7. March 24, 2016

During the March 24, 2016, session, a grand juror asked the prosecutor, "Will

you ever get Mr. Schock to actually come in and talk to us?" Gov. In Camera

App. 24. Mr. Bass answered:

> We did — I did — at your request, I did extend an invitation to him,
> and he declined. Which obviously is absolutely his right and it cannot
> be used against him in any way.
>
> But there's a procedure for extending an invitation to a target. And
> they can voluntarily choose to come or choose not to come. And he
> chose not to come, which is his right. And that's the end of it.
>
> I've never had someone accept an invitation. Sometimes it
> happens, but more often than not, the appropriate advice from the
> person's attorney is you don't want to do that. Obviously, if they did
> that, then their attorney would not be able to be with them.

*Id.* at 24-25.

### B.    Second Grand Jury

#### 1.    August 3, 2016

On August 3, 2016, the first day the government began presenting the matter

to the second grand jury, a grand juror asked the prosecutor, "In these matters, has

he consented to any interviews with anybody? Schock." Gov. In Camera App. 27.

Mr. Bass answered:

> MR. BASS: There's been no evidence presented to the grand jury
> about any interviews of Mr. Schock. We did — in accordance with
> department policy, we did extend — we can extend an invitation to a
> target for them to voluntarily appear and make a statement.

GRAND JUROR: He was busy that day.

MR. BASS: And that was declined. Which was his absolute right.

Gov. In Camera App. 27.

### 2. September 7, 2016

On September 7, 2016, Bernard Coleman, a financial analyst with the United
States Attorney's Office, testified before the grand jury concerning alleged
discrepancies between (a) the mileage Mr. Schock claimed for mileage
reimbursement from a campaign committee(s) and the Members'
Representational Allowance[4] and (b) the mileage Mr. Schock in certain tax
returns claimed as business mileage.

Concerning the alleged discrepancies, a grand juror asked Mr. Coleman, "For
the purposes of this investigation, [Mr. Schock's] business mileage on his tax
returns during these same years, does it have a role? How does it play into this,
or does it?" Gov. Under Seal App. 2. Mr. Bass then asked, and Mr. Coleman
answered, a series of questions to address the grand juror's questions. *Id.* at 2-6.
Thereafter, Mr. Bass asked the grand juror if Mr. Coleman's responses to the
questions answered the grand juror's questions and the grand juror responded,

---

[4] "During each session of Congress, each Member has a single Members'
Representational Allowance . . . available to support the conduct of official and
representational duties to the district from which he or she is elected." Gov. Under Seal
App. 349.

12

"Partially. . . . I guess the question I next have is, does this in and of itself—the

tax—tax return, signing the tax return, will that rise to the level of a separate

issue in this instance or will it be just another factor in the complete umbrella?"

*Id.* at 6. The grand juror agreed Mr. Bass could answer that question after the

grand jury excused Mr. Coleman. *Id.*

After the grand jury excused Mr. Coleman, Mr. Bass addressed what the

government believed to be the significance or inference of the alleged

discrepancies between the claimed mileage for reimbursement and the mileage

claimed on tax returns. That explanation included the following comment:

> [F]or example, I would ask the question, you submitted an e-mail to
> [your assistant] and claimed 32,700 miles official miles. Your vehicle
> was only driven this amount of miles. How do you reconcile that?
> Then you filed a tax return under oath and you said this. And it didn't
> just happen in 2009. It happened in 2010. So those would be questions
> you might ask if he decided to—I mean, this would be evidence in our
> case in chief just to show the inconsistency. But if he were to testify—
> and he has an absolute right not to testify and no inference—adverse
> inference can be given to his decision not to testify. But if he choose
> to testify, this would be an obvious question to ask.

Gov. In Camera App. 29-30.

### 3. September 8, 2016

Mr. Coleman again testified before the grand jury the following day, on

September 8, 2016. That day, Mr. Coleman testified that Mr. Schock reimbursed

the U.S. House of Representatives (House) for all mileage payments he received

13

during the time he was in Congress after media reports came out that scrutinized

mileage disbursements to Mr. Schock. Gov. Under Seal App. 8-9.

A grand juror asked Mr. Coleman (or, perhaps more accurately, commented),

"Is it disturbing—I know it is to me—all this went on for these amount of years,

if this newspaper article had never came out, would we have ever known any of

this?" *Id.* at 10. Mr. Bass responded, "That's also a judgment that you might be

able to draw which we can discuss after the witness [is excused]." *Id.*

After the grand jury excused Mr. Coleman, Mr. Bass commented:

> So I think your question when Mr. Coleman was here is how do
> you view the fact that he paid it all back. Ultimately your decision is
> how you view that evidence. There is no—he has got an absolute right
> not to. We invited him to produce any evidence, invited him to testify.
> He declined, which he has an absolute right to do.

> So all we have to answer that question is what happened and the
> testimony of the witnesses who said they were not—there was
> nothing that suggested that he was intending on paying anything
> back prior to the newspaper stories.

Gov. In Camera App. 32.

### 4. October 4, 2016

On October 4, 2016, the undersigned was present with the grand jury and

addressed the status of the government's grand jury presentation and projected

14

the government would conclude its presentation the following month. In doing

so, the undersigned stated:

> Because it is critically important that when we come here—and at
> this point we're looking at next month to say, have you had enough
> time—has the grand jury had enough time to satisfy itself that it
> knows what's going on here? Is there any other evidence you would
> like to hear? And if there is, please tell me, and we'll bring it in.

> We have invited Aaron Schock to come in on more than one
> occasion and we'll continue to extend that invitation. He has
> respectfully declined.

> Between you and I—well, between you and I and [the court
> reporter] here, any attorney that would let their client walk in here
> and testify before you that is a target is committing malpractice. There
> is nothing good that can happen to them in this room, unless there is
> something we don't know about. Because there will be a lot of
> questions being asked and they will be difficult questions, and his
> attorney isn't here and I am. So that would not be—I would never as
> a practicing attorney allow my client to walk in a grand jury without
> some grant of immunity or non-target letter.

> You've seen a lot of people that get those. It's standard operating
> procedure. It means basically the attorney is doing their job. So
> don't—don't take that as anything more.

Gov. In Camera App. 35-36.

Attachment No. 1 - page 000138

### Argument[5]

"An indictment returned by a legally constituted and unbiased grand jury,

like an information drawn by the prosecutor, if valid on its face, is enough to call

for trial of the charge on the merits. The Fifth Amendment requires nothing

more." *Costello v. United States*, 350 U.S. 359, 363 (1956).

A district court, however, is not without any supervisory power over the

grand jury. A district court's "supervisory power can be used to dismiss an

indictment because of misconduct before the grand jury, at least where that

misconduct amounts to a violation of those few, clear rules which were carefully

drafted and approved by [the Supreme] Court and by Congress to ensure the

integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46

(1992) (quotation marks omitted) (citing *Bank of Nova Scotia v. United States*, 487

U.S. 250 (1988), and *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J.,

concurring)). Such violations or errors, however, are not sufficient by themselves

to dismiss an indictment. The Court must also find sufficient prejudice to

---

[5] Because the first grand jury did not return an indictment against Mr. Schock, and
therefore no possible prejudice could have result from any alleged violation of the Fifth
Amendment before that grand jury, the government's argument addresses only the
comments made to the second grand jury. *United States v. Marrero*, 643 F. App'x 233, 237
(3d Cir. 2016) (unpubl.) (defendant could not show prejudice where violation occurred
before first grand jury, not grand jury that returned superseding indictment); *United
States v. Carr*, 764 F.2d 496, 498-99 (8th Cir. 1985) (holding no prejudice where grand
jury before which an FBI agent was improperly characterized as "agent of the grand
jury" did not return indictment before term expired).

