## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cr-20057-JES-JEH |
| | ) | |
| SARAH NIXON, | ) | |
| | ) | |
| Defendant. | ) | |

# <u>ORDER AND OPINION</u>

This matter is now before the Court on Defendant Nixon's Motion (Doc. 173) for New Trial, the United States' Response (Doc. 181), Defendant's Supplemental Motion (Doc. 204) for New Trial and Supplemental Memorandum (Doc. 218) in Support, the United States' Supplemental Memorandum (Doc. 22) in Opposition, and Defendant's Reply (Doc. 222) thereto. For the reasons set forth below, Defendant's Motions (Docs. 173, 204) are GRANTED, and Defendant's conviction and sentence are VACATED.

### BACKGROUND

**(A)** *United States v. Nixon*

*(1) Procedural History*

Sarah Nixon was convicted following a jury trial before District Judge Colin S. Bruce for international parental kidnapping, in violation of 18 U.S.C. § 1204. She was subsequently sentenced to 26 months in prison. Her conviction was affirmed on direct appeal. *United States v. Nixon*, 901 F.3d 918 (7th Cir. Aug. 28, 2018). While her appeal was pending before the Seventh Circuit, Nixon's appellate counsel filed a motion in the district court to supplement the record on appeal. Doc. 153. After Judge Bruce denied the motion, Nixon's appellate counsel renewed her motion to supplement the record on appeal before the Seventh Circuit, which was also denied.

The documents appellate counsel sought to supplement the record on appeal with are central to Nixon's postconviction proceedings and are discussed below.

Following the conclusion of her direct appeal, the Court appointed the Federal Defender to represent Nixon in connection with anticipated postconviction proceedings. *See* Sept. 26, 2018 Text Order. On October 25, 2018, Nixon filed a Motion for New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Doc. 173. Therein, she asserted Judge Bruce had a disqualifying bias against her and in favor of the United States.[1] The basis for the motion stemmed from ex parte communications between Judge Bruce and individuals employed by the United States Attorney's Office ("USAO" or "the Office") in this District. Those communications were also the subject of complaints before the Judicial Council of the Seventh Circuit ("the Council"). *See In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067 (7th Cir. Jud. Council May 14, 2019).

Judge Bruce's ex parte communications with the Office became public in August 2018, when the *Illinois Times* published an article titled "Federal judge engaged in ex parte talk." That article reported on emails exchanged between Judge Bruce and United States Attorney's Office paralegal Lisa Hopps during Nixon's December 2016 trial, over which Judge Bruce presided. Hopps did not work on the *Nixon* trial, but the two began emailing about it after Hopps sent Judge Bruce an email asking about his absence at former United States Attorney ("USA") Jim Lewis's going away party. Judge Bruce responded that he missed the party because of the *Nixon* trial. Judge Bruce went on to criticize one of the prosecutors in *Nixon* as "entirely inexperienced" and said the prosecutor was, among other things, "repeating the bullshit" to which Nixon testified, and turning a "slam-dunk" case into a "60-40" one for Ms. Nixon. Following the

---

[1] Nixon later supplemented her Motion for New Trial to add an appearance of bias claim under 28 U.S.C. § 455(a). *See* Doc. 204.

*Illinois Times* report, Chief Circuit Judge Wood (and later, Federal Public Defender Patton) filed a complaint with the Council, and the undersigned, in my capacity as Chief District Judge,[2] removed Judge Bruce from all cases involving the United States. The complaints were resolved on May 14, 2019, when the Council issued an order admonishing Judge Bruce, continuing his removal from all cases involving the United States until September 1, 2019, and requiring him to review certain judicial training materials. The Council concluded its order by indicating it has not identified any evidence suggesting Judge Bruce's ex parte contact or relationship with the U.S. Attorney's Office in the Central District of Illinois impacted his decision making in any case. *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067, at 1.

The *Nixon*-related emails came to light as a result of Hopps, reportedly in late 2017, sharing them with Assistant U.S. Attorney ("AUSA") Timothy Bass, after Judge Bruce issued an order finding that Bass had misled the court in *United States v. Schock*, No. 16-cr-30061. AUSA Bass later notified certain Office personnel in the Urbana branch of the emails with Hopps. Around May 2018, Elly Peirson, an AUSA on the *Nixon* trial, contacted Hopps asking for the emails. Peirson then shared the emails with USAO leadership—John Childress, Patrick Hansen, and Greggory Walters (an AUSA and the Office's Professional Responsibility and Ethics Advisor). Hansen and Walters subsequently shared the emails with the Department of Justice ("DOJ"). The Office then made the decision (1) to disclose the emails to Nixon's counsel and (2) to conduct a review to determine what other ex parte communications may exist and whether additional disclosures were necessary.

---

[2] My tenure as Chief District Judge concluded on March 12, 2019. District Judge Sara L. Darrow is the current Chief Judge in this District.

3

*(2) Postconviction Proceedings*

The USAO's disclosures prompted Nixon's Motion for New Trial. Doc. 173. In its response to the motion, the United States included extensive excerpts of Judge Bruce's ex parte emails. Doc. 181. Additionally, the United States disclosed several additional communications between Judge Bruce and the Office relating to other cases, and communications between various members of the USAO and other institutions. However, the United States provided Nixon with redacted versions of some of these documents, asserting the work product doctrine and other privileges precluded disclosure of certain materials. Docs. 192–96. This Court referred the discovery dispute to Magistrate Judge Hawley, who entered an oral order on Nixon's Motion (Doc. 197) to Unredact on December 17, 2019. Magistrate Judge Hawley's rulings on Nixon's Motion to Unredact were the subject of a previous appeal to this Court by the United States. *See United States v. Nixon*, No. 15-cr-20057, 2020 WL 616164 (C.D. Ill. Feb. 10, 2020); Doc. 209 (Order affirming Magistrate Judge's decision).

*(a) Ex Parte Communications*

Although the substance of the ex parte emails has been recounted numerous times between this Court, the Seventh Circuit, and the Judicial Council, the Court again summarizes those communications here in the manner Defendant presents them. *See* Doc. 218 at 5–22.

- On November 5, 2013, Judge Bruce and paralegal Staci Klayer exchanged emails about how "sad" Judge Bruce's former office in the United States Attorney's office looked. Doc. 214-1 at 1-3.

- On November 6, 2013, he was included in a group email originated by the United States Marshals Service regarding an annual security review for the courthouse which included representatives from several court units, including the United States

4

Attorney's office. Doc. 214-1 at 4-5. Judge Bruce used this email chain as an opportunity to email United States Attorney Jim Lewis to talk about the experience of moving from the USAO to the bench. *Id*. at 6-15.

- On November 7, 2013, Judge Bruce emailed First Assistant United States Attorney Eric Long, who took over the position after Judge Bruce's exit, "how much is the FASUA [sic] job sucking at this point?" *Id*. at 17.

- On November 10, 2013, then FAUSA Long emailed Judge Bruce with a copy of an email from former AUSA Matt Cannon to then FAUSA Colin Bruce concerning an "October 2012 Case Review." *Id*. at 18. The email chain was resumed the next day, November 11, 2013, in which FASUA Long and Judge Bruce discuss the work Cannon did - or in their opinion did not do - on the cases listed in the case review. *Id*. at 36-40.

- On November 21, 2013, Klayer emailed Judge Bruce about how sad she was that he was gone, to which Judge Bruce replied "Sorry. I miss all of you and everyone else . . . .Ok, maybe not Shakey Pete . . . . . I'm pretty bored and a little lonely up here. I'll keep making reasons to come back to the USAO . . . . (so where IS my favorite highliter? . . . . Must be in the USAO . . . .). Klayer then responds, "I hid it. It might take all day in here for you to find it. Come on down!!!!." *Id*. at 60.

- On November 26, 2013, in an email chain between Klayer and Judge Bruce that began with a discussion of Judge Bruce providing a letter of recommendation for a summer intern, Judge Bruce asked Klayer, "Ho's [sic] the Urbana Supervisor's on-line shopping going?!" to which Klayer responds, "OMG – between her and SONI

5

it's a shopfest. I would love to review their online activity! We need a new supervisor – bad. I still miss you. *Id.* at 77.

- On December 6, 2013, Klayer sent Judge Bruce and email stating, "Um yeah . . . I still really miss you. Call ANYtime!" Judge Bruce responded "Sorry. Not very much fun up here. Miss you guys" to which Klayer responded "It's going to get better for you – once you get past the six month deadline, it's gonna get fun! You're going to rock it." *Id.* at 108-110.

- Later on December 6, 2013, Hopps emailed Judge Bruce, "They have been given authority to post my [redacted]!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!! I'm freaking out!!!!!!!!!!!!!!!!! It's still doesn't mean it's good to go, but I've got a shot!!!!!!!!!!! THANK YOU FOR EVERYTHING YOU DID FOR ME! I'll keep you posted! P.S. – Delete your freaking messages so I can leave you one on your super-duper phone!" *Id.* at 111. Later emails make clear the posting Hopps is referring to is for an increased federal pay grade. Judge Bruce responded to Hopps' email, "I thought it would work. You will get it. You deserve it." *Id.* at 112. Hopps responds, "Aw, thanks Colin. [emoji smiley face] Did you delete your messages on your phone yet? *Id.* at 114. Judge Bruce then replies that he is going to the Verizon store to fix an issue he is having with his voicemail and tells Hopps "I want to know the moment you get the [redacted]. (I wonder how honked off Crazy and her henchman are going to be....) Later emails reveal Judge Bruce meeting with U.S. Attorney Jim Lewis and discussing Hopps' promotion and Hopps receiving the promotion.

- On December 12, 2013, in the middle of an email chain between Klayer and Judge Bruce discussing whether he has received his lump sum payment for unused vacation

time at the USAO, Judge Bruce asks Klayer, "Why were Ronda and Elly out again
together today? BAD for morale......" *Id*. at 127. Rhonda is AUSA Rhonda Coleman
and Elly is AUSA Elly Peirson. Klayer responds, "Yeah - that was about an hour and
a half lunch – just the two of them and I ate lunch with the guys at the table. It's not
going to change!!!!" to Judge Bruce responded, "That is REALLY bad. I thought once
I was gone she would step up. She is not. Is Eugene at least trying to help her or is he
still just doing his Scooter-work-only thing?" to which Klayer responds, "Oh, no
stepping up – but she doesn't ask either." *Id*. at 131-135. Judge Bruce then asks, Why
doesn't she start acting like the supervisor? Why doesn't she ask Eugene for help?
The office will not last long as it is......" *Id*. at 138. Klayer responds, "I know . . .
sucks without you. No leadership at all. Bunch of Indians and no chief." *Id*. at 141.