16

warrant a dismissal. *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005)

(citations omitted). Here, neither error not prejudice exists.

## A. The Government's Comments to the Second Grand Jury Did Not Violate the Fifth Amendment

The Fifth Amendment provides that no person "shall be compelled in any

criminal case to be a witness against himself." U.S. Const. amend V. In *Griffin v.*

*California*, 380 U.S. 609 (1965), the Supreme Court held "that it is a violation of

this constitutional guarantee to tell a jury . . . that a defendant's failure to testify

supports an unfavorable inference against him." *Lakeside v. Oregon*, 435 U.S. 333,

336 (1978). *See also United States v. Bonner*, 302 F.3d 776, 783 (7th Cir. 2002) (same)

(citing *Griffin*, 380 U.S. at 613). In other words, "*Griffin* prohibits the . . .

prosecutor from suggesting to the jury that it may treat the defendant's silence as

substantive evidence of guilt." *United States v. Robinson*, 485 U.S. 25, 31 (1988)

(quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1978)). *See also United States v.*

*Sblendorio*, 830 F.2d 1382, 1391-92 (7th Cir. 1987) ("unless the prosecutor's

comment uses the defendant's privilege as evidence against him, it is not

objectionable").

The government did not suggest to the second grand jury that Mr. Schock's

declining to appear before it was substantive evidence of his guilt (or, more

accurately, substantive evidence of probable cause). To the contrary, the

government told the grand jury on three separate occasions it was Mr. Schock's

17

absolute right not to testify before the grand jury (Gov. In Camera App. 27, 30,
32) and further instructed the grand jury on one of those occasions that no
adverse inference could be given to that decision (*Id.* at 30).

The "very purpose" of telling the grand jury it could not draw an adverse
inference from Mr. Schock's choice not to testify was "to remove from the jury's
deliberations any influence of unspoken adverse inferences. It would be strange
indeed to conclude that this cautionary instruction violates the very
constitutional provision it is intended to protect." *Lakeside*, 435 U.S. at 339. And,
as the *Lakeside* Court commented, it would be a "dubious" and "speculative
assumption[ ]" that jurors would have "totally disregard[ed] the instruction, and
affirmatively give[n] weight to what they ha[d] been told not to consider at all."
*Id.* at 340.

Admittedly, caution counsels that each time, not just once, the government
addressed the subject of Mr. Schock's testifying it should have informed the
grand jury that it must not draw an adverse inference from that decision.
Caution further counsels against the tone of the comments on October 4, 2016.
While the tone was possibly inartful or imprudent, there was no suggestion that
the grand jury should or could draw a negative inference from Mr. Schock's
decision not to testify. Indeed, the jury was told that it was the appropriate

18

course of action for him to take and for the grand jury not to take it as anything

more. Gov. In Camera App. 36.

In summary, because the government did not suggest to the grand jury that

Mr. Schock's not appearing was substantive evidence in support of the probable

cause inquiry, there was no Fifth Amendment violation.

### B. Assuming by its Comments the Government Violated Mr. Schock's Fifth Amendment Right Against Compelled Self-Incrimination, There Is No Prejudice

Assuming this Court disagrees with the government's position, this Court

should refrain from dismissing the indictment because of the lack of prejudice.

### 1. The *Bank of Nova Scotia* prejudice standard applies to constitutional errors before a grand jury

"[A]s a general matter, a district court may not dismiss an indictment for

errors in the grand jury proceeding unless such errors prejudiced the

defendants." *Bank of Nova Scotia*, 487 U.S. at 254. Prejudice occurs if a "violation

substantially influenced the grand jury's decision to indict, or if there is grave

doubt that the decision to indict was free from substantial influence of such

violations." *Id.* at 256 (citation and quotation marks omitted).

While *Bank of Nova Scotia* involved non-constitutional violations of Rules 6(d)

and (e) of the Federal Rules of Criminal Procedure and the Court said that the

prejudice standard it announced applied "at least where dismissal is sought for

nonconstitutional error," 487 U.S. at 256, the decision suggests the standard for

19

constitutional errors before a grand jury is the same as that for other types of errors. *See id.* ("it would be inappropriate to devise a rule permitting federal courts to deal more harshly with nonconstitutional errors than with constitutional errors").

The Seventh Circuit's decision in *Vincent*, 416 F.3d 593, makes clear that the *Bank of Nova Scotia* prejudice standard applies equally to alleged constitutional violations. In that case, the defendant claimed the district court erred by refusing to dismiss the indictment based on the government's alleged knowing presentation of perjured testimony to the grand jury, *see* 416 F.3d at 600 — i.e., based on an alleged constitutional error, *see Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding knowing use of perjured testimony violates due process). The Seventh Circuit assumed the defendant's allegations were true and applied the *Bank of Nova Scotia* standard in reaching its "no prejudice" determination. *See Vincent*, 416 F.3d at 600 (quoting the *Bank of Nova Scotia* prejudice standard). *See also United States v. Geisler*, 143 F.3d 1070, 1072 (7th Cir. 1998) (same); *United States v. Edmonson*, 962 F.2d 1535, 1539 (10th Cir. 1992) (applying *Bank of Nova Scotia* prejudice standard where government commented to the grand jury on defendant's post-*Miranda* silence).

Thus, *Vincent* supports the conclusion that the *Bank of Nova Scotia* prejudice standard applies when analyzing whether the government's comments to the

20

grand jury prejudiced Mr. Schock. In other words, the appropriate inquiry is

whether the alleged "violation substantially influenced the grand jury's decision

to indict" or whether "there is grave doubt that the decision to indict was free

from substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256.

Mr. Schock appears to agree this is the correct standard. *See* R. 102 at 6

(defendant's supporting memorandum, quoting the *Bank of Nova Scotia* prejudice

standard).

### 2. The prejudice inquiry is an objective one

Mr. Schock argues (R. 101; R. 102 at 7-10) that he should be permitted to call

the former grand juror as a witness for two reasons: (1) to testify whether, as

alleged in the declarant's statement, the government told the grand jury that Mr.

Schock and his attorney were requested to appear before the grand jury and that

no one had shown up, R. 64-1 at 2; and (2) to testify as to the statement's impact

on the juror's decision-making process.

The government's disclosures in this response, along with its in camera

submission, moots the first basis for Mr. Schock's request. With respect to the

second basis for Mr. Schock's request, Rule 606(b) of the Federal Rules of

Evidence prohibits this Court from undertaking the type of inquiry Mr. Schock

proposes. That rule, which codifies the "near-universal and firmly established

21

rule" that "flatly prohibited the admission of juror testimony" (*Tanner v. United States*, 483 U.S. 107, 117 (1987)), provides:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statements on these matters.

Fed. R. Evid. 606(b)(1).