- On December 18, 2013, in the middle of an email chain in which Klayer is expressing
  displeasure with an AUSA's participation in preparing a parting gift for Judge Bruce,
  he tells Klayer, "I talked to Eric earlier in the week. The Urbana USAO is going
  downhill. Sounds like there is lots of disgruntlement......" *Id*. at 198. "Eric" was First
  Assistant United States Attorney Eric Long.

- On December 19, 2013, Klayer emailed Judge Bruce saying "Sorry I missed your
  calls last night – I saw on my phone about 8:00 that you had called" and then
  discussed the exchange of Christmas gifts between some USAO staff. *Id*. at 208.
  Judge Bruce responds, "Talked to Jason last night after I couldn't talk to you. Eric
  knows it's bad. Eric concluded Eugene is unwilling to help ("Scooter mode"). I told
  him I learned that about two years before. I told Eric he has no good options and just
  needs to come over more often and GET RON! DA OFF AWS so she is in the office

and supervising. I am afraid it's only going to get worse. BTW, the Urbana numbers

are dropping since I switched out of rain-making mode last summer. That needs to be

fixed also." *Id*. at 209.

- Klayer responded to Judge Bruce's email by further commenting on the supervising

  AUSA buying Christmas gifts for only some of the staff. Judge Bruce responded,

  "The whole "Supervisor Separation" concept did not sink in. Being a supervisor can

  be lonely; it's also necessary to maintain morale. Eric and John Childress have both

  talked to me about the group of Eugene, Jason, Tim and Joe. I let them know things

  are better now that Rick is gone, but the White Man Power Group is still in operation.

  Ronda needs to step up or Eugene needs to have a chance a supervisor. He will need

  to change his behavior also. If he does not, it will be as bad as Ronda." *Id*. at 212.

- On January 22, 2014, Klayer emailed Judge Bruce, "Hello, sir. You might remember

  me. We worked together for approximately 23 years. My office is located on the 2nd

  floor of the United States Courthouse in Urbana, Suite 226. If you are ever in the

  area, please stop by. YOUR FAMILY MISSES YOU" *Id*. at 299, to which Judge

  Bruce responds, "In the words of Dick Tracy, "I'm on my way...." *Id*. at 300.

- On January 23, 2014, then First Assistant United States Attorney Eric Long emailed

  Judge Bruce about having lunch the following day when Long would be in Urbana.

  *Id*. at 301. Judge Bruce responded in favor of lunch but then added, "You REALLY

  Need to go to lunch with Ronda one-on-one. I got some reports over Wednesday and

  Thursday and they are not good. After that, I'd love to meet you.... I'll even make

  fresh coffee just for you. What do you think?" *Id*. at 303. Long responded a few hours

later, "You around now? I'd like to hear what you've got before we grab lunch." *Id.* at

304.

- On February 27, 2014, Hopps emailed Judge Bruce, "Guess who's making her move

  for an 11 and is be1ing helped along by the powers that be........I called it." *Id.* at 346.

  This email refers back to the emails regarding the promotion discussed above. Judge

  Bruce responded, "Will not happen....." *Id.* at 347. There is then a long series of

  emails between Judge Bruce and Hopps discussing whether Hopps or someone else in

  the USAO will receive the promotion culminating in Hopps informing Judge Bruce

  that she received the promotion and "Thank you so much for everything that you did

  to help me reach this goal. I'm confident if you hadn't pushed it never would have

  happened. Thank you, thank you, thank you. *Id.* at 348-364.

- On February 28, 2014, Klayer emailed Judge Bruce, "Dude – you really need to come

  see us today since today's the last day we can be your buddies. Love you, man." *Id.* at

  363.

- On March 7, 2014, Judge Bruce emailed U.S. Attorney Jim Lewis asking him to

  lunch, to which Lewis agreed, setting a date for the following Thursday, March 14,

  2014. *Id.* 397-98. Lewis suggested asking the other two federal judges in Urbana to

  join the lunch. Judge Bruce responded, "Uhhhh..... Yes on Black Dog for Thursday.

  No on McCuskey and Baker. (What? Seriously. C'mon.)." *Id.* at 401. This is the first

  of many emails setting up lunch meetings with Judge Bruce and U.S. Attorney Lewis.

- On April 22, 2014, Klayer emailed Judge Bruce about a courtroom shooting in a

  federal courthouse in Utah. *Id.* at 435. Klayer then told Judge Bruce one of her

  reasons for sending the email was "a request that you please allow the marshals

9

service to keep leg restraints on the defendants when they are in court! We don't need anything happening to you or anyone else for that matter!" *Id*. at 436. Judge Bruce responded, "Leg's restraints. Check. Woops! All of the table skirting is in Springfield." *Id*. at 437.

- On June 20, 2014, in an email chain dealing with a new arrest and the unsealing of the case and then a request to reseal the case Judge Bruce emailed Klayer, "Yes. Resealing is OK with me. So I like Joe Green. And Glenn Haas is gone. However, this morning? And now this? Seriously? If I was the FASUA, based on what ha! Ppened [sic] this morning, I would be discussing this in stern tones with DEA (to no effect if Glen was still around, but I would still be doing my job). (Hint: call Eric and advise)." R.214-2 at 583.

- On July 28, 2014, during the jury trial of JB Brown in case number 14-CR-20007, Judge Bruce sent an *ex parte* email to Klayer asking her to send him a copy of the government's jury instructions which she did. *Id*. at 702-703. Judge Bruce followed up a few minutes later with another *ex parte* email telling Klayer he was "working on my non- McCuskey, current Seventh Circuit law preliminary instructions to the jury," and asking if "Jeff Marshall [was] the case agent" in the case in trial. *Id*. at 736. Klayer responds that Marshall is the case agent. *Id*. at 737.

- On September 2, 2014, U.S. Attorney Lewis emailed Judge Bruce to ask if he wanted to go to lunch on September 11, 2014 and Judge Bruce agreed. (the reference to "burnt food" is to "burnt ends," a dining option at barbeque restaurants like the Black Dog in downtown Urbana). *Id*. at 191-92.

- On October 10, 2014, Judge Bruce sent an email to AUSA Jason Bohm with the subject line "Seriously: nice job on your recent oral argument. Posner was a dick to you." Bohm replied, "Thanks. It was an experience. Judge Tinder was kind to me." *Id*. at 846. The oral argument referred to was in *United States v. Smith*, Case No. 14-2223 (7th Cir. 2014), in which the Federal Public Defender's Office represented Mr. Smith before the Seventh Circuit.

- On October 20, 2014, AUSA Ronda Coleman sent an *ex parte* email to Judge Bruce with the subject "Jason's Trial" stating "Hello Judge Bruce, Mr. Bohm indicates his trial is not going that week." *Id*. at 848. Judge Bruce thanks Coleman for the email. It is reasonable to assume this email was in response to a request for information from Judge Bruce given there is no previous email on the subject and Coleman's reference to "that week."

- On October 27, 2014, U.S. Attorney Lewis emailed Judge Bruce asking about meeting for lunch later in the week. *Id*. at 854.

- On October 27, 2014, Klayer emailed Judge Bruce regarding the Seventh Circuit's opinion in the *Smith* case which Bruce had previously exchanged emails about with Bohm. *Id*. at 855. In the opinion the Seventh Circuit found Judge Darrow had erred by not recusing herself from Mr. Smith's revocation case because she had previously appeared on behalf of the government in the original prosecution of Mr. Smith. Judge Bruce responded to Klayer's email by stating, "This is potentially a big deal. It might be you do not see me in revocation hearings for years and years........." to which Klayer responded, "That's what I was afraid of." *Id*. at 856-57.

11

- On October 29, 2014, U.S. Probation officer Gwen Powell emailed Judge Bruce, Magistrate Judge David Bernthal, Judge Bernthal's law clerk, AUSA Eugene Miller, and Klayer reporting alleged bond violations for defendant Oscar Martinez and asking Judge Bruce at an upcoming telephone conference "to inform the offender that the Court is aware of his noncompliance and request that he abide by all of his conditions of bond." *Id*. at 859. Mr. Martinez' lawyer, AFPD Peter Henderson was not copied on the email. Judge Bruce responded, without copying Mr. Henderson, "I can do what you request." *Id*. at 860.

- On November 12, 2014, AUSA Elly Peirson and Judge Bruce exchanged a series of emails regarding child care advice.

- On November 28, 2014, AUSA Peirson sent Judge Bruce an *ex parte* email concerning *United States v. De Bennedetto* stating "FYI – because you were concerned about scheduling. This case will be going to trial." *Id* at 978. Peirson was actually forwarding an email from defense counsel rejecting the government's plea offer but did not copy defense counsel on her email to Judge Bruce. Judge Bruce responded, "Thanks! (surprising also . . .)." *Id*. at 979. While Judge Bruce added his courtroom deputy to his response, he did not add defense counsel.

- On December 18, 2014, Judge Bruce received an email from Deputy United States Marshal Brett Jackson regarding a pending motion in a criminal case for a detained defendant to have a contact visit at the Ford County Jail with his dying mother. *Id*. at 996. Jackson's email included an email chain between himself and the AUSA on the case, Eugene Miller, and an email from defense counsel concerning his filing of the motion. Jackson's email was sent only to Judge Bruce. *Id*. at 996. When Judge Bruce

responded to Jackson he copied AUSA Miller but did not copy defense counsel. *Id*.

Miller and Judge Bruce then exchanged a series of emails on the motion. *Id*. at 997-

1010.

- On February 5, 2015, Hopps emailed Judge Bruce stating, "How are you? Need your

  former FAUSA, Acting USA, Criminal Chief, Branch Supervisor, friendly advice.

  Call me when you get a minute." *Id*. at 1079.