There are three exceptions to this rule, none of which applies here. A juror or grand juror "may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2). The first two exceptions do not apply, even assuming that the government's comments made to the grand jury while the grand jury is in session constitute either "extraneous . . . information" or "an outside influence." Rules 602(b)(2)(A) and (B) permit inquiry into whether such information or influence existed, but they do not permit "consideration of evidence about whether and how such statements or conduct may have affected actual deliberations and [return of a true bill]." *United States v. Farmer*, 717 F.3d 559, 565 (7th Cir. 2013). *See also In re Grand Jury Proceedings*, 142 F.3d 1416, 1427 (11th Cir. 1998) (stating that in light of the prohibitions in Rule 606(b), "we cannot see how the [district] court could determine, by examining

22

the grand jurors, whether the grand jury had used the [allegedly improper] testimony as a basis for its indictment"). Finally, the third exception does not apply since the alleged violation has nothing to do with the entering of a verdict.

Further, by analogy, the application of the harmless-error standard in criminal appeals following a trial supports the holding that the *Bank of Nova Scotia* prejudice analysis is an objective analysis of the record, not a review of the subjective beliefs or decision-making processes of the grand jurors. A prosecutor's comments in a criminal trial on an accused's silence that is in violation of the Fifth Amendment is not automatically reversible. *See generally Chapman v. California*, 380 U.S. 609 (1965). Instead, the reviewing court asks: absent the violation, "is it clear beyond a reasonable doubt that the jury have returned a verdict of guilty?" *United States v. Hasting*, 461 U.S. 499, 510-11 (1983). In answering that question, the reviewing court "consider[s] the trial record as a whole," *id.* at 509, not by inquiring into the subject beliefs or decision-making process of any individual jurors.

The secrecy of grand jury proceedings further supports the conclusion that the prejudice analysis must be objective. *See generally* Fed. R. Crim. P. 6(e). While, as Mr. Schock correctly notes (R. 102 at 9), there are exceptions to the grand jury secrecy rule, *see* Fed. R. Crim. P. 6(e)(3), the government has not found any case that would support a holding that a district court could ever inquire into a grand

<div align="center">23</div>

juror's mental processes or the impact that any particular statement may or may not have had on the grand juror's vote.

Lastly, the Supreme Court's decision in *Bank of Nova Scotia* supports the conclusion that the prejudice inquiry is an objective inquiry, not a subjective one. There, we discuss in more detail below, the Court reviewed the grand jury record before concluding there was no prejudice, *see* 487 U.S. at 263, and did not intimate that a subjective inquiry would be relevant to that determination. If it were relevant, the Court would have remanded the case for an evidentiary hearing instead of reaching the legal conclusion that there was no prejudice based on a record that was devoid of such a hearing.

### 3. The government's comments did not substantially influence the grand jury's decision to indict, and there is no grave doubt that the decision to indict was free from substantial influence of such alleged violations

The Supreme Court in *Bank of Nova Scotia*, in considering the issue of prejudice of the alleged misconduct in that case, noted that the non-constitutional violations in that case were isolated, having occurred in the course of a twenty-month grand jury investigation, and that the investigation involved dozens of witnesses and thousands of documents. 487 U.S. at 263. "In view of this context," the Court concluded, "those violations that did occur [did] not, even when considered cumulatively, raise a substantial question, much less a

24

grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge." *Id.*

Similarly, in *Edmonson, supra*, the Tenth Circuit examined whether the district court erred in not dismissing an indictment where the government commented on the defendant's post-*Miranda* silence. *See* 962 F.2d at 1539. There, a government agent testified that when he asked about the defendant's knowledge of his co-defendant's activities, "he mentioned he wasn't going to say anything." *Id.* (quotation marks omitted). In affirming the district court, the court of appeals held that there was no misconduct, at least "no error of the magnitude required to dismiss the indictment." *Id.* The court, using the *Bank of Nova Scotia* standard, further held that there was no prejudice. It concluded that the government's "evidence against the codefendants was more than sufficient to support the indictment even absent the statements" that the defendant claimed were improper and also determined that the comments were "not sufficiently inflammatory to support the . . . theory that, absent the improper comments, the indictment would not have been returned." *Id.* (reviewing "the partial grand jury transcript of the grand jury hearing" in reaching that conclusion).

Should this Court disagree with the government that there was simply no violation, the context of the present matter should lead this Court to the same

25

conclusion reached in *Bank of Nova Scotia* and *Edmonson*: if there was any violation, there is no prejudice.

To provide this Court with context, the government has submitted the grand jury transcripts of five law enforcement witnesses who appeared before the grand jury between November 1 and 3, 2017, to present the indictment. These witnesses' testimony, consisting of fact and summary evidence, systematically supported the allegations in the indictment and the grand jury's finding of probable cause to indict. *See generally* Gov. Under Seal App. 11-21 and 32-78 (testimony of Mr. Coleman, USAO financial analysis), 110-67 (testimony of Special Agent Terrence Moody, FBI), 277-340 (testimony of Special Agent James Peacock, IRS CI), 404-512 (testimony of Intelligence Analyst Kimberly Edge, FBI), and 667-79 (testimony of Postal Inspector Shari Rowe). Included as part of the presentation by these officers were numerous documents supporting or supplementing the officers' testimony. *See generally id.* 24-31, 81-109, 170-276, 343-403, and 514-666. *See also id.* at 671-75.

More specifically:

### a. Mr. Coleman's November 1 and 2 testimony

Mr. Coleman—who had already testified before the second grand jury on August 3 and September 7 and 8, 2016 (Gov. Under Seal App. 682)—testified on November 1 and 2 concerning three areas relating to the alleged fraudulent and

other illegal activity alleged in the indictment: (a) mileage reimbursements received by Mr. Schock from the House of Representatives and various campaign entities (*id.* at 6-55); (b) decorating or remodeling expenses relating to Mr. Schock's apartment and two congressional offices (*id.* at 56-72, 76-77); and (c) the use of funds from a campaign entity to purchase a 2015 Chevrolet Tahoe for Mr. Schock and to purchase and insure a 2014 Ford Fusion and pay for fuel for that Fusion for a staff member (*id.* at 39, 45-46, 48-50, 52, 73-76).

Mr. Coleman's testimony also included his and the prosecutor's references to and/or use of various documents including, for example, a summary exhibit relating to fifty-three of fifty-five mileage payments from the House to Mr. Schock (Gov. Under Seal App. 24-25, 82-83); mileage vouchers, mileage records, and bank records underlying the wire fraud charges in counts 1 through 5 (*id.* at 27-31, 84-102); and documents relating to remodeling or redecorating expenses (*id.* at 103-09).

Mr. Coleman's testimony supported allegations in the "manner and means" portion of the indictment (*e.g.*, R. 1 at ¶¶ 20-28, 36, 56-66) and the charges in counts 1 through 5 (wire fraud), 8 (wire fraud), 11 (theft of government funds), 13 (false statements), and 17 (falsification of FEC filings).

Attachment No. 1 - page 000150

### b. Special Agent Moody's November 2 testimony

During Special Agent Moody's November 2 testimony, he testified

concerning alleged fraudulent and other illegal activity relating to: (a) claims for

reimbursement for the purchase of camera equipment and the payment of

services for a videographer/photographer (Gov. Under Seal App. 112-25, 142,

151-56, 163); (b) a November 2014 trip to a Chicago Bears game, including

expenses for meals, travel, and accommodations during that trip incurred by Mr.

Schock and others (*id.* at 125-38, 141); and (c) relatedly, misuse of a government

travel credit card for personal travel, meals, and accommodations (*id.* at 139-65).