- On February 20, 2015, Legal Assistant Soni Holmes, emailed Judge Bruce a search

  warrant for his review. *Id*. at 1081. The two then exchanged emails joking about

  Judge Bruce coming back to the USAO. Judge Bruce sent an email stating, "I hear it's

  really not so good down there. Sorry." *Id*. at 1099.

- On March 6, 2015, U.S. Attorney Lewis emailed Judge Bruce about meeting for

  lunch the next week. *Id*. at 1107. After a series of exchanges they agreed to meet for

  lunch the following Thursday. *Id*. at 1099-1126.

- On June 4, 2015, Judge Bruce emailed U.S. Attorney Lewis to recommend a former

  intern at the USAO Urbana office for a job with the USAO, and asking if Lewis

  wanted to meet for lunch soon. *Id*. at 1158. Lewis responded regarding the

  recommendation, adding, "and yes I'll get over and we can catch up (lot going on)."

  *Id*. at 1159.

- On June 22, 2015, Hopps emailed Judge Bruce, "I sure wish my friend Colin was still

  working here. Like, seriously." *Id*. at 1193. Judge Bruce responded, "Is there

  ANYTHING going on?" to which Hopps replied, "Tim and Bryan are busy. LOL

  Management – I have no clue what the mission is anymore." *Id*. at 1194-95. Hopps

then sends an email saying, "Call me when you get a chance. I need your advice on some drama." *Id*. at 1196.

- On July 2, 2015, after an email exchange between Hopps and Judge Bruce regarding when the Central District of Illinois was created Hopps tells Judge Bruce, "By the way, I never spoke to John. I just don't think he gets it and it would just create a bigger wedge between him and I. So, I'm letting it go – not forgetting mind you – but letting it go! Did you know that Dave Risley's last day was June 30th? There hasn't been an email about it yet so maybe we could just copy Candy's and insert Dave's name. Definitely be more appropriate. I can see you now saying – STOP." *Id*. at 1205. The reasonable inference is that this email references Judge Bruce's and Hopps' conversation about the "drama" Hopps needed advice on. John is most likely John Childress, who at that time was either the Criminal Chief or First Assistant United States Attorney for the Central District.

- On July 6, 2015, Klayer sent Judge Bruce an email with a copy of the appellate brief filed in the Jermain Speed appeal. *Id*. at 1228. Klayer says she's forwarding the brief to Judge Bruce for his review "given the issues that were raised on appeal." *Id*. Judge Bruce presided over Mr. Speed's case in the district court. Judge Bruce responded, "Unbelievable. Thanks for the early warning." *Id*. at 1294.

- On July 21, 2015, Klayer emailed Judge Bruce asking to move a telephone status conference in *United States v. Dorsey*, 14-20026 for the convenience of the prosecutor on the case. *Id*. 1465. Defense counsel was not included on the email. The next day Judge Bruce and Klayer engaged in a series of emails on the issue again without defense counsel being included. *Id*. at 1457-1476.

14

- On September 9, 2015, U.S. Attorney emailed Judge Bruce asking if he wanted to have lunch the next day. *Id*. at 1611. Judge Bruce agreed. *Id*. at 1614.

- On September 30, 2015, Judge Bruce emailed Hopps an article about the Department of Justice adopting the legal position that a warrant is needed to use "stingray" devices that simulate cellular telephone towers and gather information from cell phones in the area. *Id*. at 1697. The subject line of the email is "Score: Colin 1 – Tony Grootens and Tim Bass 0."

- On October 28, 2015, Judge Bruce emailed AUSA Jason Bohm with the subject line "Nice job." *Id*. at 1766. The email stated, "Jason, Nice job in US v Armour. Good ammo for your Speed argument also. Top notch. ---Colin." "US v. Armour" referred to the Seventh Circuit's opinion in *United States v. Armour*, 804 F.3d 859 (7th Cir. 2015), which was issued on October 26, 2015. The case involved challenges to conditions of supervised release similar to those raised in the Jermaine Speed appeal the USAO had brought to Judge Bruce's attention by forwarding him a copy of Mr. Speed's appellate brief. Thus the reference to "good ammo for your Speed argument also."

- On November 9, 2015, U.S. Attorney Lewis emailed Judge Bruce about going to lunch the following Thursday, November 12, 2015. *Id*. at 1807. Judge Bruce accepted the invitation. *Id*. at 1808. On November 12, 2015, at 12:07:51 p.m. Judge Bruce emailed Hopps, "Just had a hilarious lunch with JAL. Wow. There are still lots of problems in the USAO, caused by the usual suspects. (Man, I do NOT miss that......)." *Id*. at 1814.

15

- On December 30, 2015, Judge Bruce sent Klayer an email with the subject line "December 30? Seriously? Tell me this is not DEA. Please." *Id*. at 1888. It is not clear what prompted the email but Klayer responds, "Hey! Did you get my text message?" to which Bruce responds, "Yep. It's a wave off......" *Id*. at 1889-90.

- On January 4, 2016, U.S. Attorney Lewis emailed Judge Bruce about meeting for lunch on Thursday and Judge Bruce agrees to meet. *Id*. at 1897-98.

- On January 19, 2016, Judge Bruce emailed AUSA Jason Bohm regarding the Seventh Circuit's affirmance of Jermaine Speed's sentence saying, "Well done, sir. Well done." *Id*. at 1939.

- On February 1, 2016, Judge Bruce sent an *ex parte* email to AUSA Elly Peirson with regard to her performance in *United States v. Gmoser*, 14-cr-20048, telling Peirson, "My bad. You're doing fine. Let's get this thing done." *Id*. at 1985. The "thing" to get done was Mr. Gmoser's trial.

- On February 23, 2016, AUSA Eugene Miller sent Judge Bruce an email the subject line "Upcoming Criminal Trials." *Id*. at 2012. The body of the email says that "[i]n response to [Judge Bruce's] inquiry, this is our office's current understanding of the status of upcoming scheduled jury trials:" The email goes on to list several cases set for trial and an estimate of the trial length. No defense counsel is copied. Judge Bruce responded, "Thank you." *Id*. at 2013.

- On March 11, 2016, Klayer forwarded to Judge Bruce an email she sent to U.S. Attorney Lewis asking to be promoted from a legal assistant to a paralegal and asking Judge Bruce, "Wish me luck!!!!!!!!!" *Id*. at 2038. Judge Bruce in response wishes Klayer good luck. *Id*. at 2040. On April 17, 2016, Judge Bruce emails U.S. Attorney

16

Lewis about going to lunch and Lewis agrees with a date set for Wednesday April 20, 2016. *Id*. at 2138- 41. On Wednesday, April 20, 2016, at 12:56:10 p.m. Judge Bruce emails Klayer, "I took care of it for you. You're a lock for the paralegal spot." *Id*. at 2142.

- On July 21, 2016, Judge Bruce emailed AUSA Jason Bohm regarding the Seventh Circuit's opinion affirming the sentence Judge Bruce imposed in *United States v. Dorsey*, Case No. 15-3341 (7th Cir.), telling Bohm, "Nice job. Thanks."

- On September 4, 2016, Judge Bruce emailed U.S. Attorney Lewis asking about meeting for lunch to discuss a particular AUSA. *Id*. at 2417. Lewis agrees to meet for lunch and discusses performance issues with the AUSA. *Id*. at 2418. Judge Bruce then emails back with recommendations for improving the AUSA's performance. *Id*. at 2419. The two then meet for lunch. *Id*. at 2421-2428.

- On September 22, 2016, Judge Bruce again emails U.S. Attorney Lewis with the subject line "Last lunch with me as US Attorney?" setting up a lunch meeting for December 12, 2016 to which Lewis agrees. *Id*. at 2434-35.

- On October 31, 2016, Klayer emails Judge Bruce asking him "Wish me luck tomorrow!!!!! New trial presentation software . . . Trial Director. Praying all goes as planned!!!!!!" *Id*. at 2479. Judge Bruce responds by assuring Klayer, "Everything will be fine . . . . ." *Id*. at 2480.

- On November 16, 2016, U.S. Attorney Lewis emails Judge Bruce asking if he wants to meet for lunch the following day and Judge Bruce agrees. *Id*. 2496-97. Lewis then responds he actually meant to ask if Judge Bruce wanted to meet that day for lunch, but Lewis is already back in Springfield, Illinois. *Id*. at 2498.

- On December 16, 2016, Hopps and Judge Bruce engage in the email exchange concerning Ms. Nixon's trial which is discussed above. *Id.* at 2543-2548.

- On February 15, 2017, Klayer and Judge Bruce were emailing regarding a criminal complaint and arrest warrant that would be submitted for Judge Bruce's review. In the middle of the email chain Klayer notes she has not yet received the promotion to paralegal she and Bruce had previously discussed and which Judge Bruce had spoken to U.S. Attorney Lewis about during one of their lunches. *Id.* 2678. Judge Bruce responds, "Damn it!" *Id.* at 2679. On March 9, 2017, Klayer emails Judge Bruce telling him she needs to prepare a resume for the paralegal position and asking if she can use him as a reference. *Id.* at 2684. He tells her yes. *Id.* at 2685. Klayer eventually received the paralegal position.

- In a series of emails beginning on April 5, 2017, Judge Bruce and Klayer discuss pending criminal cases and the likelihood of trials and the fact that Judge Bruce will not grant any continuances based on the reassignment of the Aaron Shock case to Judge Bruce. *Id.* at 2695-2710. No defense counsel is copied on the emails.

- On May 11, 2017, Judge Bruce emailed AUSA Jason Bohm asking "Higgins-Vogt trial three days, [four] days or more?" *Id.* 2731. Defense counsel was not copied on the email.

- On June 19, 2017, the USAO sent Judge Bruce an email providing a copy of a search warrant "with AUSA Freres and FBI SA Anthony Manganaro." *Id.* 2864. The warrant was for one of Mr. Christensen's telephones.