Agent Moody's testimony also included his references to and/or use of

multiple documents consisting of, for example, credit card records, invoices,

House vouchers, emails, FEC forms, hotel receipts, and Uber records. *See*

*generally id.* at 170-276. Additionally, Moody testified concerning consensually-

recorded conversations between a cooperating individual and Mr. Schock. *Id.* at

154. Concerning those conversations, government counsel asked Moody,

"[W]ould it be fair to say that during those discussions Mr. Schock made some

exculpatory statements trying to explain away the validity of the payment to [the

photographer/videographer]?" *Id.* Moody answered, "He did on tape, yes." *Id.*

Agent Moody's testimony supported certain allegations in the "manner and

means" portion of the indictment (*e.g.*, R. 1 at ¶¶ 29-35, 37-41, 69-71) and the

28

charges in count 10 (mail fraud), count 11 (theft of government funds), and 12
(false statements).

### c. Special Agent Peacock's November 3 testimony

Special Agent Peacock's November 3 grand jury testimony concerned,
primarily: (a) background on (or reading excerpts from) the Members'
Congressional Handbook and House Ethics Manual (Gov. Under Seal App. 287-
91); (b) Mr. Schock's allegedly profiting and attempting to profit from "fly-in"
events (*id.* at 279-306) and from purchasing (and/or having a campaign entity
purchase) tickets to major sporting events and then selling the tickets for a profit
(*id.* at 307-09; 329-30, 332, 334-35) (c) Mr. Schock's allegedly paying the legal fees
of a staff member for a non-campaign-related matter, but then being reimbursed
by a campaign entity (*id.* at 320, 336), and allegedly improperly paying or
causing the improper payment of unauthorized mileage payments and bonuses
to staff members (*id.* at 310-16); and (d) Mr. Shock's allegedly false tax returns for
tax years 2010 through 2015 in which he collectively underreported his income
by approximately $100,000 (*id.* at 321-39), and his allegedly not reporting certain
income in government annual financial disclosure forms (*id.* at 316-20).

Special Agent Peacock's testimony, along with documents to which he
referred or discussed during his testimony (*id.* at 343-403) provided support for
allegations in the "manner and means" portion of the indictment (R. 1 at ¶¶ 45-

29

55, 68), the wire fraud charge in count nine, and the tax charges in counts 19
through 24.

### e. Ms. Edge's November 3 testimony

Ms. Edge provided detailed testimony, supported by numerous documents,
concerning allegedly fraudulent expenditures and reports by Mr. Schock's
various campaign entities that Mr. Schock allegedly caused. Her testimony and
supporting documents provided the basis for multiple allegations in the
indictment, including those concerning: (a) general background about the
Federal Election Campaign Act of 1971 (R. 1 at ¶¶ 13-17); (b) Mr. Schock's
causing the use of campaign entity funds for the purchase of a 2014 Ford Fusion
for a staff member who was not employed by the campaign entity (*id.* ¶¶ 36-38);
(c) various false FEC filings and fraudulent campaign entity financial
transactions for Mr. Schock's and others' personal enrichment (*id.* at ¶¶ 40-44, 46-
55, 58, 62, 65, 67-68, 70); and (d) excess bonuses to staff members purported as
mileage reimbursements (*id.* at ¶ 67). *See generally* Gov. Under Seal App. 404-514.

Ms. Edge's testimony and the financial and other documents that supported
her testimony also supported the wire fraud charges in counts 6 and 7 as well as
the false FEC-filing charges in counts 14 through 18. *Id.* at 412-20, 425-26, 444-45,
480-81, 507-09.

Attachment No. 1 - page 000153

### f. Inspector Rowe's November 3 testimony

Postal Inspector Rowe testified concerning, among other things, several

instances of consensually recorded conversations between a cooperating

individual and Mr. Schock, including a conversation on March 20, 2015. Gov.

Under Seal App. 671-75. During that conversation, Mr. Schock and the individual

discussed what the individual characterized as "the mileage stuff." *Id.* Schock

stated that the process of "estimating" his mileage began under a particular staff

member and then just continued as a new staff member took over that

responsibility, receiving instructions from the previous staff member on how to

do the mileage. *Id.* at 672. Mr. Schock stated, "[M]y responsibility is I never sat

down with them and said what are you guys doing." *Id.* at 673.

\* \* \* \* \*

The above summary, of course, does not include all of the testimony and

evidence presented to the grand jury, which included (1) the additional, seven in-

person appearances before the second grand jury (some by the same witnesses,

such as Mr. Coleman); or (2) the seventy-three transcripts of testimony before the

first grand jury that were provided to the second grand jury for its review (again,

some by the same witnesses). *See id.* at 680-82.

Given the context of this matter, there is neither a substantial question nor a

grave doubt that the four comments to the second grand jury concerning Mr.

31

Schock's testifying or not testifying had a substantial effect on the grand jury's

probable cause determination. The depth and breadth of the presentation to the

second grand jury directs this Court to only that conclusion. And that conclusion

gains further support from the government's having ameliorated the alleged

violations by telling the second grand jury that it was Mr. Schock's absolute right

not to testify and that it could not draw any adverse inference from that decision.

*Cf. Bonner*, 302 F.3d at 782 ("Absent truly unusual circumstances, errors that are

the subject of curative instructions are deemed harmless.").

Thus, even if this Court were to find that despite the repeated admonitions to

the grand jury, that the government violated Mr. Schock's Fifth Amendment

right before the grand jury, dismissal of the indictment is unwarranted.

## Conclusion

For the reasons presented, the United States requests that this Court deny the

defendant's motion to dismiss the indictment for violation of Fifth Amendment

rights before the grand jury (R. 100) and motion to subpoena grand juror (R. 101).

Respectfully submitted,

UNITED STATES OF AMERICA

By:    /s/Patrick D. Hansen
       Acting United States Attorney
       318 South 6th Street
       Springfield, Illinois 62701-1806
       Tel: 217-492-4450

32

## CERTIFICATE OF SERVICE

I certify that on September 1, 2017, I caused the government's response to be

filed with the Clerk of the Court using the CM/ECF system, which will cause

notice to be served on counsel of record.

/s/ Patrick D. Hansen
Acting United States Attorney

Attachment No. 1 - page 000156

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | Hansen, Patrick (USAILC) |
| **Cc:** | Walters, Greggory (USAILC); Childress, John (USAILC) |
| **Subject:** | Re: Schock response |
| **Date:** | Wednesday, October 11, 2017 12:33:45 PM |

Patrick:

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Thank you for allowing me to comment.

Tim

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Sent from my iPhone

On Oct 11, 2017, at 10:31 AM, Hansen, Patrick (USAILC) <PHansen@usa.doj.gov> wrote:

    Gentlemen,

Attachment No. 1 - page 000157

Patrick H.

Patrick D. Hansen
Acting U.S. Attorney
Central District of Illinois
217-492-4450

**From:** Bass, Tim (USAILC)
**To:** Hansen, Patrick (USAILC); Childress, John (USAILC)
**Subject:** FW: Schock
**Date:** Monday, October 9, 2017 1:33:10 PM
**Attachments:**

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Patrick:

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Thank you for your consideration.

Tim

**From:** Bass, Tim (USAILC)
**Sent:** Monday, October 9, 2017 12:13 PM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Patrick:

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

**From:** Hansen, Patrick (USAILC)
**Sent:** Monday, October 9, 2017 10:51 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Tim,

Thanks.

**From:** Bass, Tim (USAILC)
**Sent:** Sunday, October 08, 2017 7:01 PM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Patrick:

Tim

**From:** Hansen, Patrick (USAILC)
**Sent:** Saturday, October 7, 2017 6:27 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** Re: Schock

Thank you.