- On July 5, 2017, at 5:09:41 p.m., Klayer emailed Judge Bruce about "Upcoming Trials." *Id.* at 2885. In the email Klayer tells Judge Bruce, "Eugene and Bryan are

going to schedule a time to come up to talk to you about the upcoming trials and your

schedule." *Id*. Earlier that day both AUSA Eugene Miller and Bryan Freres appeared

before Magistrate Judge Eric Long on behalf of the government in the detention

hearing of Brendt Christensen. *United States v. Christensen*, 17-20037, Minute Entry

07/05/2017. The next day Judge Bruce responds, "The sooner the better," *Id*. at 2886,

to which Klayer responds, "Roger that." *Id*. at 2887.

- On July 25, 2017, Judge Bruce emailed AUSA Jason Bohm "Well done, compadre.

  Well done." *Id*. at 2902. It appears this email is in response to the Seventh Circuit's

  opinion in *United States v. Parkhurst*, 865 F.3d 509 (7th Cir. 2017), affirming the

  conviction and sentence of Mr. Parkhurst whose trial and sentencing was conducted

  by Judge Bruce. AUSA Bohm represented the government before the Seventh Circuit.

Doc. 218, at 5–22.

### (b) USAO Communications Regarding Judge Bruce

In addition to the ex parte emails between the USAO and Judge Bruce, the United States

has disclosed, and the Court has ordered partially unsealed, communications between members

of the USAO and other executive agencies regarding Judge Bruce. *See United States v. Nixon*,

No. 15-cr-20057, 2020 WL 616164, Doc. 209 (C.D. Ill. Feb. 10, 2020) (Order affirming

Magistrate Judge's decision); Doc. 206, at 10; Doc. 207, at 2; Docs. 213, 214 & Exhibits thereto

(Unredacted versions). These communications included, *inter alia*, the following:

#### Tim Bass/OIG Emails

In December 2017 and January 2018, AUSA Bass exchanged a series of emails with OIG

in which he asked OIG to investigate alleged wrongdoing by specific USAO attorneys in

connection with the *Schock* case. Therein, Bass stated

I respectfully submit that there are reasonable grounds for OIG to investigate whether Mr. Hansen and Mr. Childress and Judge Colin Bruce (the presiding judge in the *Schock* matter) engaged in a concerted effort … to obstruct, undermine, and sabotage an ongoing high-profile criminal case of national significance; to wrongfully obstruct, undermine, discredit, and cause my removal as the lead attorney in the *Schock* prosecution; to provide false and incomplete information to the Office of the Deputy Attorney General (ODAG) and to the U.S. district court; and to thwart and corrupt the U.S. Attorney selection process, which is also ongoing.

Doc. 201-1, at 4. Further, in an email from Bass to OIG, Bass stated "I am also able to provide additional information concerning Mr. Hansen's and Mr. Childress's repeated contact with Judge Bruce, the presiding judge in the Aaron Schock matter, if you would like." Doc. 206-1, at 14.

### Tim Bass/Elly Peirson Email

On May 18, 2018, the day after oral argument in Nixon's appeal, Bass sent an email to Peirson informing her of the existence of the *Nixon* emails. Doc. 201-16, at 3–4. Therein, Bass stated "Judge Bruce's prior employment in this office and his close relationships and ongoing contacts with interim management of the office created a conflict of interest." Doc. 201-16, at 4.

### Lisa Hopps Memorandum to EOUSA

Lisa Hopps sent a memorandum to Norman Wong, Principal Deputy Director of EOUSA, in August 2018. That message stated:

After Colin became a Federal District Judge, Tim applied for an open magistrate position. I recall speaking to Colin on the phone and he was disparaging Tim and his chances to become a magistrate judge. I became very angry and told him he had to stop and that he was "[expletive] with people's lives". He assured me he wouldn't interfere with Tim's application. Subsequently, another magistrate judge position became available. This time for Colin himself. Prior to applying, Tim met with Colin to ask if he thought he should apply and Colin told him he definitely should. In a later conversation with me, Colin laughed that Tim wouldn't even make it out of committee—he didn't. I again told him that his comment was out of line, wrong and that he needed to stop.

Patrick and our now Interim U.S. Attorney John Childress have a close relationship with Colin. USA Childress is a personal friend and is the only AUSA in our District that Colin has recused himself from hearing cases. Our prior USA James Lewis is

also a personal friend of Colin. All three of them are more than aware of Colin's dislike of Tim. In fact, Colin has been unable to disconnect himself from our office. It's almost as if he is a silent part of management. No other federal judge in our district is in constant contact with our office and seems to know everything that is going on like Colin does. It's concerning to say the least. So when the Schock matter was assigned to Colin, you would think a motion for his recusal would have been filed immediately.

Doc. 201-17, at 3.

## LEGAL STANDARD

"[T]he Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal quotations and citations omitted). "Where the judge has a direct, personal, substantial, or pecuniary interest, due process is violated." *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005). However, "[t]he general presumption is that judges are honest, upright individuals and thus that they rise above biasing influences." *Franklin*, 398 F.3d at 959. That presumption may be rebutted by showing, for example, that the temptation to be biased is so strong "we may presume actual bias." *Id*. at 959–60 (quoting *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1375 (7th Cir. 1994) (en banc)). The presumption may also be rebutted in rare cases where litigants produce evidence of actual bias. *Id*. at 960 (citing *Bracy v. Gramley*, 520 U.S. 899, 905 (1997)). Thus, to prove disqualifying bias, "a petitioner must offer either direct evidence or 'a possible temptation so severe that we might presume an actual, substantial incentive to be biased.' " *Id*. (citing *Del Vecchio,* 31 F.3d at 1380). "Absent a 'smoking gun,' a petitioner may rely on circumstantial evidence to prove the necessary bias." *Id*. (citing *Bracy v. Schomig*, 286 F.3d 406, 411–12 (7th Cir. 2002)).

In evaluating bias claims under this framework, courts ask "whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'

21

" *Williams*, 949 F.3d at 1061 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009), *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017)). Although this standard does not require proof of actual bias, "bad appearances," standing alone, do not meet this threshold. *Del Vecchio*, 31 F.3d at 1371 ("If the question truly is whether a defendant received a fair trial, bad appearances alone should not require disqualification to prevent an unfair trial. What may appear bad to an observer, especially in hindsight, may not have influenced—or, more importantly, may not have had any real possibility to influence—the judge in his decision-making process."); *see also Suh v. Pierce*, 630 F.3d 685, 691 (7th Cir. 2011).

Applying this standard, courts have identified four circumstances where it has been met. First, a judge who is actually biased against a defendant violates the defendant's due process rights. *See Franklin*, 398 F.3d at 961 (finding that the judge's writings demonstrated he decided the issue of the defendant's guilt long before trial). Second, a judge who earlier had "significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case" violates the Due Process Clause when he presides over the defendant's trial. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (stating such circumstance creates "an impermissible risk of actual bias"). Third, a judge's financial interest in the outcome of a case is disqualifying. *In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man is permitted to try cases where he has an interest in the outcome."); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 824 (1986) (state court justice's involvement in civil suits against insurer while deciding appeal was a 'direct, personal, substantial, and pecuniary" interest requiring disqualification). Fourth, a judge must disqualify himself when he becomes "personally embroiled" with a litigant. *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971).

In addition to the Due Process Clause, federal judges must abide by the federal recusal statute. 28 U.S.C. § 455. Under § 455(a), a judge must recuse himself from "any proceeding in which his impartiality might reasonably be questioned." *Id.*; *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019). A judge's violation of § 455(a) is reviewed under the harmless error standard as articulated in *Liljeberg v. Health Acquisition Corp.*, 486 U.S. 847, 864 (1988). In assessing whether a § 455(a) violation is harmless, courts consider: (1) the risk of injustice to the parties in the particular case, (2) the risk that the denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *Liljeberg*, 486 U.S. at 864; *Atwood*, 941 F.3d at 885.

DISCUSSION

The resolution of Defendant Nixon's requests for a new trial hinges largely on the application of three Seventh Circuit decisions to this case. Therefore, a discussion of those cases is in order.

**1. *United States v. Atwood***

The first Seventh Circuit decision dealing with Judge Bruce's improper ex parte communications is *United States v. Atwood*. In that case, the defendant pleaded guilty to three controlled substance offenses. A presentence report was prepared wherein Atwood's guideline sentencing range was calculated to be 188 to 235 months of imprisonment. Judge Bruce sentenced Atwood to a total of 210 months' imprisonment, which he based on the 18 U.S.C. § 3553(a) factors. While his appeal was pending, Judge Bruce's ex parte communications were disclosed, and Atwood raised in his appeal the issue of whether Judge Bruce violated the federal recusal statute. *Atwood*, 941 F.3d at 884–85.

The Seventh Circuit addressed Atwood's recusal argument by analyzing the *Liljeberg*

factors. As to the first factor—the risk of injustice to the parties in the case—the Seventh Circuit

stated:

> We begin with the potential unfairness to Atwood of upholding his sentence. Judge
> Bruce calculated Atwood's sentence based on the factors outlined in 18 U.S.C. §
> 3553(a). As we have said before, "[t]he open-endedness of the § 3553(a) factors
> leaves ample room for the court's discretion." *United States v. Warner*, 792 F.3d
> 847, 855 (7th Cir. 2015). That discretion invites the risk that a judge's personal
> biases will influence or appear to influence the sentence he imposes. *See United
> States v. Smith*, 775 F.3d 879, 882 (7th Cir. 2015) (remanding for resentencing
> because of the possibility that a judge's prior knowledge of a case was a conscious
> or unconscious influence on the sentence she imposed). Upholding Atwood's
> sentence, then, creates a real risk of unfairness to him.
>
> Conversely, there is little risk of unfairness to the government if we remand
> Atwood's case for resentencing. Although a second sentencing proceeding carries
> some administrative cost, the government concedes that resentencing would not
> impose a special hardship in this case. *Cf. Rosales-Mireles v. United States*, ——
> U.S. ——, 138 S. Ct. 1897, 1909, 201 L.Ed.2d 376 (2018) (characterizing a
> resentencing proceeding as "relatively inexpensive"). Since there is a substantial
> risk of unfairness to Atwood if we uphold his sentence and little risk of unfairness
> to the government if we do not, the first *Liljeberg* factor favors resentencing.