Sent from my iPhone

On Oct 7, 2017, at 6:26 PM, Bass, Tim (USAILC) <TBass1@usa.doj.gov> wrote:

Patrick:

Tim

> Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

**From:** Hansen, Patrick (USAILC)
**Sent:** Saturday, October 7, 2017 11:49 AM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Patrick H.

**From:** Bass, Tim (USAILC)
**Sent:** Saturday, October 07, 2017 11:21 AM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** FW: Schock

Patrick:

Tim

**From:** Bass, Tim (USAILC)
**Sent:** Friday, October 6, 2017 5:09 PM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Subject:** RE: Schock

Patrick:

Tim

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

**From:** Hansen, Patrick (USAILC)
**Sent:** Thursday, October 05, 2017 1:15 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** Schock

Tim,

Patrick D. Hansen
Acting U.S. Attorney
Central District of Illinois
217-492-4450

Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)

E-FILED
Tuesday, 17 October, 2017  04:52:28 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 16-CR-30061-CSB |
| | ) |
| AARON A. SCHOCK, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S COMPLIANCE WITH THE COURT'S OCTOBER 3, 2017 ORDER AND MOTION TO RECONSIDER

The United States of America, by Acting United States Attorney Patrick D. Hansen, for its response to this Court's Order of October 3, 2017, respectfully states:

### Background

Aaron Schock is charged with wire fraud, 18 U.S.C. § 1343 (counts 1-9); mail fraud, 18 U.S.C. § 1341 (count 10); theft of government funds, 18 U.S.C. § 641 (count 11); making false statements, 18 U.S.C. § 1001(a)(2)(c)(1) (counts 12-13); falsifying filings with the Federal Election Commission, 18 U.S.C. § 1519 (counts 14-18); and filing false tax returns, 26 U.S.C. § 7206(1) (counts 19-24). The indictment was returned following an investigation lasting over 18 months, and involved two separate grand juries.

### A. Schock's Motion for Grand Jury Minutes

In March 2017, Schock filed a motion for discovery and a supporting

memorandum of law. (R.63, R.64) Therein, Schock requested that this Court

direct the United States to produce, among other items, the transcripts of the

minutes of the second grand jury that contained "any discussion or instruction

regarding Schock testifying or his decision not to testify." (R.63 at 2) Schock

alternatively requested that this Court conduct an *in camera* inspection of these

materials. *Id.*

As the sole support for this request, Schock filed the handwritten declaration

of a third party, dated February 23, 2017, concerning the third party's alleged

conversation with a former grand juror, which occurred three months earlier, in

November 2016. (R.64-1 at 2) In the declaration, the declarant asserted that the

former grand juror "remarked that he was more free to talk about the case

because the grand jury had been dismissed." *Id.* According to the declarant, "The

[former grand juror] . . . told us that the prosecutor told the grand jury that

Aaron Schock and his attorney were requested to appear and that no one had

shown up." *Id.* Schock argued in his discovery motion that the declarant's

statement entitled him to either disclosure of the grand jury minutes or the

Court's in camera review of the minutes. (R.64 at 2-3, 15-18)

2

### B. Government's Response to Defendant Schock's Motion for Grand Jury Minutes

As an initial matter, and to put the government's response to that motion in context, unless there is some showing of substantial need, it is not the practice of the U.S. Attorney's Office in Central Illinois to request the transcription of grand jury minutes. In reviewing Defendant Schock's initial motion, it is evident that the sole basis for Schock's motion was an allegation supported only by a single hearsay statement. Based on this, and the request for the extraordinary remedy of disclosing the minutes of the second grand jury to the defense (or putting the Court through the time and effort reviewing such minutes), the government chose to respond directly to Schock's allegation. Because government counsel did not make the specified alleged statement either to the first grand jury or to the second grand jury that returned the indictment, in its opposition to Schock's March 2017 motion, the government "unequivocally" denied the allegation (R.69 at 60). Specifically, the government stated:

> According to the witness, the grand juror stated that the government advised the grand jury that Defendant Schock was 'requested to appear and that no one had shown up.' (Aff. Attach. to GJ Mem.) The government unequivocally submits to this Court that this allegation is false. It did not happen. Defendant Schock's speculation that it happened is not a 'compelling necessity' to invade grand jury secrecy. (R.69 at 60)

3

## C. This Court's Order Denying Defendant Schock's Motion for Grand Jury Minutes

In its May 18, 2017, order denying Schock's motion, this Court quoted the

government's response and further stated:

> Defendant also presents a handwritten note of a person who
> describes a conversation with another person who said he was a
> member of the grand jury and then described *a statement* allegedly
> made by the prosecutor before the grand jury.

(R.95 at 9) (emphasis added)  This Court characterized the declarant's

statement as "triple hearsay" (R.95 at 4 n.3) and held that such statement

was insufficient for this Court to examine the inner workings of the grand

jury. (R.95 at 10)

The Court stated that it "is comfortable concluding that [selected witness

testimony] and a triple hearsay note are simply not enough to require the

extraordinary relief Defendant is requesting." (R.95 at 10) Based on this Court's

order, the government reasonably understood that the Court, like the

government, was addressing the sole support for Schock's motion, namely, the

triple hearsay allegation that a specific improper "statement" (R. 95 at 9) was

made to the grand jury, and that this, without more, was simply insufficient to

grant the extraordinary relief requested.

4

### D. Defendant Schock's Motion to Dismiss Indictment

In August 2017, Schock filed a motion to dismiss the indictment, again based solely on the same third party declaration. (R.100) This motion, however, was not simply requesting that the government produce the grand jury minutes to the defense or to the court, but that the matter be dismissed due to alleged misconduct before the grand jury.  (R.100)  He also requested the authority to subpoena the grand juror to testify whether the statement occurred and the impact it had on the grand juror's decision-making process. (R.100, R.101)

### E. Government's Response to Defendant Schock's Motion to Dismiss Indictment for Violation of Fifth Amendment Rights

Partly due to the broader request in the defendant's motion to dismiss, the government, in its motion for extension of time to file its response to the motion to dismiss, advised the Court that "due to the repeated allegations (albeit with no additional support) regarding Fifth Amendment issues, and to reflect the government's complete transparency with the Court, the government has requested the grand jury minutes for both the initial and charging grand juries (which total more than 2,000 pages) and will make the minutes available to the Court in camera, as the Court deems necessary." (R.111 at 3)

Upon receipt of the grand jury minutes, several government attorneys conducted a review and confirmed the veracity of its prior representation that

5

the government did not inform the grand jury that "Defendant Schock was requested to appear and that no one had shown up." (R.69 at 60)

However, due to the breadth of the allegation (albeit with no additional support) and request to dismiss the indictment due to allegations of governmental misconduct before the grand jury, the undersigned also determined it was necessary for the government to supplement and clarify its previous response to insure there was no misunderstanding.  (R.119 at 4) (citing Illinois Rules of Professional Conduct 3.3) (the obligation of candor towards the tribunal).  In retrospect, it is clear that this was necessary as this Court understood the government's initial narrow representation to be a much broader assertion.