*Atwood*, 941 F.3d at 885. Addressing the second *Liljeberg* factor—the risk of injustice to parties

in future cases—the Seventh Circuit noted, "[a]s in *Liljeberg*, we think that enforcing § 455(a) in

this case 'may prevent a substantive injustice in some future case'—here, by encouraging judges

to exercise caution in their communications. 486 U.S. at 868, 108 S.Ct. 2194. This factor also

counsels in favor of resentencing." *Id*. And with respect to the third factor—the risk of

undermining public confidence in the judicial process—the court reasoned:

> In sentencing, the most significant restriction on a judge's ample discretion is the
> judge's own sense of equity and good judgment. When those qualities appear to be
> compromised, the public has little reason to trust the integrity of the resulting
> sentence. The government has conceded that Judge Bruce compromised his
> appearance of impartiality. Allowing Atwood's sentence to stand would undermine

24

the public's confidence in the fairness of this sentence and in the impartiality of the judiciary. All three *Liljeberg* factors, then, counsel that we remand for resentencing.

*Id*. at 886.

## 2. *United States v. Williams*

The Seventh Circuit also addressed Judge Bruce's ex parte communications in *Williams*. There, the defendant was charged with obstruction of commerce by robbery. Williams pleaded not guilty and proceeded to a jury trial before Judge Bruce. The jury found Williams guilty. After the verdict but prior to sentencing, Judge Bruce's ex parte communications were disclosed, and Williams's case was reassigned to Judge Darrow, who sentenced him to 180 months in the Bureau of Prisons. On appeal, Williams argued Judge Bruce's ex parte communications violated his due process rights and the federal recusal statute. *Williams*, 949 F.3d at 1058–59. The court first addressed Williams's due process argument. *Id*. at 1061. After identifying the four circumstances where courts have found an unconstitutional potential for bias,[3] the Seventh Circuit observed that Williams's case "does not fit into these buckets." *Id*. at 1061. Rather,

Williams has not provided any evidence of actual bias. To the contrary, the Special Committee found "no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." It is undisputed that none of the ex parte communications concerned Williams's case. Nor is there any evidence that Judge Bruce had a pecuniary interest in the outcome, previously worked on the case as a prosecutor, or became "personally embroiled" with the parties.

*Id*. at 1061–62.

---

[3] *See* Legal Standard, *supra*, at 9–11 (reciting four circumstances where courts have found due process violation for failure to recuse).

The court also rejected Williams's argument that an exchange[4] between Judge Bruce and the prosecutor in his case showed Judge Bruce's personal bias in favor of the government, reasoning there was nothing improper about the exchange, which occurred before both parties, on the record, in open court, and outside the presence of the jury. *Id*. at 1062. Additionally, the court rejected Williams's claim that Judge Bruce's preexisting relationship with members of the Office, standing alone, violated Williams's due process rights, noting Williams had presented no evidence to overcome the presumption that judges rise above biasing influences. *Id*. (citing *Del Vecchio*, 31 F.3d at 1372). Accordingly, the Seventh Circuit found Judge Bruce did not violate Williams's due process rights by presiding over his trial. *Id*. at 1063.

Next, the court analyzed whether Judge Bruce's failure to recuse was harmless error. The court began its discussion by noting the federal recusal statute provides greater protections than due process requires, and further pointing out the United States' concession that Judge Bruce violated § 455(a) (i.e., a reasonable person might question Judge Bruce's impartiality based on his communications with the Office). *Id*. Thus, the court proceeded to analyze the *Liljeberg* factors for harmless error. As to the first factor—the risk of injustice to the parties in the case— the Seventh Circuit reasoned:

> The first *Liljeberg* factor requires us to consider the risk of injustice to the parties in this particular case. We begin with the risk to Williams. The totality of the facts suggests that there is little risk of unfairness in upholding Williams's conviction. First and significantly, while some ex parte communications included Peirson or Klayer, it is undisputed that none of these communications concerned Williams's case. There is also no evidence that either Peirson or Klayer had any influence on the outcome here. Second, although Judge Bruce presided over Williams's trial, he was not the trier of fact making the ultimate determination of whether the government had proved Williams guilty beyond a reasonable doubt. A jury found Williams guilty, and Williams has not questioned the jury's impartiality. Third,

---

[4] The essence of the conversation involved the prosecutor stating she was not trying to be "sneaky" and Judge Bruce responding by stating he did not think the prosecutor to be "sneaky." 949 F.3d at 1062.

Judge Bruce made minimal rulings before and during trial, none of which either party challenges on appeal. As to his pre-trial rulings, Judge Bruce granted routine scheduling and appearance motions for both parties. He denied the government's discovery motion as moot, but he granted the government's motion to bar an alibi defense because Williams failed to file a response or object. Judge Bruce also denied as moot Williams's motion in limine to bar the government from introducing evidence of prior convictions because the government represented that it did not intend to introduce such evidence in its case in chief. The court specifically noted in its order that "should circumstances change at trial, and the government attempt to introduce such evidence during its case in chief, Defendant may revive his motion." Williams has not argued that any of these rulings prejudiced him. Indeed, the rulings were not controversial or contested and generally pertained to routine matters.

As to his trial rulings, Judge Bruce equally granted and denied objections from both parties. Judge Bruce sustained eight out of eighteen of defendant's objections and two out of four of the government's objections. He also denied Williams's Rule 29(a) motion at the close of the government's case and his renewed Rule 29 motion at the close of all evidence. None of these rulings suggest that Judge Bruce's appearance of bias had any impact on the outcome of Williams's trial. Nor does Williams argue that any particular ruling was prejudicial.

Williams attempts to rebut these facts by arguing that under the government's view, "the harmlessness inquiry would always require proof of actual bias, and would thus render § 455(a)'s prohibition on the appearance of bias a nullity." We disagree. The Supreme Court in *Liljeberg* cautioned that "[a]lthough § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty." *Liljeberg*, 486 U.S. at 862, 108 S.Ct. 2194. Rather it is up to each court to determine what remedy is appropriate on a case-by-case basis. Williams has the burden of showing that at least some of the *Liljeberg* factors counsel in favor of a new trial. A mere statutory violation alone does not automatically entitle him to a new trial.

Also for the first factor, we must consider the risk of injustice to the government if a new trial is granted. We agree with the government that the costs of retrial pose a significant risk of injustice to it. The government would likely spend valuable time and money to retry this case thereby diverting resources from other cases. *See United States v. Cerceda*, 172 F.3d 806, 814 (11th Cir. 1999) (en banc) (per curiam). Williams's case is distinguishable from *Atwood* in that regard. Unlike Williams, Atwood pleaded guilty and requested a resentencing by a different

judge. *Atwood*, 941 F.3d at 884. "[A] remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Rosales-Mireles v. United States*, —— U.S. ——, 138 S. Ct. 1897, 1908, 201 L.Ed.2d 376 (2018) (citing *Molina-Martinez v. United States*, —— U.S. ——, 136 S. Ct. 1338, 1348–49, 194 L.Ed.2d 444 (2016)). This factor favors denying Williams's request for a new trial.

*Williams*, 949 F.3d at 1064–65.

The Seventh Circuit next found the second *Liljeberg* factor weighed against granting a

new trial:

The second *Liljeberg* factor asks us to evaluate the risk that the denial of requested relief will produce injustice in future cases. Williams argues that enforcing § 455(a) here may warn judges and litigants to more carefully consider possible grounds for disqualification before trial in other cases. The government contends that the Special Committee's Report has minimized the risk of similar, future violations. The Special Committee and the Judicial Council undertook a thorough investigation and review of the complaints against Judge Bruce, including requesting and reviewing document productions from Judge Bruce and the Office, conducting interviews, and holding a hearing at which Judge Bruce testified. The Special Committee submitted a detailed report to explain its finding and recommendations, which the Judicial Council adopted and made public. The Judicial Council subsequently issued an order publicly reprimanding Judge Bruce and ordering that he remain unassigned from any matters involving the Office until September 1, 2019. *In re Complaints Against Dist. Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council May 14, 2019). Moreover, Judge Bruce changed his practices in response to the inquiry. He adopted a policy prohibiting any email communications with counsel, prepared a standard response to any future ex parte communications initiated by litigants, and created a system that populates chambers email and his work email into separate inboxes. These changes should help reduce any future problems. In this case, we believe that this factor leans towards denying Williams's requested relief.

*Id.* at 1065. And with respect to the third *Liljeberg* factor, the court reasoned:

As discussed above, none of Judge Bruce's pre-trial and trial rulings suggest any actual bias. And the Special Committee did not find any evidence that "Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party" in any case. On the other hand, overturning a jury verdict based purely on the appearance of bias creates a risk that the public will lose

confidence in the judicial process. *See, e.g.*, *Cerceda*, 172 F.3d at 815–16; *see also Bergeron*, 636 F.3d at 883–84; *Marcavage v. Bd. of Trs. of Temple Univ.*, 232 F. App'x 79, 84 (3d Cir. 2007). And requiring witnesses to relive this serious crime by testifying at a retrial would pose unwarranted hardship on the witnesses when all evidence suggests the original trial was fair and impartial. This final factor slightly favors upholding Williams's conviction. Because all three *Liljeberg* factors suggest that the statutory violation was harmless error, we deny Williams's request for a new trial and affirm his conviction.

*Id*. at 1066.

In addition to the Seventh Circuit's analysis of the *Liljeberg* factors, the court also differentiated the case before it from *Atwood*. Specifically, the court reasoned:

A key difference exists between this case and *Atwood*. In *Atwood*, the defendant entered a guilty plea, and Judge Bruce presided over his sentencing hearing. Here, Williams pleaded not guilty, and a jury found him guilty. Moreover, Judge Bruce did not preside over Williams's sentencing hearing. This distinction matters because judges generally have more discretion over sentencing than the outcome of a jury trial. As we noted in *Atwood*, " '[t]he open-endedness of the § 3553(a) factors leaves ample room for the court's discretion' ... That discretion invites the risk that a judge's personal biases will influence or appear to influence the sentence he imposes." *Id.* at 885 (quoting *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015)). After applying the *Liljeberg* factors to the particular facts in this case, we conclude that the error here was harmless and does not warrant a new trial.

*Id*. at 1064.