To be clear, in its response to Schock's motion to dismiss, under my signature as the Acting U.S. Attorney, the government did not intend to suggest that it had previously made a knowing and material misrepresentation to the Court. Instead, the intention was (1) to confirm to the Court that the government did not make the statement alleged in the declarant's affidavit that Schock appended to his motion for disclosure of the grand jury minutes; and (2) to address what the government viewed as the broader claim in Schock's motion to dismiss – i.e. whether the government commented in any manner on Schock's right not to testify.  Further, the Court should place no additional significance to the filing of

6

the response under my name, versus that of AUSA Bass.  The fact that I filed the response was due to the need to spread the workload in the case and, significantly, that I made one of the quoted statements in the response to the charging grand jury.

In an attempt to clarify the matter, the government provided the Court with the relevant excerpts of the grand jury minutes for both the initial and charging grand juries and fully addressed the issue of Schock's testifying or decision not to testify before either grand jury in an effort to put this matter to rest. Unfortunately, the government's efforts complicated the issue further.

As the government noted in detail in its response to the motion to dismiss, on eleven occasions — seven times before the first grand jury and four times before the second grand jury — government counsel commented on or addressed Schock's testifying or decision not to testify before the grand jury, typically in response to inquiries by the one or more grand jurors. (R.119 at 4-15) The excerpts of the grand jury minutes also conclusively confirms that at no time did the government make the statement that Schock claimed the government made in his motion for disclosure of grand jury minutes, that is, "Defendant [Schock] was requested to appear and that no one had shown up." (R.95 at 5; R.69 at 60)

7

## I. Compliance With Order

Pursuant to this Court's Order of October 3, 2017, the Acting U.S. Attorney has reviewed all of the pending pleadings, and respectfully submits the following as its statement of compliance:  The undersigned is confident that there are no intentionally false or misleading material claims made by the government. That being said, it is important that my representation be put in context, as many items that may be classified as "claims" or "statements" may be expressions of opinion, may be argument regarding disputed matters, and/or may be statements based on ordinary standards of practice or care.

### (1) Statements Based on Ordinary Practice and Standards

The claims and statements made in all of the matters pending before the Court were made in good faith, using due care under the ordinary practice in the United States District Court.  The government submits this caveat, as it is acutely aware of the possible repercussions should these statements be viewed using any different or greater standard.  This concern is highlighted by the Court's footnote (numbered 3) in its October 3 order, referring to the claim that the Department of Justice has authorized the charges in this case.  The Court expressed concern whether such authorization was made with "full knowledge of the occurrences before the Grand Jury" as set forth in the Government's response to Schock's Motion to Dismiss.  Simply put, the transcripts of the grand jury minutes were

8

not provided to the officials at the Department of Justice, and were, therefore, not within the knowledge of those officials in approving the indictment. In fact, those transcripts did not exist until approximately August 2017.

While it would have been well outside the standard of practice for the entire transcript of the Grand Jury proceedings to have been submitted for review, or for such a review to have taken place, nevertheless, the undersigned can state the charges in this matter were thoroughly reviewed by officials in the U.S. Department of Justice Criminal Division, Public Integrity Section and Office of the Deputy Attorney General. Substantial material was submitted by the government investigators as well as from the defense, both in writing and in person. After such review, the United States Attorney was authorized to seek an indictment against Schock.

**(2) Statements or Arguments Made Regarding Disputed Matters**

The government is certainly aware that Schock has made numerous allegations regarding the government's conduct during the course of the investigation. These allegations go all the way back to the very first pleading filed during the course of the investigation, which, among other things, accused the government attorney of violating the rules of ethics because a grand jury subpoena for Schock was served on him. It is with this understanding, and with the full understanding that Schock disputes many statements, that the

9

undersigned certifies that there are no intentional misrepresentations or

intentionally false or misleading claims in any of the government's filings.

A good example of such a disputed statement is the government's

representation made in response to an accusation that government counsel

inquired of witnesses regarding Schock's sexual orientation. (R.108 at 76) The

government has represented that "[t]his allegation is completely erroneous,"

(R.127 at 38); has agreed with Mr. Schock that this matter was the subject of

"gossip" (R.108 at 76) in the media that pre-existed the grand jury investigation,

and that it "also was of interest prior to the grand jury investigation among his

friends and staff members." (R.127 at 39) It is also correctly represented that "the

government did not inquire about it." (R.127 at 39) We further stated that out of

more than 100 witness interview reports possessed by the government, only 4

contained references to Mr. Schock's sexuality, "and those references were

initiated by the witness, not by the government." *Id.* In fact, the defendant has

claimed that based on its own investigation, "that government reports for two

other witnesses omit information regarding these types of inquiries." (R.108 at

78) The government has made requests to the defense for the source of this

information so that further inquiry or explanation can be made, but the

defendant has chosen to not share its interview summaries, reports or

information with the government, or to identify the source for such declarations.

10

I therefore certify the accuracy of the government's representation with the

knowledge that the defendant claims to possess information to the contrary.

However, I make this certification following inquiry of the agents involved in the

investigation of the matter, and with information provided by attorney J. Steven

Beckett, who represented several of the witnesses in this matter, and who is

prepared to testify that such questions were not asked by the prosecutors or

agents in his presence." Per Attorney Beckett, "the government acted

'professionally' at all times." (R.127 at 35)

### (3) Allegations of Harassment of Witnesses

A similar quandary is present when discussing claims and statements

regarding allegations that certain witnesses "felt" harassed. In response to Mr.

Schock's claims of the government "concocting a theory," presenting "false"

evidence, "misleading" the grand jury, or "influencing the witness's testimony"

(R.108 at 36), the government argued that they are "completely meritless." In

support of this argument, the government presented the grand jury transcripts of

numerous witnesses to the Court, represented that Mr. Schock had "insert[ed] an

inaccurate document into his memorandum[,]" (R.127 at 30), and further

represented that there was not "a single prospective witness before the grand

jury [who has] contended in his or her affidavit [or otherwise] that the so-called

11

'threats' by the government officials had caused him to testify falsely before that body." (R.127 at 37)

The government reaffirms these statements and is prepared, if the Court deems it necessary, to present further evidence in support of these statements, including the attorney(s) who represented several of these witnesses and was present during many of the interviews of the witnesses. However, should this Court hold a hearing and find otherwise, such would not make the government's statements or claims either false or misleading (presuming the witnesses testify consistent with their prior representations), it would simply mean that the Court disagrees with the conclusion.

There are several statements and claims throughout the government's pleadings, which rely on conclusions, legal and otherwise, reached following an assessment of the facts, the law, or both. Statements regarding the reasonableness and legality of the CI's actions[1], for example are supported by reports authored by law enforcement agents. Similarly, statements regarding the government's efforts to comply with its discovery obligations[2] are made in good faith, based on

---

[1] *See e.g.* R. 69, p. 53 ("Although Defendant Schock suggests that it is inappropriate for a government attorney to act as an 'alter ego' for law enforcement agents…there is no evidence to support that assertion because it simply did not occur.")

[2] *See e.g.* R.128, p.13 ("The government has complied with its Rule 16 obligations and the defendant's requests for materials to a remarkable extent, providing significantly more discovery than its legal requirement.")

12

the knowledge available at the time. Should it become evident, however, that an item or category of documents was overlooked and had not been provided, this would not change the fact that the representation (or this certification) was made in good faith and after a reasonable inquiry at the time that it was made.

### (4) Expressions of Opinion or Argument

Finally, there are statements in the form of argument which have been reviewed. *See e.g.* R.127, p.22 ("...Schock submits no evidence to support his extreme claims. Defendant Schock's claims are just that – naked claims with inflammatory rhetoric....") Once again, this Court may find that the government is incorrect in these assertions. The statements, however, and those like them, were made in good faith to advance an argument or position believed to be correct, and intended as advocacy to assist the Court in reviewing this position.