### 3. *United States v. Orr*

The most recent decision from the Seventh Circuit involving Judge Bruce's ex parte communications is *United States v. Orr*, which was decided after briefing in this case concluded. *United States v. Orr*, No. 19-1938, 2020 WL 4582197, at *1 (7th Cir. Aug. 10, 2020). In *Orr*, the defendant was found guilty of possessing a firearm as a felon following a two-day jury trial. Although the Seventh Circuit affirmed Judge Bruce's denial or Orr's motion to suppress evidence, the court found Judge Bruce's ex parte communications "cast a pall over certain

decisions" in the case "which required the exercise of substantial discretion." *Id*. Analyzing the

*Liljeberg* factors in conjunction with the opinions in *Atwood* and *Williams*, the court stated:

> Like the defendant in *Williams*, Orr appeals his conviction after a jury trial presided
> over by Judge Bruce. But unlike the defendant in *Williams*, Orr challenges three
> seemingly discretionary decisions by Judge Bruce: the denial of the motion to
> suppress, the admission of drug evidence under Federal Rule of Evidence 404(b),
> and the allowance of cross-examination questions about Orr's prior felony
> conviction.

*Orr*, No. 19-1938, 2020 WL 4582197, at *5. The denial of the motion to suppress "required little

discretion," and thus did not support Orr's request for a new trial. However, "Orr's challenges to

two of Judge Bruce's trial decisions are a different matter." *Id*. at *6. First,

> when Orr said he had no reason to own a firearm, Judge Bruce made a close
> discretionary call by deciding that Orr placed his motive at issue. While Orr was on
> the witness stand the prosecutor asked: "You didn't have any reason to possess a
> firearm?" Orr responded: "I haven't, I haven't touched a firearm in 25 years, sir."
> "[B]ased upon [Orr's] answers, ... tone[,] and manner," the district court determined
> Orr placed his motive at issue. Yet given this exchange, whether Orr or the
> prosecutor placed motive at issue is not a simple question. As Orr points out on
> appeal, he denied having a reason to possess a firearm *in response to* the
> prosecutor's questioning. Orr asserts the prosecutor placed motive at issue when he
> asked Orr if he had any reason for possessing a firearm. The parties dispute who
> opened the door to admitting the drug evidence, and this evidentiary ruling involved
> a substantial amount of discretion.

*Id*.

> Second, Judge Bruce made a close discretionary call when the prosecutor asked Orr if he

had been convicted of dealing drugs and if that conviction should affect his credibility. *Id*.

> The district court permitted the prosecutor's line of questioning but cautioned him
> not to "get into a prejudicial area" by "overplay[ing] it." Although the parties on
> appeal characterize the government's inquiry as potentially falling under the
> "motive" exception of Federal Rule of Evidence 404(b), the questioning likely
> occurred within the parameters of the impeachment exception contained in Federal
> Rule of Evidence 609. The district court issued a pre-trial order clarifying that Orr's
> prior conviction could not be introduced to prove motive, and the prosecutor

mentioned Orr's prior conviction only in the context of impeaching him. Further, the jury was instructed to consider Orr's prior conviction only when deciding the credibility of his testimony and whether he was a felon at the time he possessed the gun. All of these facts indicate the district court permitted the prosecutor to impeach Orr under Rule 609. But regardless of which rule the questioning occurred under, the district court exercised substantial discretion by weighing the probative value and prejudicial effect of the questioning and by allowing the questioning to proceed.

*Id*.

These two discretionary rulings distinguished *Orr* from *Williams*, the court reasoned, because

[t]he pre-trial and trial rulings in *Williams* were routine, granted in favor of both parties, uncontested on appeal, and not overly prejudicial to the defendant. *See Williams*, 949 F.3d at 1064. The two discretionary rulings in this case were non-routine, decided in favor of the government, and challenged on appeal. Notably, both rulings in this case significantly aided the prosecution. In the first, the district court permitted the prosecutor to introduce evidence that Orr stored drug-dealing paraphernalia and "several thousand dollars['] worth of drugs" in his apartment. As a result of the second, Orr was not only impeached on his felony conviction but the jury was presented with evidence that he was convicted of dealing drugs. Because this case centered on circumstantial evidence and credibility determinations, both decisions prejudiced Orr. With these discretionary decisions in mind, we turn to the *Liljeberg* factors.

*Id*. at *7.

With the above in mind, the Seventh Circuit proceeded to address the *Liljeberg* factors. As to the first factor,

[t]he record suggests that upholding Orr's conviction would create a tangible risk of unfairness to him. Because of the discretionary calls described above, it is possible the district court's personal biases influenced the outcome in this case. *See Atwood*, 941 F.3d at 885. For the first factor, though, we must also consider the risk of injustice to the government if a new trial is granted. Retrying this case would likely require the government to "spend valuable time and money ... thereby diverting resources from other cases." *Williams*, 949 F.3d at 1065. Even so, the risk of injustice to the government is directly related to the complexity of the trial. *See United States v. Cerceda*, 172 F.3d 806, 815 (11th Cir. 1999) (en banc) (per curiam) ("[T]he government would face great hardship if forced to conduct a

new trial [ ] because of the complexity of the case (a 78 count, complex white-collar prosecution the trial of which lasted two-and-a-half months).”). We conclude that the risk of injustice to the government in this matter is relatively slight due to the straightforwardness and brevity of the prosecution’s case. Orr faced one charge, and the trial lasted only two days. On these facts, the risk of injustice Orr faces if we do not vacate his conviction is greater than the risk of injustice the government faces if we upheld Orr’s conviction. So the first *Liljeberg* factor favors Orr.

*Id*. On the second factor, the Seventh Circuit considered the arguments of the parties but ultimately decided that the defendant failed to explain why the *Williams* court was wrong.

Under the second *Liljeberg* factor, we look to “the risk that the denial of relief will produce injustice in other cases.” *Liljeberg*, 486 U.S. at 864, 108 S.Ct. 2194. The parties in this case raise the same arguments as in *Williams*. 949 F.3d at 1065. The government contends no further action is necessary to induce other judges to exercise caution in their communications because Judge Bruce was thoroughly investigated, those results were adopted by the Judicial Council, he was publicly reprimanded, and he has implemented new practices to prevent similar issues in the future. Orr, on the other hand, argues these facts are not enough to ensure judges exercise more caution in the future and that further action must be taken. In *Williams*, we balanced these arguments and decided that the second *Liljeberg* factor counsels against awarding relief. 949 F.3d at 1065. *But see Atwood*, 941 F.3d at 885 (finding the second *Liljeberg* factor counsels in favor of resentencing). Because no reason is provided as to why the *Williams* decision was erroneous on this point, we conclude this factor favors upholding Orr’s conviction.

*Id*. Finally, the Seventh Circuit found the third factor weighed in favor of a new trial.

Like the defendant in *Williams*, Orr was found guilty by a jury of his peers. Although in *Williams* we decided that the jury finding the defendant guilty was “significant,” we envisioned “a case where a judge has substantial discretion and his rulings have a significant impact on the outcome, thus undermining the public confidence in the judicial process.” 949 F.3d at 1065. Such a case is now before us. Judge Bruce exercised substantial discretion by admitting evidence of Orr’s drug dealing and by permitting the prosecutor to cross-examine Orr on his felony conviction for dealing drugs. These evidentiary decisions were particularly consequential because they bolstered the prosecution’s case, which rested on circumstantial evidence and credibility calls. Given these discretionary rulings, upholding Orr’s conviction may damage the public’s confidence in the impartiality

of the judiciary. For these reasons, the final *Liljeberg* factor favors vacating Orr's conviction.

*Id*. Because two of the *Liljeberg* factors favored vacating Orr's conviction, the Seventh Circuit concluded Judge Bruce's failure to recuse was not harmless error, and thus vacated his conviction and remanded for a new trial before a different judge. *Id*. at *8.

### 4. Defendant's Motions for New Trial[5]

In her motions for new trial, Defendant makes two related arguments. First, Defendant argues Judge Bruce exhibited actual bias against her and in favor of the United States, in violation of her due process rights. Second, Defendant argues Judge Bruce's failure to recuse under 28 U.S.C. § 455(a) was not harmless and thus the Court should grant a new trial. Doc. 218, at 1. In support of both arguments, Defendant relies upon the ex parte emails between the USAO and Judge Bruce in her case and others, the complaints initiated by AUSA Bass, and Hopps' memorandum to the Deputy Director of the Executive Office of United States Attorneys. After summarizing this evidence, which the Court outlined earlier in this Opinion, Defendant proceeds to argue Judge Bruce was biased against Defendant Nixon. Doc. 218, at 28.

With respect to her actual bias claim, Defendant first points to Judge Bruce's pretrial rulings in her case. Specifically, Defendant suggests the exclusion of five out of eight of Nixon's proposed witnesses, including expert witnesses, and the limiting of testimony from the remaining witnesses "crippled Nixon's ability to assert her affirmative defense, essentially depriving her of her right to present her defense and her right to a fair trial." *Id*. at 28. Here, Defendant acknowledges the Seventh Circuit decision affirming her conviction, but asserts the deferential

---

[5] Given the legal and factual developments that have occurred since the filing of Defendant's initial Motion for New Trial, the Court principally refers to Defendant's most recent Supplemental Memorandum (Doc. 218) unless otherwise indicated.

standard of review on appeal creates the possibility that Judge Bruce's bias was cloaked under the appearance of discretion. *Id*.

Next, Defendant argues this case is distinct from the Judicial Council's findings, and the facts in *Atwood* and *Williams*. *Id*. at 29. This is so because, unlike those cases, Nixon has presented additional material not before those tribunals—the Bass complaint and Hopps memorandum. Moreover, Defendant argues that relying on the Judicial Council's conclusion that it found no evidence suggesting Judge Bruce's conduct impacted his decision making in any case would be unfair to Defendant, who was not a party to those proceedings and had no opportunity to question the evidence or cross-examine the witnesses. *Id*. at 31.

With respect to Judge Bruce's failure to recuse under the federal recusal statute, Defendant argues she is entitled to a new trial under both *Atwood* and *Williams* because the misconduct occurred in her own case and Judge Bruce made a number of discretionary calls against her. *Id*. As part of her argument, Defendant notes the Seventh Circuit found the second *Liljeberg* factor—the risk that the denial of relief will produce injustice in other cases—favored the defendant in *Atwood* and the United States in *Williams*. Defendant posits "[b]oth rulings cannot simultaneously be right, so we think really the Seventh Circuit deemed the second factor unimportant in both cases." *Id*. at 33.