### II. Request for Reconsideration of This Court's Findings in its October 3 Order

In its October 3, 2017, order, this Court stated that "the Government admitted that a previous claim made by Assistant United States Attorney Timothy Bass was misleading, if not simply false." (Order at 1) The Court noted that the "claim related to an allegation that a Government attorney made comments regarding Defendant's failure to testify before the Grand Jury." (*Id.*) The Court further stated that "the Government has now changed its position" that it "unequivocally submits to this Court that this allegation is false. It did not

13

happen." (*Id.*) The Court noted that this "clarification" was made by the Acting United States Attorney. Based on these findings, the Court further concluded that "it was misled by the Government[,]" and that the statement made by the government was "false." (*Id.* at 3)

With complete respect to the Court, the government submits that the Court's statements (1) that "the Government admitted that a previous claim made by Assistant United States Attorney Timothy Bass was misleading, if not simply false" and (2) that "the Government has now changed its position" are mistaken. The government respectfully requests that the Court reconsider its findings and withdraw any finding that the government attorney acted to intentionally mislead the Court or intentionally make a false statement.

First, as noted above, prior to filing its response to Schock's motion for grand jury minutes, the government was confident that the alleged specific "statement" (R.95 at 9) was not made to the grand jury. Then, prior to filing its response to Shock's motion to dismiss, the government obtained and reviewed the entire grand jury minutes (more than 2,000 pages) and conclusively confirmed the accuracy of its statement that there was no representation to the grand jury that "Defendant [Schock] was requested to appear and that no one had shown up" (R.95 at 5); (R.69 at 60)

14

Second, the government's more recent response to Schock's motion to dismiss the indictment (R.119) included language expressing that it was supplementing and clarifying its prior response. This response was not intended to suggest to the Court that the prior statements were false or misleading or that the government was changing its position. Rather, the government provided the supplemental information to the Court to show that, although the government did not make the specific statement Schock alleges the government made, the government did make remarks regarding Schock's testifying or decision not to testify before the grand jury, typically to clarify matters for the grand jury. Further, the government provided the supplemental information to address Schock's request for dismissal for alleged violation of his Fifth Amendment rights (a remedy broader than he previously sought) and, relatedly, to address whether Schock was prejudiced by any alleged violation before the indicting grand jury.

Unfortunately, the government failed to make clear its intent and accepts complete responsibility for any misunderstanding that the government was admitting that it knowingly misled the Court by its unequivocal denial of the accuracy of the declarant's statement. The government apologizes to the Court for causing that misunderstanding.

15

Third, the government acknowledges that it alone has caused an unintended

conflation of (a) the sole allegation in Schock's initial motion for grand jury

minutes that the government made a specific improper statement to the grand

jury that "Defendant [Schock] was requested to appear and that no one had

shown up" (R.95 at 5), on one hand; and (b) the much broader issue of Schock's

non-appearance before both grand juries and his Fifth Amendment rights, on the

other hand.   This was the result of the government's quest for complete

transparency in its response to the motion to dismiss for alleged violation of

Schock's Fifth Amendment rights, rather than any representation that it had

previously misled the Court.

In the government's response to Schock's motion to dismiss, and in an effort

to put this matter to rest, we have now fully addressed the broader issue of

Schock's non-appearance before both grand juries and, as argued, there was no

violation of Schock's Fifth Amendment rights and, alternatively, no prejudice

that would warrant dismissal of the indictment.

Fourth, the government acknowledges that it is solely responsible for causing

this conflation or misunderstanding of issues. If the Court determines that

further criticism of the government is warranted for not going beyond the

specific allegation in Schock's motion for grand jury minutes, or not ordering

and reviewing all of the grand jury minutes before it responded to Schock's

Attachment No. 1 - page 000181

discovery motion, we fully accept it. If the government had done so, this

unfortunate circumstance and the inconvenience it has caused to the Court most

certainly would have been avoided. We respectfully submit to the Court,

however, that the government has not intentionally made any false or misleading

statement to the Court.

Accordingly, the government respectfully requests that the Court reconsider

its finding that the government acted to mislead the Court or that any AUSA

intentionally made a false statement, and withdraw any such finding.

### Conclusion

For the reasons presented, the government respectfully requests that the

Court reconsider its previous findings that the government acted to mislead the

Court or that its AUSA intentionally made a false statement. Furthermore, that

the Acting U.S. Attorney has complied with this Court's Order of October 3,

2017.

Respectfully submitted,

UNITED STATES OF AMERICA

By:   /s/Patrick D. Hansen
      Acting United States Attorney
      318 South 6th Street
      Springfield, Illinois 62701-1806
      Tel: 217-492-4450

17

## CERTIFICATE OF SERVICE

I certify that on October 17, 2017, I caused the government's response to be filed with the Clerk of the Court using the CM/ECF system, which will cause notice to be served on counsel of record.

/s/ Patrick D. Hansen
Acting United States Attorney

18

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | 'OIG) |
| **Subject:** | FW: Schock |
| **Date:** | Tuesday, December 05, 2017 12:52:42 PM |

(11/16/17)

Later that afternoon, Judge Bruce, the presiding judge in the *Schock* matter, contacted Mr. Childress by phone, shortly after which (less than one hour) Mr. Childress was sworn in by a different district judge in Springfield as the Interim USA. That evening, Mr. Hansen again advised the assigned paralegal: "For the last time, I do not want this case." Both Mr. Hansen and Mr. Childress further advised the assigned paralegal that they believe Judge Bruce is personally "hostile to Tim."

Tim

**From:** Bass, Tim (USAILC)
**Sent:** Thursday, November 16, 2017 9:56 AM
**To:** Hansen, Patrick (USAILC) <PHansen@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** RE: Schock

Patrick and John:

Attorney work product on pending litigation; DOJ personnel matters; lack of relevance (no reference to communications between CSB and USAO)

Thank you.

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois

<div style="border:1px solid red; color:red;">
Attorney work product on pending litigation;
DOJ personnel matters; lack of relevance
(no reference to communications between
CSB and USAO)
</div>

**From:** Hansen, Patrick (USAILC)
**Sent:** Monday, November 13, 2017 5:55 PM
**To:** Bass, Tim (USAILC) <TBass1@usa.doj.gov>
**Cc:** Childress, John (USAILC) <JChildress@usa.doj.gov>
**Subject:** Schock

Tim,

Please let me know if you have any questions.

Patrick D. Hansen
Acting U.S. Attorney
Central District of Illinois
217-492-4450

| | |
|---|---|
| **From:** | Bass, Tim (USAILC) |
| **To:** | (OIG) |
| **Subject:** | FW: United States v. Schock, 16-30061 (CDIL) |
| **Date:** | Tuesday, December 05, 2017 12:34:43 PM |
| **Attachments:** | 2016EPerformanceEvaluation.pdf |
| | GJExcrpts..pdf |

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation.

**From:** Bass, Tim (USAILC)
**Sent:** Thursday, November 16, 2017 9:52 AM

Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO. Attorney work product on pending litigation.

Thank you for your consideration.

Tim Bass

Timothy A. Bass
Assistant United States Attorney
Central District of Illinois
(217) 492-4485

Privacy Act; confidential personnel information

**U.S. DEPARTMENT OF JUSTICE**
United States Attorneys

**Performance Work Plan and Appraisal Record**

**DISCLOSURE STATEMENT:** This information is personal. It must be appropriately safeguarded from improper disclosure and it should only be made available for review by appropriate management levels having a need to know.