Later in her brief, Defendant again circles back to Judge Bruce's exclusion of Dr. Marti Loring's expert testimony regarding Nixon's PTSD and battered person syndrome diagnoses. *Id*. at 34. Defendant believes the exclusion of Dr. Loring is significant because a district court's exclusion of an expert involves a significant exercise of discretion. Defendant also notes the United States argued before the Seventh Circuit in *Williams* that the exclusion of an expert

witness "could indicate the appearance of bias" even if the exclusion of the witness was upheld on appeal. *Id.* at 35.

### 4. The United States' Responses[6]

In the United States' responses, it argues Nixon's motions for new trial should be denied for numerous reasons. First, the United States contends the Judicial Council's report forecloses any finding of actual bias by Judge Bruce. Doc. 220, at 16–18. In making this argument, the United States suggests that the Judicial Council had before it the same evidence Defendant has submitted here. However, the United States notes it is unable to compare the documents submitted in this case to those submitted in the Judicial Council proceedings because it has been unable to obtain the necessary waivers "from all interested parties." *Id.* at 18 (citing 28 U.S.C. § 360(a)(3)). *Id.* at 18.

Next, the United States asserts the Seventh Circuit's decision and reasoning in *Williams* forecloses Nixon's request for a new trial. *Id.* at 19–29. In its view, *Williams* dooms Nixon's actual bias claim. Further, Nixon's appearance of bias claim fails because the *Williams* court considered the same evidence as presented here and found Judge Bruce's failure to recuse was harmless error under *Liljeberg*. *Id.* at 22–29.

The United States also argues nothing in the additional materials it produced requires a new trial. In doing so, the United States seeks to minimize the prior statements of its own employees. Picking up on this Court's earlier characterization of AUSA Bass's claimed conspiracy to sabotage the *Schock* case as "fantastic," the United States now distances itself from its own prosecutor, suggesting his remarks lacked factual support and were merely his opinions.

---

[6] The Court refers principally to the United States' Supplemental Memorandum in Opposition to Defendant's Motion for New Trial. Doc. 220

*Id*. at 23–32. And Hopps is not to be believed either, since Judge Bruce's disparaging comments about Bass may have influenced her impressions regarding Judge Bruce's conduct. *Id*. at 35.

**4. Application of *Atwood, Williams*, and *Orr* to Nixon's Case**

*a. Due Process*

As previously stated, in order for Nixon to prevail on her due process claim, she must rebut the presumption that judges rise above biasing influences. *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005). To do so, she must either produce evidence of actual bias, *Bracy v. Gramley*, 520 U.S. 899, 905 (1997), or a possible temptation so severe that an actual, substantial incentive to be biased may be presumed, *Franklin*, 398 F.3d at 959. When evaluating claims under this framework, courts ask "whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " *Williams*, 949 F.3d at 1061.

Defendant argues Judge Bruce's ex parte email disparaging Nixon, together with the exclusion of five out of eight of Nixon's proposed witnesses, shows Judge Bruce was actually biased against her. Doc. 218, at 28. The Court will first discuss the emails. During Nixon's trial, Judge Bruce emailed Hopps to criticize one of the prosecutors for being "entirely inexperienced" and "repeating the bullshit" to which Nixon had testified, turning a "slam-dunk" case for the prosecution into a "60-40" one for Nixon.

Judge Bruce's email was wildly inappropriate on its face, and the ex parte nature of the email makes it even worse. Yet the Judicial Council considered this communication when it found no evidence that Judge Bruce's conduct impacted any of his rulings or advantaged either party. The Court is sympathetic to Nixon's argument that the Court should not rely on the findings of a non-adversarial judicial proceeding where Nixon was not able to participate. However, it appears the *Williams* court considered the same information when it also found no

36

evidence of bias. *Williams*, 949 F.3d at 1061–62. And while this case is distinct from *Williams* because "none of the ex parte communications concerned Williams case," it appears the Seventh Circuit's analysis of the Nixon emails in *Williams* precludes any finding of actual bias here.

Defendant's reliance on Judge Bruce's adverse pretrial rulings are likewise insufficient to establish a due process violation. Here, Defendant argues the exclusion of expert witnesses, and the limiting of testimony from the remaining witnesses "crippled Nixon's ability to assert her affirmative defense, essentially depriving her of her right to present her defense and her right to a fair trial." *Id*. at 28. Like the United States acknowledged at oral argument in *Williams*, it is possible a ruling affirmed on appeal under an abuse of discretion standard might nevertheless support a claim of bias. However, the Seventh Circuit's discussion shows Judge Bruce's exclusion of witness testimony regarding mental, emotional, financial, and psychological abuse was likely proper under any standard of review.

> Nixon submits, however, that the judge made a legal error by limiting her to showing physical (including sexual) misconduct toward her or her daughter. She wanted to argue that both she and S. suffered emotional, psychological, and financial abuse from G.G.—or at least that she reasonably believed that she had suffered these kinds of abuse, even if objectively she had not. She wanted to argue, for example, that G.G. injured her emotionally by selling the house in which they had resided during their marriage and that G.G. often belittled her.

> The problem with this line of defense is the statutory text. It speaks of "domestic violence" rather than abuse more generally—and it requires the defendant to show *real* domestic violence, not just a belief that violence occurred. Selling a beloved house is not "violence"; neither is demeaning language. The Supreme Court has held that proof of "domestic violence" in 18 U.S.C. § 921(a)(33)(A) does not require as much physical contact, or as great a risk of physical injury, as other parts of the Criminal Code that use the word "violence." See *United States v. Castleman*, 572 U.S. 157, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014). We may assume that the phrase "domestic violence" elsewhere in Title 18, including § 1204, specifies the same kind of moderate violence. But the Justices have never suggested that the word "violence" in *any* part of the Criminal Code can be satisfied by emotional, psychological, or financial abuse.

> Imagine if the tables were turned, and a grand jury indicted a husband for committing "domestic violence", contrary to 18 U.S.C. § 2261(a)(1), by failing to provide adequate financial support for his wife or swearing at her in a child's presence. That might be detestable conduct, and could be tortious, but would not be a federal felony exposing the husband to five years in prison. Neither text nor context implies that "violence" has a meaning in § 1204(c)(2) different from that in other provisions addressing domestic violence.
>
> Indeed, we could not equate "violence" with "abuse" without converting every child-kidnapping prosecution into a replay of the child-custody proceedings, in which the defendant would try to relitigate the domestic-relations case by showing that he or she really should have received custody. Yet § 1204 is designed to take the outcome of the domestic-relations case as a given. It provides that the loser in a child-custody proceeding must accept the decision (subject to appeal within the state system) and may not spirit the child across an international border. Allowing an "abuse" defense would defeat that function by effectively subjecting the child-custody decision itself to review in the criminal case.

*United States v. Nixon*, 901 F.3d 918, 919–20 (7th Cir. 2018). Thus, although the Court can envision a circumstance where a judge's exclusion of witness testimony, especially expert witness testimony, may support a finding of judicial bias even when the decision was affirmed on appeal, the facts presented here do not support such a finding. And to the extent Defendant's argument is directed at a different ruling by Judge Bruce, she does not attempt to explain why such a ruling is indicative of bias rather than legal analysis. Accordingly, Defendant's due process claim must be denied.

   *b. Section 455*

   Next, the Court must consider whether Judge Bruce's violation of the federal recusal statute was harmless. In assessing whether a § 455(a) violation is harmless, courts consider: (1) the risk of injustice to the parties in the particular case, (2) the risk that the denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *Liljeberg*, 486 U.S. at 864.

I. THE RISK OF INJUSTICE TO THE PARTIES

In Defendant's motions, she argues her case is distinct from *Williams* because here the improper ex parte communications occurred in her own case. Doc. 218, at 35; *Cf. Williams*, 949 F.3d at 1064 ("[S]ignificantly … it is undisputed that none of these communications concerned Williams's case."). Second, Defendant argues her case is distinct from *Williams* because unlike the routine, minimal rulings made by Judge Bruce in that case, here Judge Bruce made a significant ruling (barring her expert testimony), decided in favor of the United States, and challenged on appeal. Doc. 218, at 35; *see also Orr*, No. 19-1938, at 15 ("The pre-trial and trial rulings in *Williams* were routine, granted in favor of both parties, uncontested on appeal, and not overly prejudicial to the defendant. The two discretionary rulings in this case were non-routine, decided in favor of the government, and challenged on appeal.") (citations omitted).

The Court agrees with Defendant that this case is distinguishable from *Williams* as it relates to the first *Liljeberg* factor. Just as the Seventh Circuit found it significant in *Williams* that no ex parte communications occurred during Williams's case, this Court finds the presence of ex parte communications during Nixon's trial to be significant. In addition to the existence of the ex parte communications regarding Nixon's case, the substance of those communications is remarkable. Judge Bruce called Nixon's testimony "bullshit." Other improper ex parte communications with the USAO show Judge Bruce's statement was not an aberration. Judge Bruce repeatedly and consistently inserted himself into the internal affairs of the USAO: he often critiqued the performance of various AUSAs; he provided recommendations for USAO employees he favored and sought to influence the USAO's employment decisions; he offered unsolicited advice on who should manage the Office and how; he encouraged more prosecutions; he expressed his preference for certain federal agents over others; he stated his approval of the

USAO's arguments supporting his rulings on appeal; and he sent unsolicited emails to USAO

staff gloating about the "score" between him and AUSA Bass, who he regularly disparaged. *See*

Doc. 218, at 5–22.

In *Liljeberg*, the Supreme Court noted "[t]he guiding consideration is that the

administration of justice should reasonably appear to be disinterested as well as be so in fact."

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869–70 (1988) (quoting *Public*

*Utilities Comm'n of D.C. v. Pollak*, 343 U.S. 451, 466–467 (1952) (Frankfurter, J., in chambers)).