Form USA-265
Rev. 2/05

Attachment No. 1 - page 000189

Privacy Act; confidential personnel information

## 2016 Performance Evaluation – Tim Bass

Privacy Act; confidential personnel information

Next 39 pages: grand jury material, Fed. R. Crim. P. 6(e)

**GRAND JURY PROCEEDINGS 10/4/2016**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF ILLINOIS

 3                 SPRINGFIELD DIVISION

 4

 5

 6            GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. PATRICK HANSEN

12   Assistant United States Attorney

13   Springfield, Illinois

14

15

16

17

18

19

20

21

22

23

24            TRANSCRIPT OF PROCEEDINGS

25               OCTOBER 4, 2016
```

GRAND JURY PROCEEDINGS  10/4/2016

Page 2

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376        Fax: 314.644.1334

GRAND JURY PROCEEDINGS  10/4/2016

Page 3

GRAND JURY PROCEEDINGS  10/4/2016

Page 4

Attachment No. 1 - page 000195

GRAND JURY PROCEEDINGS  10/4/2016

Page 5

Attachment No. 1 - page 000196

GRAND JURY PROCEEDINGS  10/4/2016

Page 6

Attachment No. 1 - page 000197

**GRAND JURY PROCEEDINGS  4/8/2015**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF ILLINOIS

 3                 SPRINGFIELD DIVISION

 4

 5

 6              GRAND JURY INVESTIGATION

 7

 8

 9

10     PRESENT:

11     MR. JOHN CHILDRESS

12     Assistant United States Attorney

13     Springfield, Illinois

14

15     MR. TIMOTHY BASS

16     Assistant United States Attorney

17     Springfield, Illinois

18

19

20

21

22

23

24         EXCERPTS OF TRANSCRIPT OF PROCEEDINGS

25                   APRIL 8, 2015
```

GOV. UNDER SEAL APP. 2

Attachment No. 1 - page 000199

**GRAND JURY PROCEEDINGS  4/8/2015**

Page 3

GOV. UNDER SEAL APP. 3          Attachment No. 1 - page 000200

Page 4

GOV. UNDER SEAL APP. 4

Attachment No. 1 - page 000201

GOV. UNDER SEAL APP. 5

GRAND JURY PROCEEDINGS 4/9/2015

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF ILLINOIS

 3                  SPRINGFIELD DIVISION

 4

 5

 6               GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. JOHN CHILDRESS

12   Assistant United States Attorney

13   Springfield, Illinois

14

15   MR. TIMOTHY BASS

16   Assistant United States Attorney

17   Springfield, Illinois

18

19

20

21

22

23

24               TRANSCRIPT OF PROCEEDINGS

25                    APRIL 9, 2015
```

GRAND JURY PROCEEDINGS  4/9/2015

Page 17

GOV. UNDER SEAL APP. 7          Attachment No. 1 - page 000204

GRAND JURY PROCEEDINGS  4/9/2015

Page 21

GOV. UNDER SEAL APP. 8

Attachment No. 1 - page 000205

**GRAND JURY PROCEEDINGS 5/7/2015**

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF ILLINOIS

 3                SPRINGFIELD DIVISION

 4

 5

 6            GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. TIMOTHY BASS

12   Assistant United States Attorney

13   Springfield, Illinois

14

15

16

17

18

19

20

21

22

23

24        EXCERPTS TRANSCRIPT OF PROCEEDINGS

25               MAY 7, 2015
```

GRAND JURY PROCEEDINGS  5/7/2015

Page 19

GOV. UNDER SEAL APP. 10

Attachment No. 1 - page 000207

GOV. UNDER SEAL APP. 11

**GRAND JURY PROCEEDINGS  6/3/2015**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF ILLINOIS

 3                 SPRINGFIELD DIVISION

 4

 5

 6            GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. JOHN CHILDRESS

12   Assistant United States Attorney

13   Springfield, Illinois

14

15   MR. TIMOTHY BASS

16   Assistant United States Attorney

17   Springfield, Illinois

18

19

20

21

22

23

24            TRANSCRIPT OF PROCEEDINGS

25                 JUNE 3, 2015
```

GRAND JURY PROCEEDINGS  6/3/2015

1
1
1
1
1
1
1
1
1
1
2
2
2
2
2
2

GOV. UNDER SEAL APP. 13                Attachment No. 1 - page 000210

GRAND JURY PROCEEDINGS  6/3/2015

Page 13



GOV. UNDER SEAL APP. 14     Attachment No. 1 - page 000211

**GRAND JURY PROCEEDINGS  6/3/2015**

Page 14

GOV. UNDER SEAL APP. 15

Attachment No. 1 - page 000212

GRAND JURY PROCEEDINGS  6/3/2015

Page 15

GOV. UNDER SEAL APP. 16

Attachment No. 1 - page 000213

GRAND JURY PROCEEDINGS 8/6/2015

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF ILLINOIS

 3                    SPRINGFIELD DIVISION

 4

 5

 6                 GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. TIMOTHY BASS

12   Assistant United States Attorney

13   Springfield, Illinois

14

15

16

17

18

19

20

21

22

23

24         EXCERPTS OF TRANSCRIPT OF PROCEEDINGS

25                    AUGUST 6, 2015
```

GOV. UNDER SEAL APP. 17          Attachment No. 1 - page 000214

GRAND JURY PROCEEDINGS 8/6/2015

Page 2

GOV. UNDER SEAL APP. 18    Attachment No. 1 - page 000215

**GRAND JURY PROCEEDINGS  8/6/2015**

GOV. UNDER SEAL APP. 19          Attachment No. 1 - page 000216

**GRAND JURY PROCEEDINGS  1/21/2016**

Page 1

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF ILLINOIS

 3                     SPRINGFIELD DIVISION

 4

 5

 6                  GRAND JURY INVESTIGATION

 7

 8

 9

10    PRESENT:

11    MR. JOHN CHILDRESS

12    Assistant United States Attorney

13    Springfield, Illinois

14

15    MR. TIMOTHY BASS

16    Assistant United States Attorney

17    Springfield, Illinois

18

19

20

21

22

23

24                  TRANSCRIPT OF PROCEEDINGS

25                     JANUARY 21, 2016
```

The image is blank/redacted. Only header and footer text visible.

**GRAND JURY PROCEEDINGS  1/21/2016**

GRAND JURY PROCEEDINGS  1/21/2016

GOV. UNDER SEAL APP. 22    Attachment No. 1 - page 000219

## GRAND JURY PROCEEDINGS 3/24/2016

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF ILLINOIS

 3                 SPRINGFIELD DIVISION

 4

 5

 6             GRAND JURY INVESTIGATION

 7

 8

 9

10   PRESENT:

11   MR. JOHN CHILDRESS

12   Assistant United States Attorney

13   Springfield, Illinois

14

15   MR. TIMOTHY BASS

16   Assistant United States Attorney

17   Springfield, Illinois

18

19

20

21

22

23

24             TRANSCRIPT OF PROCEEDINGS

25                 MARCH 24, 2016
```

GOV. UNDER SEAL APP. 24

GRAND JURY PROCEEDINGS  3/24/2016

Page 8

GOV. UNDER SEAL APP. 25              Attachment No. 1 - page 000222