Thus, courts "must continuously bear in mind that to perform its high function in the best way

justice must satisfy the appearance of justice." *Liljeberg*, 486 U.S. at 864 (quoting *In re*

*Murchison,* 349 U.S. 133, 136 (1955) (quotation omitted)). Yet here, when the *Nixon* emails are

viewed together with the rest of Judge Bruce's improper ex parte communications, any defendant

sitting in Ms. Nixon's position is exceedingly unlikely to think the judge presiding over her case

is neutral. In fact, fears about Judge Bruce's impartiality were not limited to criminal defendants;

here, Defendant has produced extraordinary evidence that at least one prosecutor within the

USAO also believed "Judge Bruce's prior employment in [the USAO] and his close relationships

and ongoing contacts with interim management of the office created a conflict of interest." Doc.

201-16, at 4; *see also United States v. Nixon*, No. 15-cr-20057, 2020 WL 616164, Doc. 209 (C.D.

Ill. Feb. 10, 2020). That sentiment was also shared by a USAO paralegal. *See* Doc. 201-17, at 3

("Colin has been unable to disconnect himself from our office. It's almost as if he is a silent part

of management. No other federal judge in our district is in constant contact with our office and

seems to know everything that is going on like Colin does. It's concerning to say the least."). As

the Supreme Court recognized in *Liljeberg*, "people who have not served on the bench are often

all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg*,

486 U.S. at 864–65. Here, Judge Bruce's conduct—in *Nixon* in particular and with the USAO more generally—gave the public, Defendant Nixon, and employees of the USAO compelling reasons believe he would not "hold the balance nice, clear and true." *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 83 (1972).

When analyzing the first *Liljeberg* factor, the Seventh Circuit found the exercise of discretion, or lack thereof, to be a significant consideration. In *Atwood*, where Judge Bruce sentenced the defendant, the court noted "the most significant restriction on a judge's ample discretion is the judge's own sense of equity and good judgment." *Atwood*, 941 F.3d at 886. Distinguishing *Atwood*, the *Williams* court noted Judge Bruce made minimal rulings before and during trial, none of which were challenged on appeal. *Williams*, 949 F.3d at 1064. In contrast, Judge Bruce's discretionary rulings in *Orr* created the possibility "the district court's personal biases influenced the outcome of the case." *Orr*, 2020 WL 4582197, at *7.

This case falls somewhere between *Williams* and *Orr*. As discussed above, Judge Bruce excluded Nixon's expert witness and limited the testimony of other witnesses. However, as this Court concluded in the previous section, the Seventh Circuit's discussion in the *Nixon* appeal shows Judge Bruce's exclusion of expert witness testimony regarding mental, emotional, financial, and psychological abuse was likely proper under any standard of review. *Nixon*, 901 F.3d at 919–20. Defendant also argues "Judge Bruce ruled on numerous pretrial motions, R.21, 35, 39, 46, 47, 49, 50, 70, 94, proposed voir dire, R. 57, 62, jury instructions, R.63, 85, 86, 89, and objections made throughout the trial, in addition to sentencing Ms. Nixon." Doc. 204, at 5. However, Defendant does not devote any attention in his briefs to these issues. Yet these rulings were more extensive than the "minimal" rulings at issue in *Williams*, and unlike *Williams*, Nixon raised challenges to many of these rulings on appeal. At least some of her arguments on appeal

were dismissed without discussion because "the district court did not abuse its discretion." *Nixon*, 901 F.3d at 922.

In addition to considering the risk of injustice to Nixon if her request for new trial is denied, the Court must also consider the risk of injustice to the United States if her request is granted. *Williams*, 949 F.3d at 1065 ("[W]e must consider the risk of injustice to the government is a new trial is granted."). Here, the United States makes a compelling argument that a retrial would entail not only financial and administrative costs to the government, but also emotional costs: witnesses would have to relive challenging personal and family circumstances involving parental kidnapping. Doc. 220, at 29. This concern is particularly acute with respect to Nixon's daughter, who previously testified by closed circuit television and required the assistance of a therapy dog. *Id.* Given that individuals employed by the USAO participated in Judge Bruce's improper ex parte communications, the Court has little sympathy for the financial and administrative costs the USAO might have to incur if Nixon's motions are granted. However, the witnesses who testified at trial stand on a different footing entirely. Granting a new trial will force Nixon's children and her former husband to relive what the Court must assume was an incredibly difficult and personal ordeal. The risk of injustice to the United States—at least vis-à-vis the familial witnesses—is greater in this case than in *Atwood*, *Williams*, or *Orr*.

With the above in mind, the Court must engage in the unenviable task of balancing the risk of injustice to Nixon if her request is denied against the risk of injustice to the United States if her request is granted. In doing so, the Court finds the ex parte communications which occurred in Nixon's own case create a significant risk of injustice to Defendant Nixon, and that risk is not outweighed by the risk of injustice to the United States. In reaching this conclusion, the Court is mindful that the facts of this case do not fall neatly into the any of the analyses in

*Atwood*, *Williams*, or *Orr*. Yet none of those cases dealt with a judge calling the criminal defendant's testimony "bullshit" in an ex parte communication with the USAO during trial. This language leaves vanishingly little room for argument that Judge Bruce maintained an open mind during the course of the trial. *Cf. United States v. Perez*, 956 F.3d 970, 978 (7th Cir. 2020). Moreover, the objective inquiry the Court must utilize strongly supports Nixon. "The test for appearance of partiality is whether an objective, disinterested observer fully informed of the reasons that recusal was sought would entertain a significant doubt that justice would be done in the case." *United States v. Herrera-Valdez*, 826 F.3d 912, 917 (7th Cir. 2016). Here, the Court reiterates that any defendant sitting in Ms. Nixon's position is exceedingly unlikely to think the judge presiding over her case is neutral. Moreover, had Judge Bruce's improper ex parte communications come to light during the *Nixon* trial, surely Judge Bruce would have been forced to recuse himself at that time. The fact that these communications were not disclosed to Defendant until much later, when the United States (specifically, Bass and Hopps) thought it convenient to disclose them, should not work to Defendant's disadvantage. Thus, although the discretionary rulings in this case (at least as set forth in Defendant's filings) fall somewhere between *Williams* and *Orr*, the ex parte communications concerning Nixon's own case tip the scales in her favor. The first *Liljeberg* factor thus weighs in favor of granting a new trial.

## II. THE RISK OF INJUSTICE IN OTHER CASES

Next, the Court must evaluate the risk that denying Nixon's request for a new trial will produce injustice in future cases. Here, Defendant argues the Seventh Circuit found the second *Liljeberg* factor favored the defendant in *Atwood* and the United States in *Williams*. Defendant posits "[b]oth rulings cannot simultaneously be right, so we think really the Seventh Circuit deemed the second factor unimportant in both cases." Doc. 218, at 33. In *Orr*, the Seventh

Circuit, while not explicitly finding this factor unimportant, did not dwell on this factor. Rather, it simply found that because Orr offered "no reason … as to why the *Williams* decision was erroneous on this point, we conclude this factor favors upholding Orr's conviction." *Orr*, No. 19-1938, 2020 WL 4582197, at *7. Because the Seventh Circuit arrived at this conclusion based largely on the same facts as presented here, the Court finds, consistent with *Williams* and *Orr*, that the second *Liljeberg* factor weighs against granting a new trial. However, given the Seventh Circuit's truncated analysis with respect to this factor, the Court does not believe this factor carries significant weight.

### III. The Risk of Undermining the Public's Confidence in the Judicial Process

Finally, the Court must assess the risk that denying Nixon's request will undermine the public's confidence in the judicial process. In *Williams*, the court noted this factor was "a close call." 949 F.3d at 1065. Ultimately, the court relied upon the fact that Williams was convicted by a jury and none of Judge Bruce's pretrial or trial rulings suggested any actual bias. *Id*. at 1065–66. Additionally, the court reasoned that "overturning a jury verdict based purely on the appearance of bias creates a risk that the public will lose confidence in the judicial process." *Id*. at 1066.

In *Orr*, the Seventh Circuit relied on the substantial discretion Judge Bruce was afforded in ruling on pretrial and trial motions to distinguish that case from *Williams*. *Orr*, No. 19-1938, 2020 WL 4582197, at *7. Yet the third *Liljeberg* factor speaks to much more than discretionary rulings in a defendant's own case; it requires courts to consider the broader impact that appearances of bias might have on the public's confidence in the judiciary. And when considering the public's confidence in the judiciary, courts must be mindful that "people who

44

have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg*, 486 U.S. at 864–65. In this particular case, Judge Bruce's conduct provided ample fodder for the public to question his integrity. The fact that his improper communications were with the office responsible for prosecuting criminal cases before him amplifies his appearance of bias even more.

Long ago, our founders recognized that "[t]he judiciary … may truly be said to have neither FORCE nor WILL, but merely judgment…." Alexander Hamilton, *The Federalist Paper* No. 78. Nevertheless, today federal judges wield awesome power. With that awesome power comes a concomitant responsibility not only to be fair, but to satisfy the appearance of fairness. *See Liljeberg*, 486 U.S. at 869–70. ("The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact."). The founders did not give the judiciary the power of the sword or the purse, but rather the power of judgment. And the public's confidence in the judiciary depends on our sound exercise of that judgment. Here, however, it is unfortunately the case that Judge Bruce's conduct creates an impermissible risk that the public will lose faith in the impartiality of the judiciary. Simply put, what person could possibly believe they had a fair and impartial judge when the facts would later reveal that same judge referenced their testimony as "bullshit" to former colleagues in the very office that was prosecuting them? The answer is: no one. For these reasons, the third *Liljeberg* factor also weighs in favor of granting Nixon's motions for new trial.

As in *Orr*, the first and third *Liljeberg* factors weigh heavily in favor of granting Nixon's motions for new trial. Thus, Judge Bruce's failure to recuse was not harmless. Accordingly, the Court vacates her conviction and sentence. In light of this order, no evidentiary hearing is necessary.

**CONCLUSION**

For the reasons set forth above, Defendant's Motions (Docs. 173, 204) are GRANTED,

and Defendant's conviction and sentence are VACATED.

Signed on this 19th day of August, 2020.

s/ James E. Shadid
James E. Shadid
United States District Judge